Donald R. Pepperman (Bar No. 109809)
  dpepperman@waymakerlaw.com
Brian E. Klein (Bar No. 258486)
  bklein@waymakerlaw.com
Sam S. Meehan (Bar No. 307934)
  smeehan@waymakerlaw.com
WAYMAKER LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
Telephone: (424) 652-7800
Facsimile:  (424) 652-7850

Cheryl L. Leahy (Bar No. 270665)
  cherylleahylaw@gmail.com
Law Office of Cheryl Leahy
 2215 Artesia Blvd.,  # 1185
Redondo Beach, California 90278
Telephone: (773) 259-7760

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| ARYOUT MICHAEL THOMAS BHOTIWIHOK**,** an individual; JEREMIAH CORNELIUS, an individual; RANDY PAUGH, an individual; AND ALL THOSE SIMILARLY SITUATED,<br><br>          Plaintiffs,<br><br>     v. | Case No.: 2:25-cv-1650<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES, RESTITUTION, AND INJUNCTIVE RELIEF FOR VIOLATION OF: (1) BREACH OF EXPRESS WARRANTY; (2) FALSE ADVERTISING; (3) UNFAIR COMPETITION; (4) CONSUMER LEGAL REMEDIES ACT; (5) UNJUST ENRICHMENT; AND (6) AIDING AND ABETTING** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FAIRLIFE, LLC, an Illinois limited liability corporation; THE COCA-COLA COMPANY, a Delaware corporation; MIKE MCCLOSKEY, an individual; SUE MCCLOSKEY, an individual; SELECT MILK PRODUCERS, INC., a New Mexico corporation; and DOES 1-10,

Defendants.

**(DEMAND FOR JURY TRIAL)**

1

2

3

## I.    <u>NATURE OF THE ACTION</u>

1.    Defendants produce a "premiumized" line of milk and milk products under the brand name "fairlife." The price premium, growth and consolidation, and overall profitability of the brand is driven in large part by an advertising and marketing practice and scheme claiming high levels of animal care and environmental sustainability, both of which have been pillars of the brand's strategy and marketing practice since the brand's inception.

2.    The fairlife brand has been phenomenally successful in terms of rapid growth and profitability, garnering a multibillion-dollar investment by Defendant Coca-Cola, which co-founded the fairlife brand and became its whole owner in 2020.

3.    The animal care marketing practices that drive the fairlife brand include, but are not limited to: the "fairlife" name itself and cartoon calf logo, claims indicating industry-leading standards and auditing, promising better and great care for animals as a top priority at fairlife, touting their investments in animal care, zero tolerance for animal cruelty in their supply chain, and similar such claims, all communicating a message to consumers of high levels of care for the animals in the fairlife supply chain, including freedom from abusive and neglectful acts and practices.

4.    The sustainability marketing practice that underpins and drive the fairlife brand include, but are not limited to: claims on renewable energy including for manure handling, claims their farms are top in the industry for environmental sustainability, and claims that their plastic packaging is recyclable.

5.    The current animal care and sustainability claims are an escalation in strength, scale, and scope of earlier iterations of the brand's marketing, with the level of the current animal care and sustainability marketing claims at an all-time high for the brand.

6.      In reality, however, the animal care and sustainability marketing scheme and practice are based on materially false, misleading, untrue, and/or unjust claims and omissions.

7.      Video evidence from multiple undercover investigations conducted by the Animal Recovery Mission ("ARM") reveals systemic widespread egregious animal cruelty, cruel standard practices, and extreme neglect, including at the hands of and with the awareness of management. Following ARM's 2019 undercover investigation of fairlife suppliers Windy Ridge and Windy Too, fairlife made public statements and settled a consumer class action false advertising lawsuit in a manner designed to communicate that improvements and solutions had been made, and later advertised that investments in animal care and oversight had been made, indicating to consumers that the animals in the fairlife supply chain were not in fact being abused or neglected and that they were being treated with higher levels of care. ARM's 2023 investigation further put Defendants on notice, revealing new and additional widespread and systemic cruelty and neglect at Windy Ridge and Windy Too, and Defendants' response was to falsely deny affiliation with these farms. Now comes the release of ARM's 2024 recent investigations into Arizona fairlife suppliers, which shows the worst, most widespread, egregious, systemic, frequent, and extreme cruelty and neglect yet—by workers and management across multiple locations.

8.      ARM's 2024 investigation reveals dumping of carcasses near waterways abutting a suburban subdivision and recreational park land outside of Phoenix, Arizona causing algae blooms indicating water pollution from the calf carcasses. ARM's investigations and other evidence make clear that fairlife suppliers are massively concentrated industrial farms with thousands of animals on them. Multiple farms have been cited for violations of environmental requirements, and fairlife is an outlier for the sheer size of its brand and farms, contributing an outsize amount to environmental impact. Fairlife's manure claims belie the negative

environmental impact of the biogas digesters Defendants were pioneers in creating. With significant public funding, Defendants built and continue to build methane digesters, which pose significant environmental and safety risk, and omit the fact that they work through incentivizing further growth and consolidation, creating a higher negative environmental impact overall.

9.      Fairlife's packaging is not in fact recyclable, despite its multiple claims of recyclability, both on and linked on the packaging. Fairlife's bottles are made from opaque pigmented PET/PETE plastic, which contains titanium dioxide ("TiO2"), which is a contaminant to the recycling process. It renders the bottles *non-recyclable* in fact and under applicable law, requiring the bottles to be sorted out from clear PET plastic in the recycling process and discarded and/or burned, and poses a contamination threat to the integrity of other plastic in the plastics recycling chain.

10.      Defendants knew, or should have known, that their false, fraudulent, misleading, and/or reckless representation of these claims and material omissions to consumers, unlawfully and unfairly drove price premiums, sales and sales growth, profitability, and growth and consolidation.

11.      Plaintiffs bring this putative civil class action to obtain injunctive relief to stop Defendants' deceptive and unlawful practices, to stop Defendants' cruel and unsustainable farming and packaging practices, and to recover monetary relief for the Plaintiffs and the members of the Class caused by reason of the Defendants' misconduct related to their false and misleading animal care claims and sustainability claims.

## II.    PARTIES

12.      Plaintiff Aryout Michael Thomas Bhotiwihok ("Bhotiwihok") is an individual residing in Los Angeles, California. Plaintiff is a consumer who purchased fairlife's milk products for himself and his children regularly from approximately 2019 through 2025. Plaintiff purchased these products in reliance on

1   the message fairlife's advertising communicated, including through the name fairlife

2   and the cartoon cow logo. Plaintiff's reasonable reliance and belief based on

3   fairlife's advertising was that the company was fair and humane to the animals in

4   the supply chain, free from cruelty and neglect, and adhered to high animal

5   treatment and environmental sustainability practices and did not come from large

6   highly concentrated farming operations. Plaintiff believed the plastic bottle was

7   recyclable and would be converted into another product via the recycling process,

8   and in fact placed the packaging in recycling bins for that reason. Plaintiff suffered

9   economic injury in the form of paying a premium price for fairlife's products under

10  the false and/or mistaken belief that their purchase supported humane animal and

11  environmentally sustainable practices.

12      13.    Plaintiff Jeremiah Cornelius ("Cornelius") is an individual residing in

13  San Francisco, California. Plaintiff is a consumer who purchased fairlife's milk

14  products regularly from May to December 2024, at which time he learned the

15  representations on animal care and sustainability were untrue. Plaintiff purchased

16  these products from Target and elsewhere in reliance on Defendants' representations

17  that its products were produced in a manner consistent with high levels of care of

18  animals and freedom from cruelty and neglect as well as environmental

19  sustainability, including recyclable packaging. Plaintiff originally started purchasing

20  fairlife's products after he became concerned about the human health risks

21  associated with milk from animals who were not treated humanely from other

22  sources. Cornelius considers himself to be an environmentally conscious consumer.

23  Plaintiff conducted research prior to purchasing, including reviewing and relying

24  upon the claims and advertising on fairlife's website regarding animal care and

25  sustainability. Plaintiff specifically chose fairlife's products because of Defendants'

26  advertisements and marketing claims that its cows were not treated cruelly or

27  neglected, and its animal care practices adhered to high ethical standards, as well as

28  the belief that fairlife products were produced in a sustainable manner, including

that its packaging was recyclable. Plaintiff Cornelius would not have purchased fairlife's products, or would have paid less for them, had Plaintiff known the truth about Defendant's actual practices. As a result of Defendant's false, misleading, and/or deceptive marketing and misrepresentations, Plaintiff suffered economic injury in the form of paying a premium price for fairlife's products under the false belief that their purchase supported humane animal and environmentally sustainable practices.

14.    Plaintiff Randy Paugh ("Paugh") is an individual residing in Sausalito, California. He purchased fairlife's Core Power milk products on a regular basis until early 2025 when he began to doubt the veracity of the representations made on fairlife's packaging and website based on social media discussions of the brand. Plaintiff Paugh purchased the products from Safeway grocery store and elsewhere on reliance on Defendants' representations of high levels of animal care and environmental sustainability. Plaintiff visited fairlife's website multiple times and relied upon the animal care and environmental sustainability claims made therein, as well as the fairlife name and representations made on the plastic bottle, including, but not limited to, the "recycle me" bottle label. Plaintiff specifically continued to purchase the brand after reviewing and relying upon the claims made on the fairlife website and packaging under the reasonable belief that the animals were treated humanely and free from cruelty or neglect, and that the brand was environmentally sustainable. Had Plaintiff Paugh known the truth concerning Defendants' actual practices, he would not have purchased fairlife's products or would have paid less for them. As a result of Defendants' false, misleading, and/or deceptive marketing and representations, Plaintiff has suffered economic injury in the form of paying a premium price for fairlife's products under the false or mistaken belief that their purchase supported humane animal and environmentally sustainable practices.

15.    The true name and capacities, whether individual, corporate, associate, or otherwise, of Defendants Does 1 through 10, inclusive, are unknown to the

1  representative Plaintiffs, who therefore sue said Defendants by such fictitious
2  names. Plaintiffs will seek leave of the Court to amend the Complaint to insert their
3  true names and capacities instead of the Doe Defendants when the same becomes
4  known to the representative Plaintiffs.

5        16.    Each of the Defendants is responsible in some manner for the violations
6  of law, conduct, liabilities, harm, and/or damages alleged herein. Plaintiffs are
7  further informed and believe, and based thereon, allege that all relevant times each
8  of the Defendants acted in concert with and/or as the principal, agent, representative,
9  employer, employee of each of the other Defendants, and within the purpose and
10 scope of said relationships, and that each Defendant authorized, ratified, approved,
11 and/or consented to the acts alleged herein of the other Defendants.

12       17.    Defendant fairlife, LLC, sometimes spelled fa!rlife ("fairlife"), is a
13 dairy company and consumer facing brand whose principal place of business is
14 Chicago, Illinois. Fairlife sells so-called "premiumized" milk and milk products at a
15 higher price than traditional milk and milk products and milk alternatives such as
16 almond and oat milk. Fairlife has two main product lines: its "filtered milk" line,
17 which comes in 2%, whole, chocolate, and fat-free varieties in both large and small
18 (14 oz.) bottles; and its Core Power line, which is higher in protein and comes in a
19 variety of flavors and protein levels. Fairlife also produces other products, including
20 ice cream. Fairlife is sold around the world and became a $1 billion brand in 2021
21 and has been growing rapidly since that time. In December of 2024, Coca-Cola's
22 CEO cited Coca-Cola and fairlife as being the two brands that added the most retail
23 sales in the U.S. Fairlife was created and continues to advertise to consumers its
24 brand identity and practices as constituting high levels of animal care and
25 sustainability, including, but not limited to recyclability of its packaging.

26       18.    Defendant The Coca-Cola Company ("Coca-Cola") is the co-founder
27 of fairlife, and acquired the remaining shares of fairlife in 2020, making fairlife
28 currently wholly owned by Coca-Cola. Coca-Cola's final payment for the 2020

acquisition of fairlife will take place in 2025. Coca-Cola has been identified as the world's largest contributor to plastics pollution, holding the #1 spot for the 6th year in a row according to one evaluation in 2023. Coca-Cola has also publicly represented plastics recyclability goals and its near complete meeting of those goals.[1] Coca-Cola is a corporation incorporated under the laws of the State of Delaware, with its headquarters located in Atlanta, Georgia.

19.    Defendant Mike McCloskey is the co-founder of fairlife and of Select Milk Producers, Continental Dairy, and Fair Oaks Farms, among other corporate entities and brands. He is married to Defendant Sue McCloskey. He was also formerly on the Board of Lake States Dairy Center, which does business as Fair Oaks Farms in Fair Oaks, Indiana.

20.    Defendant Sue McCloskey (with Mike McCloskey, "the McCloskeys") is married to Defendant Mike McCloskey and is the co-founder of Select Milk Producers, Continental Dairy, fairlife, and Fair Oaks Farms, among other corporate entities and brands.

21.    Defendant Select Milk Producers, Inc. ("Select Milk") is one of the largest dairy cooperatives in the United States. Select Milk is a corporation incorporated under the laws of the State of New Mexico, with its headquarters in Dallas, Texas. It was founded by and is owned by the McCloskeys. It was the co-founder of fairlife along with Coca Cola. While fairlife is now wholly owned by Coca-Cola, Select Milk still operates the dairy farming and supply function for fairlife along with United Dairymen of Arizona.

---

[1] https://www.breakfreefromplastic.org/2024/02/07/bffp-movement-unveils-2023-global-brand-audit-results/#:~:text=The%20Coca%2DCola%20Company%20maintains,company%20since%20the%20project's%20inception.

### III.    JURISDICTION AND VENUE

22.    The Court has personal jurisdiction over each of the Defendants because: a) fairlife markets, distributes, advertises, and sells fairlife products throughout the United States, including within this judicial District; b) Coca-Cola markets, distributes, advertises, and sells products throughout the United States, including within this judicial District, and because of its ownership of and significant oversight over fairlife; c) the McCloskeys are actively involved in the marketing, distribution and sales of fairlife products which affects and occurs within this judicial District; and d) Select Milk is the exclusive provider of milk products for fairlife which are marketed, distributed, and sold within this judicial District.

23.    Each of the Defendants has sufficient minimum contacts with this District such that the exercise of personal jurisdiction over them does not offend traditional notions of fair play and substantial justice.

24.    This Court also has subject matter jurisdiction over this putative civil class action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, and the Defendants are citizens of a state different from that of at least one Class member.

25.    Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because substantial parts of the events or omissions giving rise to the claims occurred in this District.

### IV.    FACTUAL ALLEGATIONS

26.    The fairlife concept and brand was originally created to boost milk sales where milk prices and demand were dropping. The McCloskeys and Select Milk began to create a new milk product with a different nutritional profile and a brand identity of sustainability and high animal care in order to create a separate

1 brand identity for their product, charge more for it, and grow production and

2 demand from there. This product would ultimately become fairlife.

3    27.    Select Milk partnered with Coca-Cola to start the fairlife brand as a

4 joint venture, which was launched in 2014. Sandy Douglas, Coca-Cola's Senior

5 Vice President and Global Chief Consumer Officer and President of Coca-Cola

6 North America said at the time that fairlife was "basically the premiumization of

7 milk" and explained the basis of that in terms of high animal care and sustainability,

8 stating: "Our vision for the nutrition beverage business and the milk product that I

9 showed you which is made on a sustainable dairy with fully sustainable high care

10 processes with animals, has a proprietary milk filtering process that allows you to

11 increase protein by 50%, take sugar down by 30%, and have no lactose, and a milk

12 that's premiumized and taste better and we'll charge twice as much for it as the milk

13 we used to buying in a jug."[2]

14    28.    In January of 2020, Coca-Cola announced that it had acquired the

15 remaining shares of fairlife from its joint venture partner Select Milk, bringing its

16 ownership stake to 100%, up from its previous 42.5% stake.[3]

17    29.    On information and belief, Select Milk still retains most of the

18 operational control of fairlife, executing on the supply of the product through its

19 membership, contracts, and oversight, which includes specific requirements and

20 guarantees it makes to consumers about the animal care and sustainability practices

21 in its supplying farms.

22
_____

23 [2] Seeking Alpha, The Coca-Cola Company's (KO) Presents at Morgan Stanley
   Global Consumer Conference (Transcript), Nov. 19, 2024 at

24 https://seekingalpha.com/article/2695965-the-coca-cola-companys-ko-presents-at-
   morgan-stanley-global-consumer-conference-transcript (last visited Jan. 26, 2025).

25

26 [3] Coca-Cola Canada, Who Owns Fairlife, at https://www.coca-
   cola.com/ca/en/about-us/faq/who-owns-

27 fairlife#:~:text=On%20January%203%2C%202020%2C%20The,from%20its%20pr
   evious%2042.5%25%20stake (last visited Jan 26, 2025).

28

30.    In 2022, fairlife was reported as "a value-added success story in a category that has been in steady decline for years" after becoming a billion-dollar brand in 2021, and that as of 2022, fairlife was reaching a quarter of U.S. households.[4]

31.    Coca-Cola CEO and Chairperson James Quincy reported in December of 2024, "If you look at the U.S. year-to-date, the two brands that have added most retail sales in the U.S. are Coca-Cola and Fairlife, like the number 1 and the number 2. So you've got the like one of the oldest brands and one of the youngest brands driving the retail sales growth."[5]

32.    When a consumer picks up a bottle of fairlife, the first thing they are struck by is the suggestive name – "fairlife" which communicates a message of a life of fairness for the cows. The definition of "fair" is "reasonable, right, and just."[6]

33.    The name "fairlife" is paired with the iconic logo of a cartoon calf, drawn in a way that evokes pathos and compassion, further indicating to consumers that the brand is centered around a caring ethos for the cows.



---

[4] Elaine Wilson, 50% more protein, 50% less sugar: fairlife brand reaching a quarter of US households, says VP. 'Demand is at an all-time high' Food Navigator, Sep. 22, 2022 at https://www.foodnavigator-usa.com/Article/2022/09/22/50-more-protein-50-less-sugar-fairlife-brand-reaching-a-quarter-of-US-households-says-VP.-Demand-is-at-an-all-time-high/ (last visited Jan. 26, 2025).

[5] Seeking Alpha, The Coca-Cola Company (KO) Morgan Stanley Global Consumer & Retail Conference (Transcript), Dec. 3, 2024, at https://seekingalpha.com/article/4741828-the-coca-cola-company-ko-morgan-stanley-global-consumer-and-retail-conference-transcript (last visited Jan 26, 2025).

[6] *See* Collins Dictionary, "fair," https://www.collinsdictionary.com/us/dictionary/english/fair (last visited Jan 10, 2025).



fairlife's logo

34.    If a consumer is buying the "filtered milk" line of products in 2025 or bought it in the last few years, they are directed to a QR code which takes them to a Smart Label landing page[7] which links them to fairlife's mission page at https://fairlife.com/our-mission/.

35.    If a consumer is buying the "core power" fairlife line in 2025 or bought it in the last few years, he or she is invited to follow the URLs on the bottle, corepower.com or corepower.com/great-taste, which take the consumer to the same fairlife mission page at https://fairlife.com/our-mission/ ("mission page").

36.    Fairlife has three pillars listed on its mission page, under the banner "we believe in better." The mission page is structured into three sections, for their belief in "better care for" people, animals, and the planet. The page states "our purpose extends beyond what's in our bottles. We go the extra mile to provide better care for the people we nourish, animals that provide us with milk, and the planet we live on."

---

[7] *E.g.*, For the 2% filtered milk line, the Smart Label site https://smartlabel-nutrition.fairlife.com/?fairlife-two-percent-ultra-filtered-milk-14-fl-oz&upc=811620020879#company (last visited Jan 7, 2025).

37.    With respect to animal care claims, on the mission page, it asserts "great care for the animals... will always be a top priority at fairlife", a component of which is "partnering with like-minded supplying farms that share fairlife's commitment to well cared-for cows."

38.    The animal's section of the mission page is accompanied by an image of a woman reaching her hand out to a cow who is sniffing the woman's hand, as depicted here:



39.    The consumer clicks "learn more" on the mission page as shown above and is taken to a dedicated animal care page ("animal care page").[8] This page begins with a large heading, "we believe in better care for animals." It then lays out details about its animal welfare program. This program can be summarized as processes, policies, and expenditures. Fairlife touts the $40 million-plus monetary investment in animal welfare since 2019, its audits, its on-site vet, and the fairlife Animal Welfare Advisory Council.

_____

[8] "We Believe in Better Care for Animals," fairlife, https://fairlife.com/our-mission/fairlife-cow-care-and-animal-welfare-standards/ (last visited Jan 7, 2025).

40.    Images of fairlife's animal care page:







CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

W A Y M A K E R



## Industry Leading Animal Welfare Standards

Our goal is that all cows and calves are provided with the best care possible. As a dairy processor that doesn't own farms or cows, we rely on the partnership of industry experts, advisors and our network of supplying farms to help us achieve this goal. We are committed to continuously evaluating our animal welfare program for areas of opportunity.

**100%**
of supplying farms passed critical care standards in 2022

**Regular Audits**
performed at all supplying dairies each year

**Leading Certification**
such as National Dairy FARM program and Validus is required at all supplying farms.

## Strong Farm Partnerships

Working with suppliers that share our commitment to great animal care and sustainable farming is critical to our program. Equally as important is staying up to date on industry research, innovative technologies and on-farm protocols and resources to help advance our efforts and help our programs succeed.



## Supplier Selection

We only work with farms committed to delivering the highest quality milk. This starts with meeting our strict quality standards, which is a reflection of animal health and hygiene, on-farm cleaning procedures and employee training. Additionally, we require farms to chill their milk immediately after harvest to preserve the quality.

**All farms that supply to fairlife:**

**FARM Program**
Supplying dairies must participate in the Farmers Assuring Responsible Management (FARM) program

**Regular Audits**
Supplying dairies must participate in regular audits conducted by a certified 3rd-party organization

**Zero Tolerance Policy**
Supplying dairies are required to have signed Cow Care agreements with all employees and a zero-tolerance policy for animal abuse

14
CLASS ACTION COMPLAINT



**Standards and Oversight**

fairlife has a robust set of animal welfare standards and requirements for supplying farms. Beyond care, they also include requirements for on-farm worker care, biosecurity and environmental standards.

**Audit Cadence**

Supplying farms to fairlife are audited more frequently than the cadence required by industry standards.

**Addressing Issues**

More frequent audits help to identify any issues and quickly take corrective action, when needed. Additionally, it helps reinforce a culture of transparency among supplying farms and their employees.

**Leveraging Technology**

We work with our partners to invest in camera monitoring and scaling AI technology for additional oversight. We believe in the future of on-farm camera monitoring, as it can move beyond the cow-human interaction to help farmers in other areas such as feed management, health surveillance and milking parlor analytics.

# Enforcing the Requirements of Strong Animal Care

As a dairy processor that doesn't own farms and cows, we make continued investments and take significant measures in our animal welfare program, farm partnerships and ability to oversee actions on farm.

In addition to regular 3rd-party audits, we also have regular site visits performed by our fairlife Animal Welfare team members. All findings – large and small – are investigated and timely corrective actions are taken.

Our goal is always that all cows and calves are provided with the best care possible. If you have feedback, we encourage you to share with us directly at cowcare@fairlife.com.

41.    Collectively, these claims are referred to herein as the "Animal Care Claims."

42.    When touting these processes, policies, and expenditures, fairlife omits the context in which they were created. It was only following a 2019 ARM investigation and a subsequent consumer fraud/false advertising class action lawsuit

CLASS ACTION COMPLAINT

1    that ultimately settled for $21 million and a detailed stipulated injunction covering

2    policy and oversight changes but without any admission of wrongdoing that fairlife

3    spent so much money and time to develop the processes and policies it put into

4    place.

5          43.    Despite the process-based nature of the animal welfare program, fairlife

6    has carefully curated the content on this page to make outcome-based claims and

7    representations to the consumer, which has the clear intent and effect of

8    communicating to the consumer that the animals are cared for well, and certainly not

9    abused or neglected. These claims may or may not be literally true but are

10   nonetheless misleading. For example, it states: "we work closely with supplying

11   farms to ensure great care for the cows that provide us with milk," indicating an

12   outcome of care for the cows at a high level, certainly far above criminal cruelty,

13   neglect, and even standard industry level animal welfare.

14         44.    Some of its claims also include "industry leading standards," "regular

15   audits, strong oversight."  In fact, the industry standards and auditing fairlife

16   purports to be "industry leading" are FARM and Validus.

17         45.    FARM is the Farmers Assuring Responsible Management program.

18   This is an industry-created program, created by the National Milk Producers

19   Federation and Dairy Management, Inc. The National Milk Producers Federation is

20   a Washington, D.C.-area based dairy lobby group, with 25 member cooperatives,

21   representing two-thirds of commercial dairy farmers in the United States[9] Dairy

22   Management, Inc. is a dairy trade association which gets its primary funding from

23   the U.S. Dairy Promotion Program, which is funded by federally required checkoff

24

_____

25   [9] May 1, 2023 letter from Nicole Hancock, attorney for National Milk Producers
26   Federation to Bruce Summers, Administrator, Agricultural Marketing Service,
     United States Department of Agriculture, available at
27   https://www.ams.usda.gov/sites/default/files/media/NMPFNationalHearingPetition0
28   50223.pdf (last visited Jan 7, 2025).

fees and taxpayer dollars for federal promotion and marketing of dairy products. More importantly, the FARM animal care program itself touts its membership at 98% of the dairy industry[10]

46.    Fairlife's advertising does not disclose that Defendant Mike McCloskey is listed as staff on the "Meet the Team" page of the FARM website,[11] nor the conflict of interest that position presents.

47.    On information and belief, Mike McCloskey has been employed by FARM in some capacity for at least several years.

48.    Validus is an auditing company whose mission statement is "helping the world feel good about farming."[12] It has a wide reach in the dairy industry with many major dairies participating and is often used by large agribusiness industries to conduct audits.

49.    Fairlife communicates to consumers a message of superiority, indicating better care for the animals than is standard in the industry. Not only are these not "industry leading" standards representing "better care" for the animals, they in fact represent the industry itself, and its most powerful lobby for mega dairy companies like fairlife itself.

50.    Defendants' purpose in creating the fairlife brand was to communicate to consumers that it was distinct from and greater than the industry standard.

51.    In the earliest statements from the Defendants about fairlife's founding, it is clear that the brand and related brands like Fair Oaks Farms were created to

---

[10] FARM, Dairy Farmers, Animal Care, https://nationaldairyfarm.com/dairy-farmers/ (last visited Jan 7, 2025).

[11] FARM, Meet the Team, Mike McCloskey, at https://nationaldairyfarm.com/staff/mike-mccloskey/#:~:text=Mike%20McCloskey%20is%20Co%2DFounder,attraction%20located%20in%20Northwest%20Indiana (last visited Jan. 11, 2025).

[12] Validus, https://www.validusservices.com/ (last visited Jan 7, 2025).

preempt and provide a counternarrative to the advocates for animals and the environment who raised concerns about the industrialization of the dairy industry. For example: "The farm was founded out of necessity to counter the very loud, very well-funded, and often, very misleading voices against modern farming and animal agriculture in particular," said [defendant] Sue McCloskey in an interview with Food & Wine in 2018. "Having come from a non-generational farming background"—that's another way of saying she doesn't come from a family of farmers— "and growing up in the consumer-centric East Coast, I knew the ploy of these organizations."[13]

52.     Fairlife's current animal care page claims to have a "robust animal welfare program," says that and touts its "full time staff veterinarian with more than 12 years of specialized experience in cow care," and says its "animal welfare advisory council consists of 6 of the top experts in the dairy and animal health industry. Together this group works with fairlife to review on-going animal welfare programs and guide advancement and improvement to our animal welfare program based on new research and learnings." It also states that "regular audits [are] performed at all supplying dairies each year" and that their supplying dairies are required to have a "zero tolerance policy for animal abuse." Most unequivocally, fairlife represents that "100% of supplying farms passed critical care standards in 2022." These claims and similar ones indicate to the consumer not only that the process of oversight and review is in place, but that this process in fact ensures the outcomes of higher care and prevention of animal abuse and neglect.

53.     In actuality, ARM's evidence from a confidential informant witness indicates, for example, that Windy Ridge and Windy Too only had one single

_____

[13] Monte Reel, "The Dairy Farm of Your Imagination is Disappearing," Bloomberg, Feb. 28, 2020, at https://www.bloomberg.com/news/features/2020-02-28/the-dairy-farm-of-your-imagination-is-disappearing?embedded-checkout=true&leadSource=uverify%20wall (last visited Jan 7, 2025).

veterinary visit this employee witnessed saw in approximately 15 years. On information and belief, both Windy Ridge and Windy Too where widespread rampant abuse was documented in 2023 had passed its fairlife critical care standards audit mere months before the video was shot.

54.     As described below, new ARM evidence makes it clear that the reality is that animals are being abused and neglected in the fairlife supply chain in a frequent, widespread, standard, and egregious manner.

55.     Despite industry bias and identity, lack of rigor and scope, and low bar to meeting FARM and Validus standards, ARM's 2023 and 2024 film footage of fairlife supplying farms shows widespread, frequent, standard, and egregious violations even of FARM and Validus standards.

56.     Defendants also publicly touted fairlife's purported commitment to phasing out the cruel industry standard of cow dehorning in the fairlife supply chain, a practice which causes extreme pain and suffering. The practice has *not* been phased out, as shown in ARM's 2024 Butterfield investigation discussed below.

57.     The intent and effect of the message communicated to consumers by the fairlife mission page, the animal care page, the brand's other advertisement, the statements and representations made by Defendants, and even the name and logo of the brand is that fairlife cows are treated humanely, in a way superior to industry standards, and without abuse or neglect.

58.     This messaging as described above is false and misleading to consumers in a material way.

59.     ARM conducted an additional investigation in 2023 of Windy Ridge and Windy Too in Indiana, two of the twelve farms on or near the Fair Oaks Farms facility that they had investigated in 2019 ("2023 Investigation").

60.     Windy Ridge and Windy Too are owned by Steve Bos and his wife. Bos is the Principal Officer and President of the Board of Lake States Dairy Center, Inc, which does business as Fair Oaks Farms.

61.     In its 2023 Investigation, ARM documented multiple instances of abuse and neglect, including, but not limited to:

    i)    Egregious and frequent violent animal cruelty as part of the business operating practices;

    ii)    Animals kicked, beaten, and punched daily by employees;

    iii)    Cows flogged and repeatedly whipped with heavy ropes, beaten with sawn-off golf clubs, and slammed with sharp shanks, knives, and screwdrivers;

    iv)    Cows slammed into and dragged by tractors and heavy machinery, clearly conscious and in distress;

    v)    Employees intentionally breaking cows' tails, including by management;

    vi)    Use of excessive force when moving the cows;

    vii)    Head manager shooting cows with .22 shotguns, in botched and improper attempts at euthanasia, including in one instance of shooting a cow and she lived another day with a bullet hole in her head;

    viii)    Cows trampled to death as part of milking process;

    ix)    Neglect, abandonment, and denial of access to food and water, veterinary care, and/or clean and sanitary living conditions;

    x)    Animals too sick or injured to stand ("downers") dumped and abandoned in small enclosed "death pens" along with other sick, injured, dying, and dead animals;

    xi)    Denial of veterinary care for critical infected wounds, including abscesses on their knees that immobilized the animals, where the animals were showing clear signs of pain, swelling, and distress. Managers and workers acknowledged these wounds but left the animals untreated;

CLASS ACTION COMPLAINT

xii)   Newborn calves abandoned and left to die slowly in dark corners of barns and in piles of filth and feces;

xiii)   Cows forced to live in overcrowded, unsanitary conditions, including in and around deep piles of feces, and among pungent and noxious odors;

xiv)   Cows deprived of clean drinking water and forced to drink sludge-covered water; and

xv)   Approximately half of the dairy cows had lameness causing them to walk with limps.

62.   Select images from the 2023 ARM Investigation include:

Cow dragged by tractor, being lifted by the tail ("tailing up"), and cow is tied by her face to her leg:



CLASS ACTION COMPLAINT

Cow lifted in tractor bucket upside-down, approximately 10-15 feet into the air:



Cow hoisted by her front legs:



CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Cow kicked in the face:



Cow dragged by her leg by a tractor:



1

Cow hoisted by her feet and a tractor hook:

2





CLASS ACTION COMPLAINT

1    63.    In one instance, after a manager shoots a cow in the head with a gun,

2  the ARM investigator asks the manager, "Do you feel remorse for killing her?" and

3  the manager replies, "No! It's why I live in this country, so I can kill these asshole

4  cows."



1    64.    An instance of an employee deliberately breaking the tail of a cow by

2 cracking it in his hands:



3    65.    The acts and omissions documented in the ARM 2023 Investigation

constitute criminal level animal cruelty, violate the voluntary industry standards

such as FARM and Validus, and render fairlife's representations of the quality of its

animal care and sustainability practices to be false and misleading.

66.    From July to December 2024, ARM conducted two new investigations,

only made public for the first time in February 2025 ("2024 Investigations"). These

investigations took place at Rainbow Valley Dairy, LLC in Buckeye, Arizona, aka

North Farm ("Rainbow Valley") and Butterfield Dairy, LLC, also in Buckeye,

Arizona ("Butterfield"). Both/all are owned and managed by Thomas De Jong

individually and in his capacity as trustee of the Tom and Susan De Jong Family

Trust.

67.    Rainbow Valley and Butterfield are suppliers of fairlife. Rainbow

Valley's milk is trucked to the fairlife processing plant in Goodyear, Arizona via

1    United Dairymen of Arizona, a co-op which the DeJongs and their dairies are
2    members of.

3        68.    Butterfield is a calf ranch that is a supplier to multiple area dairy farms
4    which ultimately truck their milk to the fairlife processing plant in Goodyear,
5    Arizona.

6        69.    In its 2024 Rainbow Valley dairy farm investigation, ARM
7    documented multiple instances of abuse and neglect, including, but not limited to:

8            i)      Egregious and frequent violent animal cruelty as part of the
9                    business operating practices;

10           ii)     Animals hit in the face, genitals, and other sensitive areas with
11                   knives, screwdrivers, and shards of metal;

12           iii)    Employees, including management, kicking animals, including
13                   downed cows and calves too sick or weak to stand, and in
14                   sensitive areas like an injured leg repeatedly;

15           iv)     Animals dragged by chains across concrete floors by a tractor,
16                   hoisted by the neck over a wall;

17           v)      Downed cows pushed and scooped into tractor buckets,
18                   sometimes over long periods of time, including by the top
19                   manager of the dairy driving the tractor, resulting in death of
20                   multiple cows. In some instances, dirt is shoveled on or near the
21                   cow with the tractor bucket, including burying the head,
22                   suffocating the animal and effectively burying her alive;

23           vi)     Cows shot with .22 rifle in the back of the neck in botched
24                   attempts to kill them, often causing pain and suffering. Every
25                   cow shot is shot in this manner;

26           vii)    Excessive use of electric prod, including numerous instances
27                   where head manager electrically shocked downed cow in labor
28                   over 70 times, including while tailing up, including inside the

mouth and genitals, causing bellowing and other indications of distress;

viii)  Cows hoisted off the ground by the hips with a hip clamp chained to a tractor and dragged;

ix)   Whipping and beating animals multiple times a day to get them into the milking area, including dozens of instances of hard whipping;

x)    Multiple workers intentionally and frequently breaking tails of the cows on dozens of occasions as apparent "discipline" by snapping them in half and holding it in that folded fashion, and crushing them with their hands or yanking them until they crack. In multiple instances, this is done until another worker gets the milker attached to the cow's udder. The pain of the broken tail and folding causes the cow to shake and freeze, unable to move or escape, which apparently makes it more convenient to attach the milking device to the udder;

xi)   Hard plastic ankle strap ID tags attached together a few at a time to create whipping devices, which are given to employees and approved by management to beat the animals;

xii)  Newborn calves dragged by their legs, either by hand, with leg chains, by the ears, or a rope around the neck. In one instance, a calf struggles while dragged by leg chains thousands of feet across dirt and concrete while an adult cow looks on and vocalizes. In another instance, a newborn calf is dragged by a rope around the neck across the dirt while an adult cow, presumably the mother, chases after and is shooed away by the workers;

xiii)   During the dragging of the newborn calves by chains, multiple instances of workers intentionally twisting the calves legs to inflict pain and injury, often breaking the bones in the legs;

xiv)   The chains and ropes used to drag and hoist cows and calves are formed like nooses, exacerbating the pain and injury via tightening around the necks, legs, or other body parts as the dragging or hoisting is done;

xv)   Calves carried upside down by the legs or by the tail and ear, including by every manager;

xvi)   Shoving, throwing, flipping calves into transport trucks;

xvii)   Force-feeding calves by pinning them and shoving a sharp tube down their throat, in such a manner to purposefully inflict pain. In some cases, botched use of this feeding tube resulted in death of the calves;

xviii)   Neglect, abandonment, and denial of access to food and water, veterinary care, and/or clean and sanitary living conditions;

xix)   Some calves kept in conditions without shade in weather up to 115 degrees;

xx)   Large numbers of dead calves and cows; and

xxi)   The majority of cows exhibiting lameness. Straight blades used by workers on hooves without pain medication while animals showed severe signs of distress.

70.   Every worker at the Rainbow Valley 2024 Investigation committed acts of cruelty and abuse. The head manager often participated in the cruelty itself or was standing by observing while the cruelty was taking place.

71.   Select images from the 2024 Rainbow Valley dairy investigation include:

Employee hitting a cow in the face with a metal object:



Cow being hoisted by the neck over a wall after being dragged across the floor by a chain attached to a tractor:



CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Downed cow being pushed by a tractor bucket:



The same cow after being hit again with the tractor bucket and being pushed onto her back:



Cow hoisted and dragged by hip clamp chained to tractor:



Worker bending tail backward to break it with his hands as apparent "discipline":



CLASS ACTION COMPLAINT

Employee has wrapped tail around bar before he holds onto it and yanks backward with his body weight to break it:



Calf force feeding:



72.     In its 2024 Butterfield dairy farm investigation, ARM documented multiple instances of abuse and neglect, including, but not limited to:

CLASS ACTION COMPLAINT

i)      Egregious abuse such as throwing calves into trucks on multiple occasions;

ii)     Evidence of calves having been subjected to cruel and unnecessary suffering through the standard practice of dehorning, some via manual cutting and some by caustic paste;

iii)    Neglect, abandonment, and denial of access to food and water, veterinary care, and/or adequately spacious, safe, or clean and sanitary living conditions;

iv)     Calves in individual calf crates so small they cannot turn around or lie down comfortably. In some cases, they grow so large they can barely move. They are often kept in crates designed for newborn animals approximately 5 x 2 feet, up to the age of four months;

v)      In some cases, crates packed with two calves;

vi)     Stuck animals, sometimes so entangled in the crates they die that way;

vii)    Live calves being put into crates with decomposing corpses of calves;

viii)   Bar biting in the calf crates, which is an indicator of extreme frustration and stress; and

ix)     Temperatures over 130 degrees with some animals denied access to shade for multiple hours of the day, in some cases causing death.

73.    Select images from the 2024 Butterfield investigation include:

CLASS ACTION COMPLAINT

Calf having recently been manually dehorned with clippers and then thrown back into the crate with no pain relief, marked by a strip of paint to indicate having been dehorned:



35

Three-month-old calves in crates having grown so large they can barely move. Note some have no access to shade and some are bar biting:



Calf unable to turn around in crate and got stuck, alive:



74.     The acts and omissions documented in the 2024 Investigations constitute criminal level animal cruelty, violate the voluntary industry standards such as FARM and Validus, and render fairlife's representations of the quality of its animal care and sustainability practices to be false and misleading.

75.     When a consumer buys fairlife products, he or she has a number of indications of its environmental sustainability, including the name fairlife and the cartoon calf logo, manure sustainability claim, top farm sustainability claim, and recyclability claims. (collectively "Sustainability Claims")

76.     If a consumer is buying the "filtered milk" line of products in 2025 or bought it in the last few years, they are directed to a QR code which takes them to a Smart Label landing page[14] which links them to fairlife's mission page at https://fairlife.com/our-mission/.

77.     If a consumer is buying the "core power" fairlife line in 2025 or bought it in the last few years, he or she is invited to follow the URLs on the bottle, corepower.com/great-taste or corepower.com, which take them to the same fairlife mission page at https://fairlife.com/our-mission/ ("mission page").

78.     Fairlife has three pillars listed on its mission page, under the banner "we believe in better." The mission page is structured into three sections, for their belief in "better care for" people, animals, and the planet. The page states "our purpose extends beyond what's in our bottles. We go the extra mile to provide better care for the people we nourish, animals that provide us with milk, and the planet we live on."

---

[14] *E.g.*, For the 2% filtered milk line, the Smart Label site https://smartlabel-nutrition.fairlife.com/?fairlife-two-percent-ultra-filtered-milk-14-fl-oz&upc=811620020879#company (last visited Jan 7, 2025).

79.    On the "planet" section of the mission page, fairlife advertises that they have "sustainable farming efforts [that] focus on several opportunity areas, including using renewable energy on farms, cow feed, and manure handling."

80.    This manure sustainability claim indicates a false and misleading message to consumers about the environmental sustainability and benefits of biogas–methane digesters Defendants pioneered and continue to build and grow, discussed below.

81.    Also, on the "planet" section of the mission page, fairlife advertises that it has: "Completed life cycle analysis at supplying farms and validated that they are among the most sustainable in the country for environmental footprint."

82.    This top farm sustainability claim communicates a false and misleading message to consumers that fairlife-supplying farms are objectively less polluting and resource consumptive than is standard in the industry. It also communicates the false and misleading message to consumers that the life cycle analysis and validation process yields an outcome of increased sustainability and lower environmental footprint. In addition, it materially omits the issue of fairlife's growth and consolidation, and all of the actions and strategies it has taken to accelerate that growth and consolidation, some of which are illegal and form the basis of this complaint, while having the intent and effect of becoming an outlier in the industry with rapid growth, consolidation, and record profits while other dairies in the industry continue to fold or be consolidated into massive conglomerates like fairlife and other Defendants, with disproportionately negative impact on small family dairies and non-dairy alternative companies.

83.    The 2024 Investigation also revealed large amounts of animal waste discharged into nearby wildlife areas near waterways and groundwater and open disposal of animal carcasses on or near adjacent recreational lands, rendering the top farm sustainability claim additionally false and misleading.

84.     Also, on the "planet" section of the mission page, until very recently, fairlife advertised the concrete "100% recyclable packaging commitment by 2025." On nearly all fairlife bottles, the chasing arrow symbol is stamped, indicating recyclability. Some of the large filtered milk line bottles and some of the Core Power bottles are also stamped with a "1" which indicates recyclability to consumers. The Core Power bottles also say "Recycle Me" on the label. Each of these is independently a recyclability claim and also together indicate recyclability of the packaging, including all of the fairlife bottles.

85.     Fairlife's recyclability claims communicate a message to consumers that its packaging is recyclable. Its website recyclability claim specifically indicates 100% of its bottles are in fact recyclable, now that it is 2025. It also communicates the message that far greater than 0% of the packaging was recyclable prior to 2025.

86.     Coca-Cola has made specific representations about its commitment to recyclability of its bottles[15], including a progress report in 2023 that reported a 90% recyclability rate across its products[16] and has reported even higher percentages elsewhere.

87.     In addition to the website recyclability claim and the other sustainability claims, fairlife consumers are directed in other ways by fairlife's bottles to the conclusion that they are recyclable.

88.     Many fairlife bottles are stamped with the "1" and "PETE" on the bottle. The "1" indicates the bottle is PET or PETE plastic, which is known widely

---

[15] https://www.coca-colacompany.com/sustainability/packaging/united-states-recycling#:~:text=Coca%E2%80%91Cola%20North%20America%20has,offer%20sustainable%20solutions%20at%20scale.

[16] https://www.coca-colacompany.com/content/dam/company/us/en/reports/2023-environmental-update/2023-environmental-update.pdf p. 5

CLASS ACTION COMPLAINT

by consumers and industry alike to be the most commonly recycled and recyclable plastic, and most of these additionally have the chasing arrows symbol, which also indicates recyclability.

89.    Even the industry trade group the Association of Plastic Recyclers ("APR"), of which Coca-Cola is a member,[17] lists #1 in its guidelines as recyclable in most communities.[18]

90.    On information and belief, most large fairlife bottles have been stamped with "1" from 2023-present and some of the small bottles are currently stamped with a 1. Currently other fairlife bottles are stamped with the "7" apparently they are a composite of different substances. Some of the bottle types that now bear 1s formerly bore 7s.

91.    APR does not list "7" on its list of recyclable plastic.

92.    On information and belief, the large fairlife bottles have a nylon liner, which would render the bottle ineligible to be stamped with the "1" and would make the "7" the correct designation.

93.    On information and belief, some fairlife bottles were changed from the 7 to the 1 to knowingly and falsely indicate recyclability to consumers.

94.    Most of the Core Power line and some of the filtered milk line bottles are marked as a 7 on the bottom of the bottle. The 7 is the "other" category and includes mixed plastics, which can contain PET or PETE but is usually not recyclable.

95.    The smaller Core Power line of fairlife products explicitly say on the bottle "Recycle Me."

[17] Association of Plastic Recyclers, About APR, APR Member Sampling, at https://plasticsrecycling.org/about-apr/ (last visited Jan. 17, 2025).

[18] https://plasticsrecycling.org/how-recycling-works/the-plastic-recycling-process/

96.     All of these fairlife bottles are pigmented opaque PET or PETE containing plastic, with white or brown pigment.

97.     Nearly all of the fairlife bottles also have the chasing arrows symbol stamped on them, also indicating recyclability.

98.     Coca-Cola also touts its commitment to recyclability, including by claiming PET is the most valuable type of plastic for its recyclability, saying "Plastic, especially PET, is among the most highly valued recyclable materials because it can be remade to make new bottles. No new plastic (PET) is used in the creation of bottles made from 100% recycled plastic* (rPET)–all thanks to consumers who recycle, thus contributing to the circular economy of plastic and reducing waste."[19]

99.     Separately and together, the above indications constitute recyclability claims and communicate a clear message of recyclability to consumers.

100.    In reality, 0% of fairlife's bottles are recyclable.

101.    Fairlife bottles are all wholly or partially PET or PETE opaque plastic.

102.    In order to create opaque plastic, titanium dioxide is used in the construction of the plastic. Titanium dioxide (TiO2) is also used to create a specific sheen for the plastic. If TiO2 is present in the plastic, it renders the plastic *not* recyclable by current available means, called mechanical recycling.

103.    Fairlife used bottles that are sent to be recycled are ultimately pulled out and discarded and/or burned, and *not* recycled into a new product.

104.    In addition, where there are attempts to recycle the plastic used to create fairlife bottles, it not only does not succeed, the intermixing of the fairlife bottles with the clear PET bottles contaminates the supply of plastic recycling from

---

[19] Coca-Cola, Recycling in the United States, https://www.coca-colacompany.com/sustainability/packaging/united-states-recycling (last visited Jan 17, 2025).

WAYMAKER

other brands and companies, damaging the integrity of the plastic products the recycling process is intended to create and frustrating the purpose of recycling altogether. Put another way, fairlife's recycling fraud is not only harming consumers and the environment vis-à-vis fairlife's bottles, but also a scourge to the institution of plastic recycling and the very concept of it.

105.   Even industry trade group APR, of which Coca-Cola is a member, publishes a design guide which classifies white or opaque pigmented plastic as "detrimental to recycling" because of the TiO2.[20]

106.   Coca-Cola is a member of another trade group as part of the Ellen MacArthur Foundation ("EMF") U.S. Plastics Pact. APR and the EMF Group U.S. Plastics Pact ("Plastics Pact") are perpetuating false and misleading information to communicate to the consuming public greater recyclability and commitment to recycling of plastics than is actually the case.

107.   Even so, fairlife's packaging violates even the low AMF and EMF standards.

108.   The Plastic Pact set forth specific targets. The first was to define a list of problematic or unnecessary packaging by 2021 and take steps to eliminate the items on the list by 2025. The second target was to make 100% of plastic packaging recyclable, compostable, or reusable by 2025.[21] The problematic and unnecessary

---

[20] APR Design Guide, "The Authority on Recyclable Plastic Packaging Design," PET Rigid, Color, at https://plasticsrecycling.org/apr-design-hub/apr-design-guide/pet-rigid/, direct link at https://plasticsrecycling.org/apr-design-hub/apr-design-guide/pet-rigid#color-opaquewhite, (last visited Jan 17, 2025).

[21] U.S. Plastics Pact, U.S. Pact 2023-2024 Impact Report, at https://usplasticspact.org/2023-24-Impact-Report/ (last visited Jan. 17, 2025).

materials list includes "Opaque or Pigmented PET–Polyethylene Terephthalate bottles (any color other than transparent blue or green)."[22]

109.   The bottles, which contain TiO2 for opaque colored pigment and sheen, are deceptively advertised as recyclable, containing component(s) that eliminate and/or significantly limit the ability to recycle the items.

110.   The recyclability claims related to fairlife products are in violation of the FTC Green Guides, which sets forth standards for such advertising, as well as the state laws that adopt the Green Guides, including California.

111.   Fairlife is the only brand that uses opaque pigmented plastic drink containers. Its competitors use clear PET bottles or similar packaging.

112.   As fairlife grows, the damage to consumers and the environment from the recycling fraud and contamination is accelerated and exacerbated.

113.   Fairlife knowingly perpetuates this fraud and it is aware that its packaging is not recyclable. It is also aware that its packaging contaminates plastic recycling more broadly. It has made admissions that "clear PET … better supports recyclability and material circularity."

114.   Defendants also know, or should know, that consumers do in fact put these bottles in to be recycled, have the expectation that they will be recycled, and Defendants know that in reality at least some of the plastic used to make them makes it into the recycling processing chain such that they contaminate the recyclability of other plastics.

115.   In or before 2021, fairlife conducted market research and testing on clear PET bottles because that "better supports recyclability." It also made the claim that "we are getting closer to our long-term goal of 100% recyclable packaging."

---

[22] U.S. Plastics Pact, U.S. Plastics Pact Problematic and Unnecessary Materials Report, at https://usplasticspact.org/problematic-materials/ (last visited Jan. 17, 2025).

This statement is false and deceptive because it has not launched clear PET bottles. They also set a false and misleading 2022 goal of "launch[ing] additional products in 100% recyclable clear PET material."

116.   There are no operating recycling facilities that would consider opaque plastic PET bottles–including fairlife bottles–to be recyclable.[23]

117.   On information and belief, at some recycling facilities, the process does not (fully) sort out the white or opaque PET plastic used in fairlife bottles from the clear PET, so some of them do get into the stream and cannot be recycled themselves and contaminate the clear recyclable plastic.

118.   There is no end market able or willing to purchase the fairlife plastic bottles and recycle them into new products or for use in new products.

119.   On information and belief, fairlife plastic bottles actually contaminate the plastic recycling stream, causing structural damage and destruction of the recycled product. In response, multimillion dollar insurance payments have been made to settle claims for the damage to other companies for harm that can be traced back to fairlife bottles.

120.   There is no reasonable basis for Defendants' recyclability claims and they cannot be substantiated.

121.   The recyclability claims are false and misleading to consumers, both because the product packaging is not in fact recyclable and because Defendants belie the greater harmful effect of the contamination the fairlife packaging causes to the plastics recycling supply chain more broadly. Both types of harm are further aggravated by the growth of the brand, driven by the false, misleading, and fraudulent practices alleged herein as a whole.

---

[23] https://plasticsrecycling.org/how-recycling-works/the-plastic-recycling-process/

122.    Defendants also regularly tout their sustainability practices in the context of the biogas anerobic manure digesters via their manure sustainability claim. Defendants are pioneers in the biogas industry. Referring to their biogas digester system, Sue McCloskey has said "it's the ultimate in recyclability" and touted the system as the way Defendants exceeded dairy industry climate change goals.[24] About fairlife, she has said, "We have created a renewable biofuel... we displace 2 million gallons of diesel from having to be mined from the earth every year."[25]

123.    In reality, dairy biogas digesters are profit centers for highly industrialized and consolidated dairy companies. The success of their business model relies upon increasing consolidation and growth of the number of animals confined in these industrial farms.

124.    Biogas digesters also present their own environmental damage risks and hazards. For example, they can leak methane, and one such leak resulted in a fine from the Marion County, Indiana Department of Environmental Management against the McCloskeys' Prairies Edge Dairy Farms in 2017.[26] Biogas digesters can also present an explosion risk.

125.    While advertising fairlife as a sustainable brand and touting its practices such as biogas as climate change solutions, Defendants were all the while

---

[24] Christine Kopaczewski, "Meet 2017 Awesome Women Awards Honoree, Sue McCloskey," Good Housekeeping, August 17, 2017, available at https://www.goodhousekeeping.com/life/inspirational-stories/a45431/awesome-women-awards-sue-mccloskey/ (last visited Jan 11, 2025).

[25] The Innovation of Milk, Sue McCloskey, May 18, 2018, Tedx Talks https://www.youtube.com/watch?v=IhZwSu394D8.

[26] *State of Indiana County of Marion Commissioner of the Department of Environmental Management v. Prairies Edge Dairy Farms LLC*, Case No. 2017-24978-A (2017).

fighting the characterization of dairy as a contributor to climate change and the regulation of greenhouse gases via the dairy checkoff program.

126.   In touting their sustainability–even recyclability–of the biogas component of their operations, Defendants mislead consumers by mischaracterizing these systems as a means to reduce the carbon footprint of the dairy industry and their role in it. In reality, even if these biogas systems reduce the per-animal carbon footprint, their very structure and purpose is to accelerate the growth of the number of animals and concentration of animals so rapidly that the Defendants' ultimate contribution to environmental degradation is exacerbated by its biogas digesters, not alleviated by them.

127.   Select Milk and fairlife were focused on rapid growth, consolidation, and profit creation. Central to that strategy was the "story" of environmental sustainability and high levels of care for the cows.[27] As alleged herein, that story was and continues to be false and misleading. Defendants continued to grow, consolidate, and concentrate more and more animals while the typical "family" dairy farmer lost profits and went out of business. Politico called Mike McCloskey the "closest thing to a rock star in the industry."[28] Defendants' growth both relied upon the false and misleading representations about sustainability and animal care

---

[27] In one germane example, fairlife, LLC and Continental successfully lobbied for taxpayer funding of a pipeline for their family of large dairies to the Continental/fairlife Coopersville, Michigan plant. Defendants lobbied for this money based on a representation that fairlife is "dedication to animal care and comfort, and a commitment to agricultural sustainability." Michigan Strategic Fund Board Meeting Packet, December 2019, pp. 67 and 113. Available at https://www.michiganbusiness.org/4a8352/globalassets/documents/msf-board/msf-board-packets/december-2019_msf-board-packet_final_redacted.pdf (last visited Jan 11, 2025).

[28] David Rogers, "GOP, Industry Rift Spills Over," Politico, Dec. 30, 2012, available at https://www.politico.com/story/2012/12/gop-industry-rifts-bring-milk-imbroglio-to-a-head-085589 (last visited Jan 11, 2025).

1  and also caused the harms to the environment and to animals to be immeasurably

2  worse.

3      128.  In addition, Defendants' sustainability claims also communicate a false

4  and misleading message of high animal care to consumers. The evidence of

5  mistreatment of animals as described above also renders any representation of

6  sustainability false and misleading.

7      129.  Fairlife's brand was built and grown on false and misleading animal

8  care and sustainability messaging from the brand's inception. In actuality, this was a

9  fiction meant to drive profit through growth, consolidation, and artificially

10  increasing prices and the number of purchases. That growth further exacerbated–and

11  continues to exacerbate–the harms caused by their false and misleading advertising.

12      130.  In the early 2000's, consumer demand for milk was naturally declining

13  in favor of other products, and milk prices were dropping. Select Milk and fairlife

14  co-founder Sue McCloskey has described the initial creation of Select Milk and

15  growth of the brand through the creation of a "story" of high animal care and

16  sustainability:

> "[Mike McCloskey] came home from that cooperative meeting and…
> Mike challenged us to do something better [than the existing
> cooperative structure at the time], so we got out a map around our farm
> and we drew a big circle and within the 300 mile radius circle, we
> started identifying milk buyers and processors. And then we started
> knocking on and what we told these milk buyers was that because of
> the incredible care we were able to give our cows, we were able to
> create this incredibly high-quality milk. We emphasized to them that
> we had a story to tell that their consumers were really looking for. One
> milk buyer company got it… they saw the big picture of how having
> this higher quality milk and having this story behind it was not only
> going to be beneficial to their bottom line, but also to their consumers.
> So we invited them to come out to the farm…Because of our belief in
> quality and transparency, we actually–together with a bunch of like-
> minded dairy farmers–created our own dairy cooperative, Select Milk
> Producers. Today, Select Milk Producers is one of the largest dairy co-
> ops in the country…As big as we are today, really it's all about the

47

WAYMAKER

same values that we had at that small little 300-cow dairy farm in California. It's about making sure that our girls are extremely well taken care of, comfortable, have wonderful fresh air. It's about making the higher quality milk for our consumers and it's about creating continuous improvement practices so that our farms can continue to become more and more sustainable."[29]

131.   This kind of sustainability and animal care messaging has continued and gotten more egregiously false and misleading over time, continuing to present day.

132.   A central part of the fairlife brand's development, strategy, and focus is to anticipate the (legitimate) animal welfare and sustainability concerns of the consuming public and the nonprofit organizations that represent those public values. The strategy to address this included spinning a false and misleading story of high animal care, and the creation of Fair Oaks Farms, discussed in more detail below.

133.   Sue McCloskey commented on a "mommy blogger" page about the impetus behind the creation of the high animal care brand identity and claims, including the creation of Fair Oaks Farms, saying "It's funny that you mention PETA because they, along with a number of other acronym-named organizations, were exactly the catalyst that prompted us to open our doors. I think we all know that they have a vegan agenda and are willing to perpetuate myth or emotions to the fact level. There's not much we can do to change their minds other than what we're doing, which is trying to have an honest discussion."[30]

134.   Dismissing potential critics as perpetuating myths and emotions while framing the presentation of their "story" as "transparent" and "honest" became and

---

[29] The Innovation of Milk, Sue McCloskey, May 18, 2018, Tedx Talks https://www.youtube.com/watch?v=IhZwSu394D8 (last visited Jan 21, 2025).

[30] Mommy Shorts, Our Big Trip to Fair Oaks Farms, 2016, Comment Section https://www.mommyshorts.com/2016/07/big-trip-farm.html (last visited Jan 21, 2025).

CLASS ACTION COMPLAINT

continues to be hallmark of the fairlife brand, all the while knowing these were false, misleading, and disparaging.

135.    A particularly nefarious aspect of this was Defendants attempted–and in many ways successful–capture of animal advocacy and environmental leaders to praise the brand and further the lie of high animal care and sustainability. Survey data shows public opinion opposing animal cruelty is near universal, at well over 90%, and most of that population is concerned about factory farming practices.

136.    Defendants were aware of the public negative critiques of factory farming on animal treatment and environmental grounds and specifically chose to craft their story to prevent and diminish the impact of such criticism from being directed at them.

137.    One such component of their strategy was the creation–and continued operation–of Fair Oaks Farms, discussed below.

138.    Another component was the use of specific animal protection and environmental charity leadership to neutralize and co-opt these groups to actively praise fairlife, which Defendants used in promoting the brand to consumers. It was also a preemptive strategy to discredit and minimize any criticism or inquiry that might arise.

139.    The Humane Society of the United States ("HSUS") is one of the nation's largest animal protection nonprofit organizations. Its mission is to create a better world for all animals. Its most recently published IRS Form 990 in 2023, which shows assets over $414 million and contributions of over $157 million. HSUS has represented its membership and constituency level at 11 million, or "1 in 28" Americans. It is also well known for its campaigns against factory farming, including undercover investigations showing animal cruelty and inhumane conditions and practices. In 2012, Mike McCloskey invited HSUS' then-President and CEO, Wayne Pacelle, to tour Fair Oaks Farms and presented the same false and misleading narrative about animal care and sustainability to him. In response,

Pacelle publicly praised the operation, calling McCloskey "innovative" and "charismatic," praising both the animal care–saying he "didn't see the animals exhibiting any lameness" and "I celebrate his steps toward more humane treatment"–and the environmental sustainability in the form of the biogas digesters, calling them "innovations in manure management and energy production." [31] The McCloskeys then quoted these positive statements in promoting fairlife,[32] co-opting the goodwill of HSUS, using it as a mouthpiece to communicate false and misleading advertising to consumers, and further insulating its brand from criticism

---

[31] "It's a mega-dairy for sure, but the charismatic owner of this farm, Michael McCloskey, has been an innovator within the industry. For years, he's been a dissenter when it comes to the once-standard practice of tail docking, and every one of the cows on his farm has a tail, as she was meant to have. The cows bed on sand, which is more comfortable for the animals than concrete, and I didn't see the animals exhibiting any lameness as they walked back and forth between their living area and the milking facility.

The cows are milked by machine on an automated rotary, and the whole enterprise bears little resemblance to the images of a family dairy. But I celebrate his steps toward more humane treatment, as well as innovations in manure management and energy production (he's developed digesters to transform the manure into energy and to fuel the entire complex and his fleet of 18- wheelers that haul the milk to pasteurizing plants and then to market)." Wayne Pacelle, Humane Nation Blog, "Moving Forward for Pets and Farm Animals in the Heartland," Aug. 17, 2012, found in web archive at https://web.archive.org/web/20180613055645/https://blog.humanesociety.org/2012/08/farm-shelter-tour.html on Jan 5, 2025.

[32] *See, e.g.*, from the same mommy blog comment that indicates PETA and similar groups were the driving force behind the creation of Fair Oaks, Sue McCloskey says "You might find the following link an interesting read; http://blog.humanesociety.org/wayne/2012/08/farm-shelter-tour.html. In it, Wayne Pacelle, CEO of the USHS, talks about his visit to Fair Oaks Farms. It's pretty positive about what we are doing…" [32] Mommy Shorts, Our Big Trip to Fair Oaks Farms, 2016, Comment Section https://www.mommyshorts.com/2016/07/big-trip-farm.html (last visited Jan 21, 2025).

CLASS ACTION COMPLAINT

1  and driving sales and prices up based on false and misleading representations of

2  animal care.

3      140.   People for the Ethical Treatment of Animals ("PETA") is a well-known

4  large animal rights organization, touting 9 million members and supporters and

5  calling itself the largest animal rights organization in the world. Among other anti-

6  factory farming campaigns, PETA has been conducting undercover investigations of

7  factory farms for decades revealing abuse and inhumane conditions, and criticizing

8  the meat, dairy, and egg industries, encouraging consumers to boycott them by

9  going vegan. Defendants were able to get even PETA to make a positive statement

10  about fairlife, praising its public commitment to phase out dehorning of calves. This

11  commitment never came to fruition, as evidenced by the 2024 Investigation of

12  Butterfield by ARM. The false and misleading nature of this empty phase-out

13  commitment was compounded by co-opting and deactivating potential critique by

14  PETA, perhaps the most notorious anti-factory farming voice for consumers in the

15  world.

16      141.   In 2019, the McCloskeys were made aware that ARM had conducted

17  an undercover investigation of fairlife suppliers before the video was made public.

18  Mike McCloskey reached out to ARM's founder and lead investigator Richard

19  Couto in an attempt to align himself with ARM in exchange for ARM agreeing to

20  cancel its impending public release. This effort was not successful.

21      142.   The World Wildlife Fund ("WWF") touts itself as the world's leading

22  conservation organization, with a worldwide reputation for environmental

23  sustainability and wildlife protection. Its 2023 IRS Form 990 lists over $355 million

24  in contributions. WWF has a number of campaigns, including a major one on

25  plastics pollution. WWF is a leading member of the U.S. Plastics Pact, indicating to

26  consumers the legitimacy of the program and its commitments. Defendant Coca-

27  Cola is also a member of the U.S. Plastics Pact and sits on its board. Recyclability

28

claims of fairlife are further given a false boost by the co-opting of the public goodwill and trust in the WWF.

143.    From the early days of crafting the high animal care and sustainability "story" around Select Milk and then Fair Oaks and the fairlife brand, using it to boost its growth and profitability, Defendants knew, or should have known, the "story" was false and misleading to consumers. Defendants were fully aware of and even cited consumer concern over animal care and environmental destruction by consolidated dairies like theirs as an impetus to craft the story.

144.    At the time they were crafting the high animal care and sustainability "story," Defendants specifically knew of and were driven by the undercover investigations of other dairies and industrial animal agriculture conducted by HSUS and PETA and saw the negative consequences of the revelation of the truth of industrial animal farming. Creation of this "story" of animal care and sustainability must have been done with the knowledge and intent of the animal care and sustainability claims being false and misleading to consumers, as a contrast to the damage the exposure of the truth would have caused the brand.

145.    Defendants also knew that some of the practices their farms engaged in were cruel and unnecessary for business purposes, such as dehorning. Fairlife made public statements regarding their intent to phase out dehorning and other cruel and publicly unpopular standard practices, and then later reneged, continuing these practices to this day. This appears to have been done specifically to deceive and mislead.

146.    Following ARM's 2019 investigation, the *mea culpa* public response by McCloskey, fairlife, and other Defendants, there was no longer any plausible deniability that the animal care representations were false and misleading to consumers. The response was to make public commitments to making changes, although they never legally admitted any wrongdoing.

147.   The changes Defendants committed to making in the wake of the ARM 2019 Investigation and the ensuing consumer protection class action lawsuit were aimed at communicating to consumers an outcome of high levels of animal care, including absence of cruelty and neglect. In reality, these were merely policy and process commitments that the Defendants knew were set up to fail to prevent animal abuse and neglect. Their true purpose and effect were to falsely alleviate the concerns of the consumers while attempting to distance Defendants from potential future liability, and ultimately to tout these so-called changes as a way to further increase profits and growth.

148.   On information and belief, the changes Defendants purported to make in the wake of the 2019 Investigation regarding firing offenders and cutting ties with offending entities were not genuine. For example, Defendants merely moved some of the worst offending employees and managers from the Indiana farms to a more out-of-sight location at fairlife's Puerto Rico facilities/suppliers.

149.   The 2023 ARM Investigation revealed widespread animal cruelty and neglect, and removed any doubt about Defendants' knowledge that its animal care claims were false and misleading, and eliminated the ability for Defendants to credibly use the same strategy of issuing a public *mea culpa* paired with a promise to do better in the future.

150.   Instead, Defendants' response to the 2023 ARM Investigation was to discredit ARM's claims by denying their veracity, falsely distancing themselves from what could not be denied, and threatening ARM with a defamation lawsuit if they did not cease their public allegations. All of this had the intent and effect of shutting down the media attention on the story, which yielded almost no publicity, and successfully shielded Defendants from what could have been widespread bad publicity. What cannot be denied, however, is that the 2023 ARM investigation caused Defendants to have both actual and constructive knowledge of extreme and

CLASS ACTION COMPLAINT

widespread animal cruelty, and therefore the falsity and misleading nature of their animal care claims.

151.   The most recent 2024 ARM Investigations reveal animal cruelty at a frequency, scale, and scope across the fairlife supply chain that is unprecedented. In addition, multiple high-level managers and employees are directly implicated in criminal-level cruelty across different locations and supplier types. Individual and corporate defendants are legally liable for this cruelty.

152.   Today, the misleading nature, level of falsity, and fraud of the fairlife animal care and sustainability claims are all at an all-time high. The claims themselves are more egregious and robust, while the evidence of animal cruelty and environmental degradation has never been so extreme and widespread, nor so clearly linked to the higher-ups and corporate levels.

153.   Fair Oaks Farms is an umbrella name for a number of operations that take place at or near a Fair Oaks, Indiana compound. This includes but is not limited to Fair Oaks Farms, which is a d/b/a for Lake States Dairy Center and is also referred to as Fair Oaks Dairy Adventure. It includes working dairies, a small portion of which are visible to the public via tours, as part of the "Dairy Adventure," as well as a "Pig Adventure" which as a pork producing facility, and a "Crop Adventure" which includes attractions like U-Pick.

154.   The Fair Oaks Farms Dairy Adventure includes the Dairy Adventure Museum, tours on a cow-spotted and pig-snout painted tour bus, tours that show milking, and the birthing barn where guests can see cows giving birth.  It is particularly targeted at children and families, including school tour groups. It includes displays with fiberglass cartoon cows representing their diva-like care.

155.   Fair Oaks Farms holds representations of high animal care and environmental sustainability as central to its brand, messaging, and purpose. The Fair Oaks Farms website describes the Dairy Adventure Museum as 15,000 square foot experiential learning space, saying, "Have fun learning about cow comfort,

1  manure management, milk production, and the many other aspects of sustainable

2  dairy farming that help feed the world!" and "meet the farmers who provide dairy to

3  the world, and realize just how much goes into sustainably producing dairy."[33]

4      156.   Fair Oaks Farms exists to promote the fairlife brand. The fairlife brand

5  is advertised and sold throughout the facility, and Fair Oaks Farms represents to its

6  customers that the milk produced on site is bottled as fairlife milk and other fairlife

7  products.

8      157.   As discussed throughout this Complaint, representations of high animal

9  care and sustainability regarding fairlife are in fact false and misleading.

10     158.   A central feature of the origin and continued operation of Fair Oaks

11 Farms is the promotion of sale and growth of the fairlife brand on the basis of high

12 animal care and sustainability claims while also being a mechanism in anticipation

13 of criticism of those very issues, in order to discredit and mislead consumers and

14 consumer-facing leaders about fairlife's practices.

15     159.   In the 1990's, Defendant Select Milk became aware of the threat the

16 industry faced from undercover investigations that animal protection organizations

17 such as PETA and HSUS were conducting, as discussed above. Select Milk

18 commissioned a White Paper to assess the threat from such groups and decided to

19 preemptively create a high animal care narrative.

20     160.   The center of this strategy was the creation of Fair Oaks Farms for this

21 purpose. Select Milk hired Gary Corbett to launch Fair Oaks Farms, who told

22 Pacific Standard in 2019 that the White Paper Select Milk commissioned in the

23 1990's on so-called "anti-agriculture" activists found "these groups tend to be very

24

25

26

27 [33] Fair Oaks Farms, Planning your Adventure at Fair Oaks Farms, "The Dairy

28 Adventure Museum" at https://fofarms.com/activities/ (last visited Jan 24, 2025).

committed to their cause, very articulate, very well-funded, and passionate," and referred to himself as one of the "founding fathers" of Fair Oaks Farms.[34]

161.   As Pacific Standard reported:

"With fewer farms and fewer farmers to sway consumers toward their side, the co-op worried that city folks, whom Corbett calls their "urban brethren," could fall prey to PETA's messaging. "Our initial reaction was that we've got to go on the offense," Corbett says. There was only one solution: Win the public over before it could turn on them. Prominent reformers in the industry, like celebrated animal scientist Temple Grandin, had already suggested that farms turn the metaphorical "high walls of industrial agriculture" into glass. Why not be literal about it? "We thought maybe the best credibility builder is if we invite people into our home," Corbett says."[35]

162.   The inception of Fair Oaks farms came from the desire to combat the perceived threat of criticism and exposure by animal advocates. Specifically, the threat was defined as the threat of undercover investigation by animal advocates. Undercover investigations, by their very nature, reveal the truth of an operation. The focus on transparency or "inviting people into our home" in the form of Fair Oaks Farms, which began as a central concept and continues to be so today, is definitionally distinct from Defendants' point of view from the literal truth as revealed by undercover investigations. This indicates both that Defendants knew, or should have known, that their animal care representations were false and misleading–and in fact created them to be so–and that animal abuse, neglect, or other mistreatment was occurring. ARM's 2019 and 2023 Investigations only served to remove any doubt of that knowledge or intent.

---

[34] Emily Moon, Dairy Disneyland: One Farm's Quest to Save Industrial Agriculture, Pacific Standard, March 19, 2019, at https://psmag.com/environment/dairy-disneyland-one-farms-quest-to-save-industrial-agriculture/ (last visited Jan. 24, 2025).

[35] Id.

163.    Further, the Fair Oaks Farms animal care concept and messaging (later to include environmental sustainability, particularly as the biogas elements of Defendants business model were implemented) was refined and developed via research into other museums and improving the appeal of Fair Oaks Farms based on that, the use of an outside advertising agency, and collaboration with government agencies in a way that resulted in checkoff funds being used to fund Fair Oaks Farms.

164.    Fair Oaks Farms is a successful instrument of the fairlife brand's false advertising and the animal cruelty taking place in its supply chain. Currently it's considered the number one agritourism destination in the Midwest.[36]

165.    Fair Oaks Farms has 12 farms on or near its campus. Two of these farms are Windy Ridge and Windy Too, owned by Steve Bos.

166.    Fair Oaks Farms sells milk and milk products at its retail stores from its on-site farms. These products are labeled and advertised as fairlife products.

167.    Windy Ridge and Windy Too were investigated by ARM in 2019. Subsequent to the investigation and confirmed as part of the ensuing 2022 class action litigation settlement, fairlife claimed to have Windy Ridge and Windy Too out of its supply chain and made public representations to that effect.

168.    In 2023, ARM conducted a new investigation of Windy Ridge and Windy Too. During the course of that investigation, ARM found evidence of truck routes transporting milk from Windy Ridge to the Coopersville, Michigan plant.

169.    In the publicization of the investigation, ARM represented that fairlife was still being supplied by Windy Ridge and Windy Too, which was reported in at least one media outlet.

---

[36] Austin Frerick, <u>Barons: Money, Power, and the Corruption of America's Food Industry</u> 70 (2024).

170.   On information and belief, in response, fairlife and Coca-Cola communicated with media outlets denying that they sourced any of their milk from Fair Oaks Farms, including Windy Ridge or Windy Too, which are two of the farms on or near the Fair Oaks Farms compound.

171.   No additional media covered the ARM investigation, or the connection ARM alleged between Fair Oaks Farms / Windy Ridge and Windy Too and the Coopersville fairlife plant following fairlife and Coca-Cola's denial.

172.   Around the same time as ARM's 2023 public release and this denial, fairlife and Coca-Cola privately sent ARM a cease-and-desist letter from a law firm in Ohio, followed by a voicemail to the same effect. In this letter and voicemail, fairlife and Coca-Cola denied the sourcing from Fair Oaks Farms, insisted that ARM cease making those statements, and threatened a defamation lawsuit.

173.   Steve Bos also denied any connection between his farms Windy Ridge and Windy too and Fair Oaks Farms or fairlife in 2023 following the ARM investigation[37], telling the Chicago Tribune, "I would like to make it clear that I do not sell milk to [f]airlife, I am not one of the dairies of Fair Oaks Farms, and [Fair Oaks Farms owners] Sue and Mike McCloskey do not have ownership in Windy Ridge Farm."

174.   However, Bos and McCloskey were listed as officers in the 2022 IRS Form 990 for Lake States Dairy Center Inc. in Fair Oaks, Indiana, with Bos listed as the Principal Officer and President and Board member, and McCloskey listed as Secretary and Board member. Steve Bos is listed as the Principal Officer and board member for Lake States Dairy Center in the 2023 IRS Form 990. The 990s also list the website as fairoaksdairyadventure.com. Fair Oaks Farms is a d/b/a for Lake States Dairy Center.

---

[37] https://plasticsrecycling.org/how-recycling-works/the-plastic-recycling-process/

175.    In response to the denial and the cease-and-desist letter and voicemail, ARM issued a statement saying it had evidence of a truckload of milk driven by a Ruhan trucker going from Windy Ridge to Coopersville on September 11, 2023, to be sold as fairlife milk.

176.    In response to this statement by ARM, fairlife and Coca-Cola admitted a singular truckload did in fact go from Windy Ridge to the Coopersville fairlife plant on September 11, 2023 but stated that it was a test run and subsequently dumped.

177.    Shortly after this admission, ARM realized that the date it had cited in its response was in error. In reality, their evidence shows a shipment on September 10, 2023.

178.    In December of 2024, a milk truck was followed from Windy Ridge to Coopersville, and the truck was documented entering the Continental Dairy entrance to the plant.

179.    Continental Dairy and fairlife products are manufactured at the same Coopersville plant. Continental Dairy and fairlife share infrastructure at the Coopersville plant, which is considered one stationary source by the Michigan Department of Environment, Great Lakes, and Energy Air Quality Division.

180.    Raw milk that enters the Coopersville plant is stored together in a storage silo. It is then divided into Continental Dairy products, which are powdered milk, and fairlife products, which remain liquid. Any milk that enters the Coopersville plant is mixed together, and the Continental and fairlife-destined milk are not kept separate. Any given truckload will supply at least some fairlife milk.

181.    On information and belief, Windy Ridge and Windy Too have been supplying and continue to supply fairlife since at least 2019.

# V.    CLASS ACTION ALLEGATIONS

182.    **Class Definition:** Plaintiffs Cornelius, Bhotiwihok, and Paugh bring this civil putative class action on behalf of themselves individually, and on behalf of all others similarly situated, as a class action pursuant to Rules 23(b)(2), (b)(3), and, as applicable, (c)(4) of the Federal Rules of Civil Procedure. The "Class" that Plaintiffs seek to represent are composed of, and defined as follows:

"All persons residing in California who purchased Defendants' fairlife Products during the relevant time period (February 26, 2021 thought the present)."

183.    Excluded from the above Class are Defendants, any entity in which Defendants have a controlling interest or that has a controlling interest in Defendants, and Defendants' legal representatives, assignees, and successors. Also excluded are those who purchased the fairlife products for resale; all persons who make a timely election to be excluded from the Class; and the judicial officers and staff to whom this case is assigned and any immediate family members thereof.

184.    Plaintiffs reserve the right to modify the definition of the proposed Class (or add one or more subclasses) should it be necessary and/or after further investigation or discovery.

185.    This action may be properly brought and maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. As alleged below, this class action satisfies the numerosity, typicality, adequacy, predominance, and superiority requirements.

186.    Upon application by Plaintiffs' counsel for certification of the Plaintiff Class(es), the Court may also be requested to utilize and certify subclasses in the interests of manageability, adequacy, predominance, and/or superiority requirements.

187.    **Numerosity:** The number of persons within the Class is substantial, estimated to be in excess of 100,000 persons dispersed throughout California. It is, therefore, impractical to join each member of the Class as a named Plaintiff.

CLASS ACTION COMPLAINT

Accordingly, the utilization of the class action mechanism pursuant to Rule 23 is the most economically feasible means of determining and adjudicating the merits of this litigation and is in the interests of judicial economy. It is estimated that Defendants have sold millions of units of the fairlife products to Class members in California.

188. **Commonality and Predominance:** This civil action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

i)    whether the representations alleged herein that Defendants made about the fairlife products were or are true, misleading, or likely to deceive a reasonable consumer;

ii)    whether Defendants took adequate steps to ensure that the representations they made concerning the treatment of animals, sustainability, and recyclability were true, or whether they intended to make such false and misleading representations, and whether they knew, or should have known, that such representations were false and misleading to consumers;

iii)    whether the representations alleged herein concerning fairlife Products were material to a reasonable consumer's purchasing decision;

iv)    whether Defendants engaged in false or misleading advertising;

v)    whether Defendants' conduct constitutes violations of the laws asserted herein;

vi)    whether Plaintiffs and the other Class members have been economically injured and the proper measure of their losses or restitution as a result of those injuries; and

vii)    whether Plaintiffs and the other Class members are entitled to injunctive, declaratory, or other equitable relief.

CLASS ACTION COMPLAINT

189.   **Typicality:** The claims of the named Plaintiffs are generally the same or typical of the claims of the members of the Class, and the named Plaintiffs' interests are consistent with, and not antagonistic to, those of the other Class members they seek to represent. The named Plaintiffs and all members of the Class have been injured by and/or sustained actual economic loss, and face continuing harm arising out of, Defendants' continuing uniform unlawful conduct as alleged herein.

190.   **Adequacy**: The Plaintiff Class representatives have no interests that are adverse to, or which conflict with, the interests of the absent members of the Class and are able to fairly and adequately represent and protect the interests of such a Class. Plaintiffs have raised viable statutory and common law claims of the type reasonably expected to be raised by members of the Class and will vigorously pursue those claims. If necessary, Plaintiffs may seek leave of this Court to amend this Complaint to include additional Class representatives to represent the Class as may be appropriate.

191.   **Competency of Class Counsel**: Plaintiffs have retained and are represented by experienced, qualified and competent counsel who are committed to prosecuting this class action. Class counsel have significant experience in consumer protection, product liability, animal protection rights, and/or complex civil class action litigation.

192.   **Superiority**: Class actions serve an important function in the judicial system by providing a vehicle whereby the claims of many individuals can be resolved at the same time. The class action procedure both eliminates the possibility of repetitious litigation and provides small claimants with a method of obtaining redress. A class action is superior to other viable methods for the fair and efficient adjudication of this controversy since individual litigation of the claims of all Class members is impracticable. Even if every Class member could afford to pursue individual litigation, the court system could not. It would be unduly burdensome and

unwieldy to the courts in which individual litigation of numerous cases would proceed. Individualized and piece meal litigation would also present the potential for varying, inconsistent, or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual and legal issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues raised herein, presents few management difficulties, provides comprehensive supervision by a single court, and conserves the resources of the parties and the court system and protects the rights and interests of each member of the Class. Plaintiffs do not anticipate any unusual difficulties in the management of this civil action as a class action.

193. Additionally, the prosecution of separate actions by individual Class members may create a risk of multiple adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other members of the Class not parties to such adjudications or that would substantially impair or impede the ability of such nonparty Class members to protect their interests. The prosecution of individual actions by Class members could establish inconsistent or contradictory results and result in establishing incompatible standards of conduct for the Defendants.

## VI.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Breach of Express Warranty**

*(All Plaintiffs Against Defendants fairlife and Coca-Cola)*

194. Plaintiffs reassert the allegations set forth in Paragraphs 1 through 193 above and incorporate such allegations in full by reference herein.

195. Express warranties by sellers of consumer goods are created when an affirmation of fact or promise is made by the seller to the buyer, which relates to the goods and becomes the basis of the bargain. Such warranties can also be created based upon descriptions of the goods which are made as part of the basis of the

bargain that the goods shall conform to the description. *See, e.g.*, Cal. Com. Code § 2313(1)(a)-(b).

196.   Each of the Plaintiffs formed a contract with Defendants fairlife and Coca-Cola —by virtue of their joint venture in creating fairlife and Coca-Cola's ownership. The terms of that contract include the promises and affirmations of fact that Defendants make on the fairlife products' packaging and through marketing and advertising, including the animal care claims and the sustainability and recyclability claims. The marketing and advertising constitute express warranties and became part of the basis of the bargain, and they are part of the standardized contracts between Plaintiffs and Class members on the one hand, and these Defendants, on the other.

197.   In addition, or in the alternative, to the formation of an express contract, Defendants made each of their above-described representations, including the animal care claims and the sustainability and recyclability claims to induce Plaintiffs and Class members to rely on such representations.

198.   Defendants' animal care, sustainability, and recyclability claims were material, and Plaintiffs and members of the Class did rely and were reasonable in relying upon such representations in making their purchases of the fairlife products.

199.   Defendants have breached their express warranties about the fairlife products because the representations set forth herein, including their animal care, sustainability, including the recyclability claims and express representations concerning how Defendants ensure the humane treatment of animals in the fairlife supply chain, as well as environmental sustainability in the supply chain and on the packaging, are false and misleading. They are false and misleading because Defendants could not, and in fact do not, live up to the promises made by the very name of the products themselves, "fairlife," or the promises of "caring for animals is a top priority at fairlife" and "our goal is that all cows and calves are provided with the best care possible that the supplying dairy farms are required to have a "zero

tolerance policy for animal abuse," that they have "industry-leading animal welfare standards," and that "100% of supplying farms passed critical care standards in 2022," among other animal care claims made on, or linked to by, each and every label of the fairlife products.

200.    Nor do Defendants live up to the promises made by the sustainability claims, including fairlife's claim of "100% recyclable packaging commitment by 2025," the "Recycle Me" and chasing arrows symbol on the products indicating recyclability when in fact they are not, among other sustainability claims.

201.    Defendants knew, or should have known, of the false and misleading nature of these claims from the very inception of the brand, which was created to increase sales and pricing via sustainability and animal care claims.  This was motivated by watching the negative consequence of animal protection organizations conducting undercover investigations revealing the truth of industrial farming operations like theirs and responded by creating false and misleading representations on animal care.

202.    Defendants gained actual knowledge of the falsity and misleading nature of the animal care claims at least from the 2019 ARM Investigation, which they responded to by publicly promising to do better to consumers, and in reality, failed to take adequate steps to correct, making further–and worse–false and misleading animal care claims in response. Defendants then gained actual knowledge of the false and misleading nature of the specific animal care claims at issue and the failure of their remedial efforts at least through the 2023 ARM Investigation and continued with making the false and misleading animal care claims and denied, threatened, and attempted to contain the negative publicity from the 2023 ARM Investigation instead.

203.    The 2024 ARM Investigation shows the continuation, expansion, and worsening of animal cruelty and neglect. With respect to the sustainability claims, Defendants knew, or should have known, of the false and misleading nature of those

claims as well. All of the sustainability claims were a mechanism to drive growth of an inherently high-resource consuming and polluting product over less resource consuming and polluting alternatives. This omission and misleading and false characterization of the sustainability claims was the Defendants' intent and effect on consumers. The sustainability claims around biogas were knowingly false and misleading because they have known risks such as methane production and explosions, and because they incentivize and drive greater growth and consolidation which is inherently polluting and resource intensive. Defendants also knew, or should have known, the sustainability claims around recyclability are false and misleading because Coca-Cola has been part of multiple industry groups acknowledging the problematic nature of opaque PET and the lack of recycling facilities which would recycle opaque PET or number 7 plastic, and the fact that fairlife tested clear PET bottles.

204.   Defendants both knowingly enabled and contributed to the false and misleading nature of the animal care claims and sustainability claims and failed to ensure that the material representations and omissions they were making to consumers were true. As a result of the systemic acts and omissions through intentional, knowing, or reckless acts and failure of oversight to ensure the truthfulness of the representations of every fairlife product label and linked advertisement, consumers purchased fairlife products from a company that sourced dairy from farms that mistreated their cows and calves and caused environmental degradation in violation of the express agreement that it created with its consumers.

205.   Defendants could not legitimately make animal care claims and sustainability claims to consumers because they could not operate a brand in a way that comported with the animal care claims and sustainability claims and/or they could not verify whether those promises were accurate and because they knew, or should have known, those claims were false and misleading. Nor did they enforce these promises through adequate oversight, even where a given claim may not have

1    been impossible or clearly false. Accordingly, Defendants charged consumers a
2    price premium for express—but empty—promises.

3         206.   Defendants breached their express warranties about the fairlife products
4    because the representations, as set forth herein, were false and misleading.

5         207.   Plaintiffs and the Class members expected, and would have been
6    reasonable in expecting, that Defendants ensured the statements on the products'
7    labels were truthful such that cows and calves were treated humanely, and the
8    product packaging was recyclable and not otherwise environmentally destructive
9    when purchasing fairlife products. Accordingly, Plaintiffs and the members of the
10   Classy did not receive the benefit of their bargain when they discovered that at least
11   some of Defendants' cows and calves were abused, neglected, and treated in a cruel
12   and inhumane manner and that the packaging is not in fact recyclable and
13   Defendants' practices are also not environmentally sustainable.

14        208.   Defendants had actual notice of the breaches set forth herein via
15   multiple investigations by ARM, prior litigation, as well as public pressure against
16   biogas and plastic waste pollution and recyclability fraud.

17        209.   By reason of, and as a proximate result of, Defendants' breaches of
18   their express warranties, Plaintiffs and the Class members have been damaged in the
19   amount of the price they purchased for the fairlife products, or in an amount equal to
20   the price premium that they paid when they purchased the products, in an amount to
21   be proven at trial.

22        210.   Therefore, Plaintiffs on behalf of themselves and the members of the
23   Class, pray for the relief as set forth below.

24

25

26

27

28

## SECOND CLAIM FOR RELIEF

**Violations of California's False Advertising Law**

**Cal. Bus. & Prof. Code § 17500,** *et seq.*

*(All Plaintiffs Against Defendants fairlife and Coca-Cola)*

211.    Plaintiffs reassert the allegations set forth in Paragraphs 1 through 210 above and incorporate such allegations in full by reference herein.

212.    Plaintiffs bring this claim against Defendants for violations of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq*. ("FAL").

213.    California's FAL makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public. . . in any advertising device. . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

214.    Defendants have intentionally represented and continue to represent to the public, including Plaintiffs and members of the Class, through Defendants' deceptive packaging and marketing in making the animal care claims and sustainability claims, including  recyclability, that the fairlife products are made with milk from animals treated with high levels of care and not abused or neglected and that production methods are environmentally sustainable, including that the packaging is recyclable. Defendants' representations are untrue, misleading, and/or deceptive and Defendants know, or should know, they are untrue, misleading and/or deceptive, because the products do not contain milk from animals treated with high levels of care and not abused or neglected and production methods are not environmentally sustainable, including the fact that the fairlife supplying farms are

1   not among the most sustainable in the country for environmental footprint, their

2   manure handling is not environmentally sustainable, and the packaging is not

3   recyclable. Because Defendants have disseminated false and misleading information

4   regarding the products, and Defendants know, knew, or should have known, through

5   the exercise of reasonable care that the representations are, and continue to be, false

6   and misleading, Defendants have violated the FAL.

7        215.   Defendants' conduct is also misleading because they fail to disclose

8   material information about the fairlife products, such as the fact that, in spite of

9   explicit representations and marketing, the products have been created using cows

10  and calves that have been abused and mistreated and that the production methods

11  are not environmentally sustainable, including plastic packaging that is not

12  recyclable.

13       216.   Defendants also failed to disclose material information regarding their

14  explicit representations and marketing, such as Mike McCloskey's employment with

15  animal welfare certifier/auditor FARM, that the FARM standards are not industry

16  leading but in fact representative of the dairy industry generally with nearly all

17  dairies being FARM members, the cruelty and neglect revealed in the 2023 ARM

18  Investigation, that the reasoning behind changes like the $40 million-plus

19  investment in animal care and increased auditing was due to ARM's 2019

20  Investigation and the ensuing legal action, that Defendants' business model and

21  marketing strategy was one of extreme growth and consolidation in a way that

22  exacerbates environmental destruction in spite of its environmental sustainability

23  claims, and that the animal care and sustainability claims were part of a long-

24  running brand strategy to avoid losing consumers if the truth regarding animal care

25  and sustainability were revealed via an undercover investigation by an animal

26  protection organization, which ultimately did in fact happen with ARM's

27  investigations.

28

217.   Cal. Bus. & Prof. Code § 17580 specifically addresses environmental representations, including recyclability.

a)   17580. A person who represents in advertising or on the label or container of a consumer good that the consumer good that it manufactures or distributes is not harmful to, or is beneficial to, the natural environment, through the use of such terms as "environmental choice," "ecologically friendly," "earth friendly," "environmentally friendly," "ecologically sound," "environmentally sound," "environmentally safe," "ecologically safe," "environmentally lite," "green product," or any other like term, or through the use of a chasing arrows symbol or by otherwise directing a consumer to recycle the consumer good, shall maintain in written form in its records all of the following information and documentation supporting the validity of the representation:

1)   The reasons the person believes the representation to be true.

2)   Any significant adverse environmental impacts directly associated with the production, distribution, use, and disposal of the consumer good.

3)   Any measures that are taken by the person to reduce the environmental impacts directly associated with the production, distribution, and disposal of the consumer good.

4)   Violations of any federal, state, or local permits directly associated with the production or distribution of the consumer good.

5)   Whether, if applicable, the consumer good conforms with the uniform standards contained in the Federal Trade Commission Guidelines for Environmental Marketing Claims for the use of the terms "recycled," "recyclable," "biodegradable," "photodegradable," or "ozone friendly."

6)   If the person uses the term "recyclable," uses a chasing arrows symbol, or otherwise directs a consumer to recycle the consumer good, whether the consumer good meets all of the criteria for statewide recyclability pursuant to subdivision (d) of Section 42355.51 of the Public Resources Code.

a)   Information and documentation maintained pursuant to this section shall be furnished to any member of the public upon request…. (emphasis added)[38]

218.   The California Public Resources Code section incorporated by Cal. Bus. & Prof. Code § 17580 regarding recyclability claims is Public Resources Code - PRC § 42355.51 which states:

a)   A person shall not offer for sale, sell, distribute, or import into the state any product or packaging for which a deceptive or misleading claim about the recyclability of the product or packaging is made.

b)   (1) Subject to paragraph (2), a product or packaging that displays a chasing arrows symbol, a chasing arrows symbol surrounding a resin identification code, or any other symbol or statement indicating the product or packaging is recyclable, or otherwise directing the consumer to recycle the product or packaging, is deemed to be a deceptive or misleading claim pursuant to this section and Section 17580.5 of the Business and Professions Code unless the product or packaging is considered recyclable in the state pursuant to subdivision (d) and is of a material type and form that routinely becomes feedstock used in the production of new products or packaging.

3)   …for a product or packaging that is not considered to be recyclable in the state pursuant to subdivision (d), all of the following apply:

(A)   Displaying a chasing arrows symbol or any other statement indicating the product is recyclable directly on the product shall be deemed to be deceptive or misleading pursuant to this section and Section 17580.5 of the Business and Professions Code.

(B)   If a product or packaging has multiple material types, a chasing arrows symbol or statement indicating recyclability may be displayed on the external packaging that is considered to be

---

[38] Cal. Bus. & Prof. Code § 17580(e)(2) excludes from the scope of misleading recycling directions to consumers "beverage container[s] subject to the California Beverage Container Recycling and Litter Reduction Act." That Act excludes milk from its definition of "beverage" so does not apply to the fairlife packaging.

recyclable in the state pursuant to subdivision (d) if the chasing arrows symbol or statement makes clear in the same or greater font, font size, or symbol size which other components of the product or packaging are not recyclable.

(C)  Displaying a chasing arrows symbol or any other statement indicating recyclability on packaging containing a consumable product shall, for purposes of this section, be deemed to refer only to the packaging. For purposes of this subparagraph, "consumable product" means a commodity that is intended to be used and not disposed of.

…

2)  Subject to paragraph (3), a product or packaging is considered recyclable in the state if, based on information published by the department pursuant to subparagraph (B) of paragraph (1), the product or packaging is of a material type and form that meets both of the following requirements:

(A)  The material type and form is collected for recycling by recycling programs for jurisdictions that collectively encompass at least 60 percent of the population of the state.

(B)  (i) The material type and form is sorted into defined streams for recycling processes by large volume transfer or processing facilities, as defined in regulations adopted pursuant to Section 43020, that process materials and collectively serve at least 60 percent of recycling programs statewide, with the defined streams sent to and reclaimed at a reclaiming facility consistent with the requirements of the Basel Convention.

(iii)  The department may adopt regulations modifying this requirement to encompass transfer or processing facilities other than large volume transfer or processing facilities, as the department deems appropriate for achieving the purposes of this section.

CLASS ACTION COMPLAINT

3)   A product or packaging shall not be considered recyclable in the state unless the product or packaging meets all of the following criteria, as applicable:

(A)   For plastic packaging, the plastic packaging is designed to not include any components, inks, adhesives, or labels that prevent the recyclability of the packaging according to the APR Design® Guide published by the Association of Plastic Recyclers.

(B)   For plastic products and non-plastic products and packaging, the product or packaging is designed to ensure recyclability and does not include any components, inks, adhesives, or labels that prevent the recyclability of the product or packaging.

(C)   The product or packaging does not contain an intentionally added chemical identified pursuant to the regulations implementing subparagraph (4) of subdivision (g) of Section 42370.2.

…

4)  Notwithstanding paragraphs (2) and (3), a product or packaging is recyclable in the state if the product or packaging has a demonstrated recycling rate of at least 75 percent, meaning that not less than 75 percent of the product or packaging sorted and aggregated in the state is reprocessed into new products or packaging.

5)  (A) Before January 1, 2030, notwithstanding paragraphs (2) and (3), a product or packaging not collected pursuant to a curbside collection program is recyclable in the state if the non-curbside collection program recovers at least 60 percent of the product or packaging in the program and the material has sufficient commercial value to be marketed for recycling and be transported at the end of its useful life to a transfer, processing, or recycling facility to be sorted and aggregated into defined streams by material type and form….

73

219.   Cal. Bus. & Prof. Code § 17580.5 additionally prohibits untruthful or deceptive environmental marketing claims: "It is unlawful for a person to make an untruthful, deceptive, or misleading environmental marketing claim, whether explicit or implied. For the purpose of this section, "environmental marketing claim" shall include any claim contained in the "Guides for the Use of Environmental Marketing Claims" published by the Federal Trade Commission ("FTC"). Cal. Bus. & Prof. Code § 17580.5(a). These Guides are also known as the FTC Green Guides.

220.   Defendants' recyclability claims are covered in the FTC Green Guides, which govern both general environmental claims and specific strict requirements for recyclability claims, including but not limited to available recycling facilities for a substantial majority of consumers or communities where the product is sold, requirements for qualifications and disclosures to be made and to be clear, classifying as deceptive unqualified recycling claims where the presence of an incidental component significantly limits the ability to recycle the product, and overstatement directly or by implication an environmental attribute or benefit such as the claim of recyclability where the material is unlikely to be used again for another purpose. Section 260.12 of the Guides states: "Recyclable claims. (a) It is deceptive to misrepresent, directly or by implication, that a product or package is recyclable. A product or package should not be marketed as recyclable unless it can be collected, separated, or otherwise recovered from the waste stream through an established recycling program for reuse or use in manufacturing or assembling another item. (b) Marketers should clearly and prominently qualify recyclable claims to the extent necessary to avoid deception about the availability of recycling programs and collection sites to consumers."

221.   Defendants' recyclability claims are deceptive under Cal. Bus. & Prof. Code §§ 17580, 17580.5 and Public Resources Code - PRC § 42355.51, as well as the FTC Green Guides. Fairlife advertises "100% recyclable packaging commitment

by 2025," uses the chasing arrows symbol on all of its products, uses a "1" code on its large filtered milk line bottles, the Core Power line bottles marked "7" with the chasing arrows symbol additionally say "Recycle Me" on the bottle. All of these, separately and together, constitute recyclability claims which are all are false and deceptive to consumers because in fact none of this fairlife packaging is recyclable.

222.    Fairlife bottles are all opaque PET/PETE, which is made opaque by a TiO2-based pigment, rendering the bottles nonrecyclable.

223.    Fairlife has not disclosed any clarifying information pursuant to California Business & Professions Code § 17580 or 17580.5 including the fact that its environmental marketing claims do not comply with the FTC Green Guides, 16 CFR Part 260, Guides for the Use of Environmental Marketing Claims. Defendants have also not disclosed the significant adverse environmental impacts of the production of their Products. The recyclability claims are also deceptive and misleading under the California Public Resources Code - PRC § 42355.51, since the packaging is not considered recyclable under the California standards referenced herein and does not routinely become feedstock used in the production of new products or packaging.

224.    Fairlife packaging is not sorted into defined streams for recycling or sent to and reclaimed at a recycling facility. It also includes components and/or labels that prevent the recyclability of the packaging according to the APR Design Guide and in fact includes components and/or labels that prevent the recyclability of the packaging. Fairlife plastic bottles also have no sufficient commercial value to be sorted for recycling.

225.    Defendants' advertising and fairlife product labels give consumers the false impression that Defendants' oversight would ensure that their products are not, nor have they been, created using dairy cows and calves that were mistreated, nor using practices that were environmentally damaging, including packaging that is 100% recyclable–or even that any percentage of its packaging is recyclable.

226.   As a result of Defendants' false advertising, Defendants have fraudulently obtained and continue to fraudulently and deceptively obtain money from Plaintiffs and the members of the Class.

227.   Plaintiffs request that this Court cause Defendants to restore this fraudulently obtained money to Plaintiffs and the members of the Class, to disgorge the profits the Defendants made on these transactions, and to permanently enjoin Defendants from violating the FAL or violating it in the same fashion in the future as discussed herein. Plaintiffs and the members of the Class may be irreparably harmed and/or denied an effective and complete remedy if the Court does not grant such an Order.

228.   Therefore, Plaintiffs on behalf of themselves and the members of the Class, pray for the relief as set forth below.

## THIRD CLAIM FOR RELIEF

### Violation of California's Unfair Competition Law
### Cal. Bus. & Prof. Code § 17200, *et seq.*

*(All Plaintiffs Against Defendants fairlife and Coca-Cola)*

229.   Plaintiffs reassert the allegations set forth in Paragraphs 1 through 228 above and incorporate such allegations in full by reference herein.

230.   Plaintiffs bring this claim against these Defendants alleging violations of California's Unfair Competition Law. Cal. Bus. & Prof. Code § 17200, *et seq*. ("UCL").

231.   The UCL provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. The intent and purpose of the UCL is to protect consumers and competition by promoting fair competition in commercial markets for goods and services. The coverage of section 17200 is broad and intended to enjoin ongoing wrongful business in whatever context such activity might occur. The UCL is written in the

disjunctive and each of its prongs is a separate and distinct theory of liability and provide an independent basis for relief. Defendants' wrongful conduct satisfies all thee prongs of the UCL.

232.    Each of the named Plaintiffs is a "person" within the meaning of California Business & Professions Code section 17201. Each of the Plaintiffs and the members of the Class are residents of California.

233.    Under the UCL, a business act or practice is "unlawful" if it violates any established federal, state, statutory, regulatory, or court-made or local law.

234.    Defendants' false and misleading advertising of the fairlife products was and continues to be "unlawful" conduct because it violates the FAL, sections 17580 and 17580.5 of the California Business & Professions Code, section 42355.51 of the California Public Resources Code, the FTC Green Guides, and other applicable laws and statutes as described herein.

235.    As a result of Defendants' unlawful business acts and practices, Defendants have unlawfully obtained money from Plaintiffs and the members of the Class.

236.    Under the UCL, a business act or practice is "unfair" if the defendants' conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the benefits for committing such acts or practices are outweighed by the gravity of the harm to the alleged victims.

237.    Defendants' conduct was and continues to be of no benefit to purchasers of the fairlife products, as it is misleading, unfair, unlawful, offends public policy, is immoral, unethical, oppressive, unscrupulous, and is substantially injurious to consumers who rely on the fairlife products' packaging and marketing. Creating consumer confusion and a carefully curated false understanding as to the recyclability of the packaging, welfare of the animals and the environmentally

1  impactful acts and practices used to derive the products is of no benefit to

2  consumers. Therefore, Defendants' conduct was and continues to be "unfair."

3      238.   As a result of Defendants' unfair business acts and practices,

4  Defendants have unfairly obtained and continue to unfairly obtain money from

5  Plaintiffs and the members of the Class.

6      239.   Under the UCL, a business act or practice is "fraudulent" if it actually

7  deceives or has the capacity, likelihood, or tendency to deceive a reasonable

8  consumer and the consuming public.

9      240.   Defendants' conduct here was and continues to be fraudulent because it

10  has the effect of deceiving consumers into believing that Defendants have methods

11  to ensure the ethical and treatment of the animals from which they source dairy for

12  the fairlife products at a high level of care. In reality, if Defendants were willing or

13  able to ensure that their animal care claims were truthful and accurate, multiple

14  undercover investigations would not have revealed systematic abuse and cruel and

15  neglectful practices at its facilities.

16      241.   Defendants' conduct here is also fraudulent because its acts and

17  omissions in their sustainability claims have the effect of deceiving consumers into

18  believing the acts and practices that go into the production of fairlife Products are

19  environmentally sustainable, including, but not limited to its plastic packaging being

20  100% recyclable. In fact, Defendants' farms are highly growth- and consolidation-

21  oriented which causes and exacerbates environmental destruction, such as with

22  pollution from large amounts of manure, which Defendants then contribute

23  additionally to environmental destruction with its (growing) biogas manure digester

24  systems which cause environmental pollution and hazards; and fairlife packaging is

25  in fact not recyclable and poses a contamination hazard to plastics that are

26  recyclable.

27      242.   Because Defendants misled and deceived Plaintiffs and the members of

28  the Class, Defendants' conduct was "fraudulent."

243.   As a direct and proximate result of Defendants' fraudulent business acts and practices, Defendants have fraudulently obtained and continue to fraudulently obtain money from Plaintiffs and the members of the Class.

244.   By reason of, and as a direct and proximate result of, the Defendants' unfair, unlawful, and/or fraudulent business practices and conduct, Plaintiffs have suffered economic harm. Accordingly, pursuant to the provisions of the UCL (section 17203), Plaintiffs and the Class members are entitled to restitution from the Defendants for their injuries.

245.   Redress and relief under the UCL are necessary because Plaintiffs have no adequate remedy at law.

246.   Whether a business practice is unfair, unlawful, and/or fraudulent is a question of fact for the finder of fact to determine.

247.   The UCL is a strict liability statute, and it is not necessary to show Defendants intended to injure or harm the Plaintiffs. Moreover, a business practice may violate the UCL even if it affects only one victim.

248.   Pursuant to sections 17203 and 17535 of the California Business & Professions Code, the entry of permanent and mandatory relief against the Defendants is necessary and warranted to enjoin their ongoing unfair business conduct.

249.   Therefore, Plaintiffs on behalf of themselves and the members of the Class, pray for the restitutionary and injunctive relief as set forth below.

## FOURTH CLAIM FOR RELIEF

### Violation of California's Consumers Legal Remedies Act

### Cal. Civ. Code § 1750, *et seq.*

*(All Plaintiffs Against Defendants fairlife and Coca-Cola – Injunctive Relief Only))*

250.   Plaintiffs reassert the allegations set forth in Paragraphs 1 through 249 and incorporate such allegations in full by reference herein.

251.    Plaintiffs bring this claim against Defendants fairlife and Coca-Cola alleging violations of California's Consumers Legal Remedies Act, Cal. Civ. Code §1750, *et seq*. ("CLRA").

252.    The fairlife products are "goods" within the meaning of California Civil Code section 1761(a), and the purchases of such products by Plaintiffs and the members of the Class "transactions" within the meaning of California Civil Code section 1761(e).

253.    California Civil Code section 1770(a)(2) prohibits "misrepresenting the source, sponsorship, approval, or certification of goods or services." By marketing the fairlife products with the animal care claims and sustainability and recyclability claims, Defendants have represented and continue to represent that the products are derived from cows treated with high animal care and without cruelty and neglect, as well as environmentally sustainable practices including recyclability of packaging, none of which is truthful. Accordingly, Defendants have violated section 1770(a)(2) of the CLRA.

254.    California Civil Code section 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have." By marketing the fairlife products with the animal care claims and sustainability and recyclability claims, Defendants have represented and continue to represent that the products have characteristics (are derived from cows treated with high levels of care and not cruelly treated or neglected and products produced in a sustainable manner including recyclable packaging) that they do not have. Accordingly, Defendants have violated section 1770(a)(5) of the CLRA.

255.    California Civil Code section 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." By marketing the products with the animal care claims and sustainability and recyclability claims, Defendants have

represented and continue to represent that the products are of a particular standard or quality (from cows treated with high levels of care and not cruelly treated or neglected and products produced in a sustainable manner including recyclable packaging) when they are not. Therefore, Defendants have violated section 1770(a)(7) of the CLRA.

256.   California Civil Code section 1770(a)(9) prohibits: "[a]dvertising goods or services with intent not to sell them as advertised." By marketing the fairlife products with the animal care claims and sustainability and recyclability claims, where they knew, or should have known, that such representations were untruthful and also by not ensuring the truthfulness of the representations, Defendants have violated section 1770(a)(9) of the CLRA.

257.   Defendants have also violated the CLRA by intentionally failing to disclose material information about the products, such as the fact that Defendants' promises regarding the treatment of dairy cows and calves and other animal care, sustainability, and recyclability claims are empty, not genuine, not enforced or in some cases not enforceable, and that products have been derived from cows and calves that are or have previously been systematically abused and mistreated, and environmentally destructive practices including packaging that is not in fact recyclable.

258.   All of these failures to disclose constitute a fraudulent omission under the CLRA because they are contrary to representations made by the Defendants, and they are facts Defendants were obligated to disclose.

259.   At all relevant times, Defendants have known, or reasonably should have known, that their animal care claims and sustainability claims were inaccurate; consumers purchased the fairlife products based upon guarantees that the cows and calves in Defendants' supply were treated in accordance with the animal care and sustainability claims including that they lived a "fair" life–and not being treated in violation of criminal cruelty laws–and based upon guarantees of environmental

impact and practices consistent with Defendants' sustainability claims, including 100% recyclable packaging. Consumers justifiably relied upon Defendants' promises based upon the packaging on and linked to the products themselves, and Defendants made those promises because they would drive sales and increase the price of the products.

260.    Accordingly, the promises and representations are material, because reasonable consumers would rely upon them when making purchases of the products. Because of the materiality of the representations, reliance may be inferred on behalf of the Class members.

261.    Plaintiffs and the members of the Class have suffered and continue to suffer injuries caused by Defendants because they would not have purchased the fairlife products or would have paid significantly less for the products had they known that Defendants' conduct was misleading and fraudulent.

262.    Under California Civil Code section 1780(a), Plaintiffs and the members of the Class seek injunctive relief pursuant to the CLRA, prohibiting the Defendants from further wrongful acts and unfair and unlawful business practices.[39]

263.    Therefore, Plaintiffs for themselves and the members of the Class pray for the injunctive relief set forth below.

## FIFTH CLAIM FOR RELIEF

### Common Law Unjust Enrichment

*(All Plaintiffs Against Defendants fairlife and Coca-Cola)*

264.    Plaintiffs reassert the allegations set forth in paragraphs 1 through 263 above and incorporate such allegations in full by reference herein.

265.    Plaintiffs bring this common law claim for unjust enrichment against Defendants, in the alternative, to their breach of express warranty claim.

---

[39] Plaintiffs reserve the right to amend this Complaint at a later date to add a claim for damages under the CLRA.

266.   Plaintiffs and the Class members conferred benefits on Defendants by purchasing the fairlife products, including by paying a price premium for the products.

267.   Defendants have been unjustly enriched by retaining the revenues derived from Plaintiffs and the Class members' purchases of the fairlife products. Retention of the monies under these circumstances is unjust and inequitable because Defendants' labeling of the products was misleading to consumers, which caused injuries to Plaintiffs and the Class members because they would not have purchased or would have paid less for the products if they had known the true facts.

268.   Defendant Coca-Cola retained a benefit despite not exercising adequate oversight over operations and processes that source dairy and packaging for the fairlife products.

269.   Defendant fairlife retained a benefit through the profits it retained in spite of and because of its failure to ensure that dairy cows are treated with high animal care in sourcing milk products and its lack of oversight over and knowing or reckless participation in environmentally damaging practices. Fairlife was also unjustly enriched by reason of its misrepresentations concerning environmental sustainability including the recyclability of its plastic bottles and labels.

270.   Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiffs and the Class members is unjust and inequitable, Plaintiffs and the Class members seek restitution of all monies Defendants acquired from their unlawful conduct, including disgorgement of all profits and establishment of a constructive trust.

271.   Therefore, Plaintiffs on behalf of themselves and the members of the Class, pray for the relief as set forth below.

CLASS ACTION COMPLAINT

1

## SIXTH CLAIM FOR RELIEF

2

### Aiding and Abetting

3

*(All Plaintiffs Against Defendants Select Milk and the McCloskeys)*

4    272.   Plaintiffs reassert the allegations set forth in paragraphs 1 through 270

5    above and incorporate such allegations in full by reference herein.

6    273.   Plaintiffs bring this claim for aiding and abetting against Defendants

7    Select Milk and the McCloskeys. These Defendants have aided and abetted

8    Defendants fairlife and Coca-Cola's false advertising, unfair competition, and

9    CLRA violations, as set forth in Plaintiffs' Second, Third, and Fourth Claims for

10   Relief above.

11   274.   These Defendants substantially aided and/or encouraged Defendants

12   fairlife and Coca-Cola' unlawful and wrongful false advertising and unfair

13   competition conduct and practices.

14   275.   These Defendants had accrual knowledge of the purpose and unlawful

15   practices of Defendants fairlife and Coca-Cola.

16   276.   Defendants' aiding and abetting has caused economic harm to the

17   Plaintiffs and the members of the Class.

18   277.   Therefore, Plaintiffs on behalf of themselves and the members of the

19   Class, pray for the relief as set forth below.

20

## PRAYER FOR RELIEF

21   **WHEREFORE**, Plaintiffs, individually and on behalf of the members of the

22   Class alleged and identified in this Complaint, respectfully request the Court enter

23   an Order:

24
25           1.     Certifying the proposed Class under Federal Rule of Civil
26                  Procedure 23(a), (b)(2), and (b)(3), and, in the alternative, (c)(4)
27                  as set forth above;

28

CLASS ACTION COMPLAINT

2.    Declaring that Defendants are financially responsible for providing sufficient notice to the Class members of the pendency of this lawsuit;

3.    Declaring that Defendants have committed the violations of law alleged herein;

4.    Ordering and overseeing any and all injunctive relief the Court deems appropriate;

5.    Awarding statutory damages in the maximum amount for which the law provides;

6.    Awarding restitution, monetary damages, including, but not limited to any compensatory, incidental, or consequential damages in an amount that the Court or jury will determine, in accordance with applicable law;

7.    Providing for any and all equitable monetary or other relief the Court deems appropriate;

8.    Awarding punitive or exemplary damages in accordance with proof and in an amount consistent with applicable precedent;

9.    Appointing Plaintiffs' counsel of record as Class Counsel;

10.   Awarding Plaintiffs' counsel their reasonable costs and expenses of suit, including attorneys' fees;

11.   Awarding pre- and post-judgment interest to the extent the law allows; and

CLASS ACTION COMPLAINT

12. Providing such further relief as this Court may deem just and proper.

DATED:  February 26, 2025          WAYMAKER LLP

By: */s/ Donald R. Pepperman*
    DONALD R. PEPPERMAN
    BRIAN E. KLEIN
    SAM S. MEEHAN

    LAW OFFICE OF CHERYL LEAHY
    CHERYL L. LEAHY

    *Attorneys for Plaintiffs*

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, and Local Rule 38-1, Plaintiffs hereby demand a trial by jury on all claims and/or issues so triable.

DATED:  February 26, 2025          WAYMAKER LLP

By: */s/ Donald R. Pepperman*
    DONALD R. PEPPERMAN
    BRIAN E. KLEIN
    SAM S. MEEHAN

    LAW OFFICE OF CHERYL LEAHY
    CHERYL L. LEAHY

    *Attorneys for Plaintiffs*



CLASS ACTION COMPLAINT