1  Donald R. Pepperman (Bar No. 109809)
     dpepperman@waymakerlaw.com
2  Brian E. Klein (Bar No. 258486)
     bklein@waymakerlaw.com
3  Sam S. Meehan (Bar No. 307934)
     smeehan@waymakerlaw.com
4  WAYMAKER LLP
   515 S. Flower Street, Suite 3500
5  Los Angeles, California 90071
   Telephone: (424) 652-7800
6  Facsimile:  (424) 652-7850

7  Cheryl L. Leahy (Bar No. 270665)
     cherylleahylaw@gmail.com
8  Law Office of Cheryl Leahy
    2215 Artesia Blvd., # 1185
9  Redondo Beach, California 90278
   Telephone: (773) 259-7760

10

11  *Attorneys for Plaintiffs*

12            **UNITED STATES DISTRICT COURT**

13           **CENTRAL DISTRICT OF CALIFORNIA**

14                 **WESTERN DIVISION**

15

16  ARYOUT MICHAEL THOMAS          | Case No.: 2:25-cv-1650-ODW-AGR
    BHOTIWIHOK**,** an individual;   |
17  JEREMIAH CORNELIUS, an          | **FIRST AMENDED CLASS ACTION**
    individual; RANDY PAUGH, an     | **COMPLAINT FOR DAMAGES,**
    individual; AND ALL THOSE       | **RESTITUTION, AND INJUNCTIVE**
18  SIMILARLY SITUATED,             | **RELIEF FOR VIOLATION OF: (1)**
                                    | **BREACH OF EXPRESS**
19            Plaintiffs,            | **WARRANTY; (2) FALSE**
                                    | **ADVERTISING; (3) UNFAIR**
20       v.                         | **COMPETITION; (4) CONSUMER**
                                    | **LEGAL REMEDIES ACT;**
21

22
─────────────────────────────────────────────
            FIRST AMENDED CLASS ACTION COMPLAINT

1  FAIRLIFE, LLC, an Illinois limited
   liability corporation; THE COCA-
2  COLA COMPANY, a Delaware
   corporation; MIKE MCLOSKEY, an
3  individual; SUE MCCLOSKEY, an
   individual; SELECT MILK
4  PRODUCERS, INC., a New Mexico
   corporation; and DOES 1-10,
5
           Defendants.
6

**(5) UNJUST ENRICHMENT; AND
(6) AIDING AND ABETTING**


**(DEMAND FOR JURY TRIAL)**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

### I.    <u>NATURE OF THE ACTION</u>

1.      Defendants produce a "premiumized" line of milk and milk products under the brand name "fairlife." The price premium, growth and consolidation, and overall profitability of the brand is driven in large part by an advertising and marketing practice and scheme claiming high levels of animal care and environmental sustainability, both of which have been pillars of the brand's strategy and marketing practice since the brand's inception.

2.      The fairlife brand has been phenomenally successful in terms of rapid growth and profitability, garnering a multibillion-dollar investment by Defendant Coca-Cola, which co-founded the fairlife brand and became its whole owner in 2020.

3.      The animal care marketing practices that drive the fairlife brand include, but are not limited to: the "fairlife" name itself and cartoon calf logo, claims indicating industry-leading standards and auditing, promising better and great care for animals as a top priority at fairlife, touting their investments in animal care, zero tolerance for animal cruelty in their supply chain, and similar such claims, all communicating a message to consumers of high levels of care for the animals in the fairlife supply chain, including freedom from abusive and neglectful acts and practices.

4.      The sustainability marketing practice that underpins and drives the fairlife brand include, but are not limited to: claims on renewable energy including for manure handling, claims their farms are top in the industry for environmental sustainability, and claims that their plastic packaging is recyclable.

5.      The current animal care and sustainability claims are an escalation in strength, scale, and scope of earlier iterations of the brand's marketing, with the level of the current animal care and sustainability marketing claims at an all-time high for the brand.

1

6.      In reality, however, the animal care and sustainability marketing scheme and practice are based on materially false, misleading, untrue, unfair, and/or unjust claims and omissions.

7.      Video evidence from multiple undercover investigations conducted by the Animal Recovery Mission ("ARM") reveals systemic widespread egregious animal cruelty, cruel standard practices, and extreme neglect, including at the hands of and with the awareness of management. Following ARM's 2019 undercover investigations of fairlife suppliers in several locations, including but not limited to Windy Ridge, Windy Too, Natural Prairie, and Fair Oaks Farms, fairlife made public statements and settled a consumer class action false advertising lawsuit in a manner designed to communicate that improvements and solutions had been made, and later advertised that investments in animal care and oversight had been made, indicating to consumers that the animals in the fairlife supply chain were not in fact being abused or neglected and that they were being treated with higher levels of care. ARM's 2023 investigation further put Defendants on notice, revealing new and additional widespread and systemic cruelty and neglect at Windy Ridge and Windy Too, and Defendants' response was to falsely deny affiliation with these farms. Now comes two separate investigative initiatives, both of which show widespread cruelty. The February 2025 release of ARM's 2024 investigations into Arizona fairlife suppliers ("2024 Investigation" or "Arizona Investigation") shows the worst, most widespread, egregious, systemic, frequent, and extreme cruelty and neglect up to that point—by workers and management across multiple locations. Following the publicity of the Arizona investigation, fairlife and dairy co-operative United Dairymen of Arizona further falsely denied suspending these farms from their supply chain. The newest investigation is to be released in June 2025, conducted at a Select Milk farm in New Mexico ("2024-2025 Investigation" or "New Mexico Investigation") where 100% of the farm's milk goes to fairlife, revealing near-

constant torment and torture of cows as a daily practice at this facility, including in front of the owners.

8.      ARM's 2024 Investigation reveals dumping of carcasses near waterways abutting a suburban subdivision and recreational park land outside of Phoenix, Arizona causing algae blooms indicating water pollution from the calf carcasses. ARM's investigations and other evidence make clear that fairlife suppliers are massively concentrated industrial farms with thousands of animals on them. Multiple farms have been cited for violations of environmental requirements, and fairlife is an outlier for the sheer size of its brand and farms, contributing an outsize amount to environmental impact. Fairlife's manure claims belie the negative environmental impact of the biogas digesters Defendants were pioneers in creating. With significant public funding, Defendants built and continue to build methane digesters, which pose significant environmental and safety risk, and omit the fact that they work through incentivizing further growth and consolidation, creating a higher negative environmental impact overall.

9.      Fairlife's packaging is not in fact recyclable, despite its multiple claims of recyclability, both on and linked on the packaging. Fairlife's bottles are made from opaque pigmented PET/PETE plastic, which contains titanium dioxide ("TiO2"), which is a contaminant to the recycling process. It renders the bottles *non-recyclable* in fact and under applicable law, requiring the bottles to be sorted out from clear PET plastic in the recycling process and discarded and/or burned, and poses a contamination threat to the integrity of other plastic in the plastics recycling chain.

10.    Defendants knew, or should have known, that their false, fraudulent, misleading, and/or reckless representation of these claims and material omissions to consumers, unlawfully and unfairly drove price premiums, sales and sales growth, profitability, and growth and consolidation.

FIRST AMENDED CLASS ACTION COMPLAINT

11.     Plaintiffs bring this putative civil class action to obtain injunctive relief to stop Defendants' deceptive and unlawful practices, to stop Defendants' cruel and unsustainable farming and packaging practices, and to recover monetary relief for the Plaintiffs and the members of the Class caused by reason of the Defendants' misconduct related to their false and misleading animal care claims and sustainability claims.

## II.    PARTIES

12.     Plaintiff Aryout Michael Thomas Bhotiwihok ("Bhotiwihok") is an individual residing in Los Angeles, California. Plaintiff is a consumer who purchased fairlife's milk products for himself and his children regularly from approximately 2019 through 2025. Plaintiff purchased these products in reliance on the message fairlife's advertising communicated, including through the name fairlife and the cartoon cow logo. Plaintiff's reasonable reliance and belief based on fairlife's advertising was that the company was fair and humane to the animals in the supply chain, free from cruelty and neglect, and adhered to high animal treatment and environmental sustainability practices and did not come from large highly concentrated farming operations. Plaintiff Bhotiwihok believed the plastic bottle was recyclable and would be converted into another product via the recycling process, and in fact placed the packaging in recycling bins for that reason. Plaintiff suffered economic injury in the form of paying a premium price for fairlife's products under the false and/or mistaken belief that their purchase supported humane animal and environmentally sustainable practices.

13.     Plaintiff Jeremiah Cornelius ("Cornelius") is an individual residing in San Francisco, California. Plaintiff is a consumer who purchased fairlife's milk products regularly from May to December 2024, at which time he learned the representations on animal care and sustainability were untrue. Plaintiff Cornelius purchased these products from Target and elsewhere in reliance on Defendants'

representations that fairlife's products were produced in a manner consistent with high levels of care of animals and freedom from cruelty and neglect as well as environmental sustainability, including recyclable packaging. Plaintiff originally started purchasing fairlife's products after he became concerned about the human health risks associated with milk from animals who were not treated humanely from other sources. Cornelius considers himself to be an environmentally conscious consumer. Plaintiff conducted research prior to purchasing, including reviewing and relying upon the claims and advertising on fairlife's website regarding animal care and sustainability. Plaintiff specifically chose fairlife's products because of Defendants' advertisements and marketing claims that its cows were not treated cruelly or neglected, and its animal care practices adhered to high ethical standards, as well as the belief that fairlife products were produced in a sustainable manner, including that its packaging was recyclable. Plaintiff Cornelius would not have purchased fairlife's products, or would have paid less for them, had Plaintiff known the truth about Defendant's actual practices. As a result of Defendant's false, misleading, and/or deceptive marketing and misrepresentations, Plaintiff suffered economic injury in the form of paying a premium price for fairlife's products under the false belief that their purchase supported humane animal and environmentally sustainable practices.

14.    Plaintiff Randy Paugh ("Paugh") is an individual residing in Sausalito, California. He purchased fairlife's Core Power milk products on a regular basis until early 2025 when he began to doubt the veracity of the representations made on fairlife's packaging and website based on social media discussions of the brand. Plaintiff Paugh purchased the products from Safeway grocery store and elsewhere on reliance on Defendants' representations of high levels of animal care and environmental sustainability. Plaintiff Paugh visited fairlife's website multiple times and relied upon the animal care and environmental sustainability claims made

FIRST AMENDED CLASS ACTION COMPLAINT

therein, as well as the fairlife name and representations made on the plastic bottle, including, but not limited to, the "recycle me" bottle label. Plaintiff specifically continued to purchase the brand after reviewing and relying upon the claims made on the fairlife website and packaging under the reasonable belief that the animals were treated humanely and free from cruelty or neglect, and that the brand was environmentally sustainable. Had Plaintiff Paugh known the truth concerning Defendants' actual practices, he would not have purchased fairlife's products or would have paid less for them. As a result of the Defendants' false, misleading, and/or deceptive marketing and representations, Plaintiff has suffered economic injury in the form of paying a premium price for fairlife's products under the false or mistaken belief that their purchase supported humane animal and environmentally sustainable practices.

15.     The true name and capacities, whether individual, corporate, associate, or otherwise, of Defendants Does 1 through 10, inclusive, are unknown to the representative Plaintiffs, who therefore sue said Defendants by such fictitious names. Plaintiffs will seek leave of the Court to amend this First Amended Complaint to insert their true names and capacities instead of the Doe Defendants when the same becomes known to the representative Plaintiffs.

16.     Each of the Defendants is responsible in some manner for the violations of law, conduct, liabilities, harm, and/or damages alleged herein. Plaintiffs are further informed and believe, and based thereon, allege that all relevant times each of the Defendants acted in concert with and/or as the principal, agent, representative, employer, employee of each of the other Defendants, and within the purpose and scope of said relationships, and that each Defendant authorized, ratified, approved, and/or consented to the acts alleged herein of the other Defendants.

17.     Defendant fairlife, LLC, sometimes spelled fa!rlife ("fairlife"), is a dairy company and consumer facing brand whose principal place of business is

Chicago, Illinois. Fairlife sells so-called "premiumized" milk and milk products at a higher price than traditional milk and milk products and milk alternatives such as almond and oat milk. Fairlife has two main product lines: its "filtered milk" line, which comes in 2%, whole, chocolate, and fat-free varieties in both large and small (14 oz.) bottles; and its Core Power line, which is higher in protein and comes in a variety of flavors and protein levels. Fairlife also produces other products, including ice cream. Fairlife is sold around the world and became a $1 billion brand in 2021 and has been growing rapidly since that time. In December of 2024, Coca-Cola's CEO cited Coca-Cola and fairlife as being the two brands that added the most retail sales in the U.S. Fairlife was created and continues to advertise to consumers its brand identity and practices as constituting high levels of animal care and sustainability, including, but not limited to recyclability of its packaging.

18.     Defendant The Coca-Cola Company ("Coca-Cola") is the co-founder of fairlife, and acquired the remaining shares of fairlife in 2020, making fairlife currently wholly owned by Coca-Cola. Coca-Cola's final payment for the 2020 acquisition of fairlife will take place in 2025. Coca-Cola has been identified as the world's largest contributor to plastics pollution, holding the #1 spot for the 6th year in a row according to one evaluation in 2023. Coca-Cola has also publicly represented plastics recyclability goals and its near complete meeting of those goals.[1] Coca-Cola is a corporation incorporated under the laws of the State of Delaware, with its headquarters located in Atlanta, Georgia.

19.     Defendant Mike McCloskey is the co-founder of fairlife and of Select Milk Producers (and is or was its CEO), Continental Dairy, and Fair Oaks Farms, among other corporate entities and brands. He is married to Defendant Sue

---

[1] https://www.breakfreefromplastic.org/2024/02/07/bffp-movement-unveils-2023-global-brand-audit-results/#:~:text=The%20Coca%2DCola%20Company%20maintains,company%20since%20the%20project's%20inception.

McCloskey. He was also formerly on the Board of Lake States Dairy Center, which does business as Fair Oaks Farms in Fair Oaks, Indiana.

20.    Defendant Sue McCloskey (with Mike McCloskey, "the McCloskeys") is married to Defendant Mike McCloskey and is the co-founder of Select Milk Producers, Continental Dairy, fairlife, and Fair Oaks Farms, among other corporate entities and brands.

21.    Defendant Select Milk Producers, Inc. ("Select Milk") is one of the largest dairy cooperatives in the United States. Select Milk is a corporation incorporated under the laws of the State of New Mexico, with its headquarters in Dallas, Texas. It was founded by and is owned by the McCloskeys. It was the co-founder of fairlife along with Coca Cola. While fairlife is now wholly owned by Coca-Cola, Select Milk still operates the dairy farming and supply function for fairlife along with United Dairymen of Arizona.

### III.    JURISDICTION AND VENUE

22.    The Court has personal jurisdiction over each of the Defendants because: a) fairlife markets, distributes, advertises, and sells fairlife products throughout the United States, including within this judicial District; b) Coca-Cola markets, distributes, advertises, and sells products throughout the United States, including within this judicial District, and because of its ownership of and significant oversight over fairlife; c) the McCloskeys are actively involved in the marketing, distribution and sales of fairlife products which affects and occurs within this judicial District; and d) Select Milk is the primary provider of milk products for fairlife which are marketed, distributed, and sold within this judicial District.

23.    Each of the Defendants has sufficient minimum contacts with this District such that the exercise of personal jurisdiction over them does not offend traditional notions of fair play and substantial justice.

FIRST AMENDED CLASS ACTION COMPLAINT

24.     This Court also has subject matter jurisdiction over this putative civil class action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, and the Defendants are citizens of a state different from that of at least one Class member.

25.     Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because substantial parts of the events or omissions giving rise to the claims occurred in this District.

## IV.     FACTUAL ALLEGATIONS

26.     The fairlife concept and brand was originally created to boost milk sales where milk prices and demand were dropping. The McCloskeys and Select Milk began to create a new milk product with a different nutritional profile and a brand identity of sustainability and high animal care in order to create a separate brand identity for their product, charge more for it, and grow production and demand from there. This product would ultimately become fairlife.

27.     Select Milk partnered with Coca-Cola to start the fairlife brand as a joint venture, which was launched in 2014. Sandy Douglas, Coca-Cola's Senior Vice President and Global Chief Consumer Officer and President of Coca-Cola North America said at the time that fairlife was "basically the premiumization of milk" and explained the basis of that in terms of high animal care and sustainability, stating: "Our vision for the nutrition beverage business and the milk product that I showed you which is made on a sustainable dairy with fully sustainable high care processes with animals, has a proprietary milk filtering process that allows you to increase protein by 50%, take sugar down by 30%, and have no lactose, and a milk

that's premiumized and taste better and we'll charge twice as much for it as the milk we used to buying in a jug."[2]

28.    In January of 2020, Coca-Cola announced that it had acquired the remaining shares of fairlife from its joint venture partner Select Milk, bringing its ownership stake to 100%, up from its previous 42.5% stake.[3]

29.    On information and belief, Select Milk still retains most of the operational control of fairlife, executing on the supply of the product through its membership, contracts, and oversight, which includes specific requirements and guarantees it makes to consumers about the animal care and sustainability practices in its supplying farms.

30.    In 2022, fairlife was reported as "a value-added success story in a category that has been in steady decline for years" after becoming a billion-dollar brand in 2021, and that as of 2022, fairlife was reaching a quarter of U.S. households.[4]

31.    Coca-Cola CEO and Chairperson James Quincy reported in December of 2024, "If you look at the U.S. year-to-date, the two brands that have added most retail sales in the U.S. are Coca-Cola and Fairlife, like the number 1 and the number

---

[2] Seeking Alpha, The Coca-Cola Company's (KO) Presents at Morgan Stanley Global Consumer Conference (Transcript), Nov. 19, 2024 at https://seekingalpha.com/article/2695965-the-coca-cola-companys-ko-presents-at-morgan-stanley-global-consumer-conference-transcript (last visited Jan. 26, 2025).

[3] Coca-Cola Canada, Who Owns Fairlife, at https://www.coca-cola.com/ca/en/about-us/faq/who-owns-fairlife#:~:text=On%20January%203%2C%202020%2C%20The,from%20its%20previous%2042.5%25%20stake (last visited Jan 26, 2025).

[4] Elaine Wilson, 50% more protein, 50% less sugar: fairlife brand reaching a quarter of US households, says VP. 'Demand is at an all-time high' Food Navigator, Sep. 22, 2022 at https://www.foodnavigator-usa.com/Article/2022/09/22/50-more-protein-50-less-sugar-fairlife-brand-reaching-a-quarter-of-US-households-says-VP.-Demand-is-at-an-all-time-high/ (last visited Jan. 26, 2025).

FIRST AMENDED CLASS ACTION COMPLAINT

2. So you've got the like one of the oldest brands and one of the youngest brands driving the retail sales growth."[5]

32.     When a consumer picks up a bottle of fairlife, the first thing they are struck by is the suggestive name – "fairlife" which communicates a message of a life of fairness for the cows. The definition of "fair" is "reasonable, right, and just."[6]

33.     The name "fairlife" is paired with the iconic logo of a cartoon calf, drawn in a way that evokes pathos and compassion, further indicating to consumers that the brand is centered around a caring ethos for the cows.



fairlife's logo.

---

[5] Seeking Alpha, The Coca-Cola Company (KO) Morgan Stanley Global Consumer & Retail Conference (Transcript), Dec. 3, 2024, at https://seekingalpha.com/article/4741828-the-coca-cola-company-ko-morgan-stanley-global-consumer-and-retail-conference-transcript (last visited Jan 26, 2025).

[6] See Collins Dictionary, "fair," https://www.collinsdictionary.com/us/dictionary/english/fair (last visited Jan 10, 2025).

34.    If a consumer is buying the "filtered milk" line of products in 2025 or bought it in the last few years, they are directed to a QR code which takes them to a Smart Label landing page[7] or directly to URLs printed on the bottle, fairlife.com and fairlife.com/ultra-filtered-milk, each of which links them to fairlife's mission page at https://fairlife.com/our-mission/.

35.    If a consumer is buying the "core power" fairlife line in 2025 or bought it in the last few years, he or she is invited to follow the URLs on the bottle, corepower.com or corepower.com/great-taste, which take the consumer to the same fairlife mission page at https://fairlife.com/our-mission/ ("mission page").

36.    Fairlife has three pillars listed on its mission page, under the banner "we believe in better." The mission page is structured into three sections, for their belief in "better care for" people, animals, and the planet. The page states "our purpose extends beyond what's in our bottles. We go the extra mile to provide better care for the people we nourish, animals that provide us with milk, and the planet we live on."

37.    With respect to animal care claims, on the mission page, it asserts "great care for the animals… will always be a top priority at fairlife", a component of which is "partnering with like-minded supplying farms that share fairlife's commitment to well cared-for cows."

---

[7] *E.g.*, For the 2% filtered milk line, the Smart Label site https://smartlabel-nutrition.fairlife.com/?fairlife-two-percent-ultra-filtered-milk-14-fl-oz&upc=811620020879#company (last visited Jan 7, 2025).

38.    The animal's section of the mission page is accompanied by an image of a woman reaching her hand out to a cow who is sniffing the woman's hand, as depicted here:



39.    The consumer clicks "learn more" on the mission page as shown above and is taken to a dedicated animal care page ("animal care page").[8] This page begins with a large heading, "we believe in better care for animals." It then lays out details about its animal welfare program. This program can be summarized as processes, policies, and expenditures. Fairlife touts the $40 million-plus monetary investment in animal welfare since 2019, its audits, its on-site vet, and the fairlife Animal Welfare Advisory Council.

---

[8] "We Believe in Better Care for Animals," fairlife, https://fairlife.com/our-mission/fairlife-cow-care-and-animal-welfare-standards/ (last visited Jan 7, 2025).

FIRST AMENDED CLASS ACTION COMPLAINT

40.    Images of fairlife's animal care page:



FIRST AMENDED CLASS ACTION COMPLAINT

## Industry Leading Animal Welfare Standards

Our goal is that all cows and calves are provided with the best care possible. As a dairy processor that doesn't own farms or cows, we rely on the partnership of industry experts, advisors and our network of supplying farms to help us achieve this goal. We are committed to continuously evaluating our animal welfare program for areas of opportunity.



### 100%
of supplying farms passed critical care standards in 2022

### Regular Audits
performed at all supplying dairies each year

### Leading Certification
such as National Dairy FARM program and Validus is required at all supplying farms.

## Investing in Animal Care

From growing our internal animal welfare team, to leveraging industry expertise and exploring innovations in animal care, we work closely with supplying farms to ensure great care for the cows that provide us with milk.



### $40M+ Investment
in our animal welfare program since 2019

### Full-time Staff Veterinarian
with more than 12 years of specialized experience in cow care

### fairlife Animal Welfare Advisory Council
includes 6 of the leading experts in the dairy and animal health industry

15

## Strong Farm Partnerships

Working with suppliers that share our commitment to great animal care and sustainable farming is critical to our program. Equally as important is staying up to date on industry research, innovative technologies and on-farm protocols and resources to help advance our efforts and help our programs succeed.

### Supplier Selection

We only work with farms committed to delivering the highest quality milk. This starts with meeting our strict quality standards, which is a reflection of animal health and hygiene, on-farm cleaning procedures and employee training. Additionally, we require farms to chill their milk immediately after harvest to preserve the quality.





### Standards and Oversight

fairlife has a robust set of animal welfare standards and requirements for supplying farms. Beyond care, they also include requirements for on-farm worker care, biosecurity and environmental standards.

### Audit Cadence

Supplying farms to fairlife are audited more frequently than the cadence required by industry standards.

### Addressing Issues

More frequent audits help to identify any issues and quickly take corrective action, when needed. Additionally, it helps reinforce a culture of transparency among supplying farms and their employees.

### Leveraging Technology

We work with our partners to invest in camera monitoring and scaling AI technology for additional oversight. We believe in the future of on-farm camera monitoring, as it can move beyond the cow-human interaction to help farmers in other areas such as feed management, health surveillance and milking parlor analytics.

41.    Collectively, these claims are referred to herein as the "Animal Care Claims."

FIRST AMENDED CLASS ACTION COMPLAINT

42.     When touting these processes, policies, and expenditures, fairlife omits the context in which they were created. It was only following a 2019 ARM investigation and a subsequent consumer fraud/false advertising class action lawsuit that ultimately settled for $21 million and a detailed stipulated injunction covering policy and oversight changes but without any admission of wrongdoing that fairlife spent so much money and time to develop the processes and policies it put into place.

43.     Despite the process-based nature of the animal welfare program, fairlife has carefully curated the content on this page to make outcome-based claims and representations to the consumer, which has the clear intent and effect of communicating to the consumer that the animals are cared for well, and certainly not abused or neglected. These claims may or may not be literally true but are nonetheless misleading. For example, it states: "we work closely with supplying farms to ensure great care for the cows that provide us with milk," indicating an outcome of care for the cows at a high level, certainly far above criminal cruelty, neglect, and even standard industry level animal welfare.

44.     Some of its claims also include "industry leading standards," "regular audits, strong oversight."  In fact, the industry standards and auditing fairlife purports to be "industry leading" are FARM and Validus.

45.     FARM is the Farmers Assuring Responsible Management program. This is an industry-created program, created by the National Milk Producers Federation and Dairy Management, Inc. The National Milk Producers Federation is a Washington, D.C.-area based dairy lobby group, with 25 member cooperatives, representing two-thirds of commercial dairy farmers in the United States[9] Dairy

---

[9] May 1, 2023 letter from Nicole Hancock, attorney for National Milk Producers Federation to Bruce Summers, Administrator, Agricultural Marketing Service, United States Department of Agriculture, available at

Management, Inc. is a dairy trade association which gets its primary funding from the U.S. Dairy Promotion Program, which is funded by federally required checkoff fees and taxpayer dollars for federal promotion and marketing of dairy products. More importantly, the FARM animal care program itself touts its membership at 98% of the dairy industry[10]

46.    Fairlife's advertising does not disclose that Defendants Mike and Sue McCloskey are both listed as staff on the "Meet the Team" page of the FARM website,[11] nor the conflict of interest that position presents.

47.    On information and belief, Mike McCloskey and Sue McCloskey have both been employed by FARM in some capacity for at least several years.

48.    Validus is an auditing company whose mission statement is "helping the world feel good about farming."[12] It has a wide reach in the dairy industry with many major dairies participating and is often used by large agribusiness industries to conduct audits.

49.    Fairlife communicates to consumers a message of superiority, indicating better care for the animals than is standard in the industry. Not only are

---

https://www.ams.usda.gov/sites/default/files/media/NMPFNationalHearingPetition050223.pdf (last visited Jan 7, 2025).

[10] FARM, Dairy Farmers, Animal Care, https://nationaldairyfarm.com/dairy-farmers/ (last visited Jan 7, 2025).

[11] FARM, Meet the Team, Mike McCloskey, at https://nationaldairyfarm.com/staff/mike-mccloskey/#:~:text=Mike%20McCloskey%20is%20Co%2DFounder,attraction%20located%20in%20Northwest%20Indiana (last visited Jan. 11, 2025) and Meet the Team, Sue McCloskey, at https://nationaldairyfarm.com/staff/sue-mccloskey/ (last visited April 22, 2025).

[12] Validus, https://www.validusservices.com/ (last visited Jan 7, 2025).

FIRST AMENDED CLASS ACTION COMPLAINT

these not "industry leading" standards representing "better care" for the animals, they in fact represent the industry itself, and its most powerful lobby for mega dairy companies like fairlife itself.

50.     Defendants' purpose in creating the fairlife brand was to communicate to consumers that it was distinct from and greater than the industry standard.

51.     In the earliest statements from the Defendants about fairlife's founding, it is clear that the brand and related brands like Fair Oaks Farms were created to preempt and provide a counter narrative to the advocates for animals and the environment who raised concerns about the industrialization of the dairy industry. For example: "The farm was founded out of necessity to counter the very loud, very well-funded, and often, very misleading voices against modern farming and animal agriculture in particular," said [defendant] Sue McCloskey in an interview with Food & Wine in 2018. "Having come from a non-generational farming background"—that's another way of saying she doesn't come from a family of farmers— "and growing up in the consumer-centric East Coast, I knew the ploy of these organizations."[13]

52.     Fairlife's current animal care page claims to have a "robust animal welfare program," says that and touts its "full time staff veterinarian with more than 12 years of specialized experience in cow care," and says its "animal welfare advisory council consists of 6 of the top experts in the dairy and animal health industry. Together this group works with fairlife to review on-going animal welfare programs and guide advancement and improvement to our animal welfare program based on new research and learnings." It also states that "regular audits [are] performed at all supplying dairies each year" and that their supplying dairies are

---

[13] Monte Reel, "The Dairy Farm of Your Imagination is Disappearing," Bloomberg, Feb. 28, 2020, at https://www.bloomberg.com/news/features/2020-02-28/the-dairy-farm-of-your-imagination-is-disappearing?embedded-checkout=true&leadSource=uverify%20wall (last visited Jan 7, 2025).

required to have a "zero tolerance policy for animal abuse." Most unequivocally, fairlife represents that "100% of supplying farms passed critical care standards in 2022." These claims and similar ones indicate to the consumer not only that the process of oversight and review is in place, but that this process in fact ensures the outcomes of higher care and prevention of animal abuse and neglect.

53.     In actuality, ARM's evidence from a confidential informant witness indicates, for example, that Windy Ridge and Windy Too only had one single veterinary visit this employee witnessed in approximately 15 years. On information and belief, both Windy Ridge and Windy Too where widespread rampant abuse was documented in 2023 had passed its fairlife critical care standards audit mere months before the video was shot.

54.     As described below, new ARM evidence makes it clear that the reality is that animals are being abused and neglected in the fairlife supply chain in a frequent, widespread, standard, and egregious manner.

55.     Despite industry bias and identity, lack of rigor and scope, and low bar to meeting FARM and Validus standards, ARM's 2023, 2024, and 2024-2025 Investigations yielded video/film footage of fairlife supplying farms shows widespread, frequent, standard, and egregious violations even of FARM and Validus standards.

56.     Defendants also publicly touted fairlife's purported commitment to phasing out the cruel industry standard of cow dehorning in the fairlife supply chain, a practice which causes extreme pain and suffering. The practice has *not* been phased out, as shown in ARM's 2024 Butterfield investigation discussed below.

57.     The intent and effect of the message communicated to consumers by the fairlife mission page, the animal care page, the brand's other advertisement, the statements and representations made by Defendants, and even the name and logo of

the brand is that fairlife cows are treated humanely, in a way superior to industry standards, and without abuse or neglect.

58.    This messaging as described above is false and misleading to consumers in a material way.

59.    ARM conducted an additional investigation in 2023 of Windy Ridge and Windy Too in Indiana, two of the twelve farms on or near the Fair Oaks Farms facility that they had investigated in 2019 ("2023 Investigation").

60.    Windy Ridge and Windy Too are owned by Steve Bos and his wife. Bos is the Principal Officer and President of the Board of Lake States Dairy Center, Inc, which does business as Fair Oaks Farms.

61.    In its 2023 Investigation, ARM documented multiple instances of animal abuse and neglect, including, but not limited to:

      i)     Egregious and frequent violent animal cruelty as part of the business operating practices;

      ii)    Animals kicked, beaten, and punched daily by employees;

      iii)   Cows flogged and repeatedly whipped with heavy ropes, beaten with sawn-off golf clubs, and slammed with sharp shanks, knives, and screwdrivers;

      iv)   Cows slammed into and dragged by tractors and heavy machinery, clearly conscious and in distress;

      v)    Employees intentionally breaking cows' tails, including by management;

      vi)   Use of excessive force when moving the cows;

      vii)  Head manager shooting cows with .22 shotguns, in botched and improper attempts at euthanasia, including in one instance of shooting a cow and she lived another day with a bullet hole in her head;




21

viii)   Cows trampled to death as part of milking process;

ix)    Neglect, abandonment, and denial of access to food and water, veterinary care, and/or clean and sanitary living conditions;

x)     Animals too sick or injured to stand ("downers") dumped and abandoned in small enclosed "death pens" along with other sick, injured, dying, and dead animals;

xi)    Denial of veterinary care for critical infected wounds, including abscesses on their knees that immobilized the animals, where the animals were showing clear signs of pain, swelling, and distress. Managers and workers acknowledged these wounds but left the animals untreated;

xii)   Newborn calves abandoned and left to die slowly in dark corners of barns and in piles of filth and feces;

xiii)  Cows forced to live in overcrowded, unsanitary conditions, including in and around deep piles of feces, and among pungent and noxious odors;

xiv)   Cows deprived of clean drinking water and forced to drink sludge-covered water; and

xv)    Approximately half of the dairy cows had lameness causing them to walk with limps.

62.   Select images from the 2023 ARM Investigation include:



Cow dragged by tractor, being lifted by the tail ("tailing up"), and cow is tied by her face to her leg.



Tractor lifting a cow off the ground by its front legs.



Cow lifted in tractor bucket upside-down, approximately 10-15 feet into the air.



Cow dragged by her leg by a tractor.

FIRST AMENDED CLASS ACTION COMPLAINT



Cow hoisted by her feet and a tractor hook.

63.    In one instance, after a manager shoots a cow in the head with a gun, the ARM investigator asks the manager, "Do you feel remorse for killing her?" and the manager replies, "No! It's why I live in this country, so I can kill these asshole cows:



64. An instance of an employee deliberately breaking the tail of a cow by cracking it in his hands:



65. The acts and omissions documented in the ARM 2023 Investigation constitute criminal level animal cruelty, violate the voluntary industry standards such as FARM and Validus, and render fairlife's representations of the quality of its animal care and sustainability practices to be false and misleading.

66. From July to December 2024, ARM conducted two new investigations, only made public for the first time in February 2025 ("2024 Investigations"). These investigations took place at Rainbow Valley Dairy, LLC in Buckeye, Arizona, aka North Farm ("Rainbow Valley") and Butterfield Dairy, LLC, also in Buckeye, Arizona ("Butterfield"). Both/all are owned and managed by Thomas De Jong individually and in his capacity as trustee of the Tom and Susan De Jong Family Trust.

67. Rainbow Valley and Butterfield are suppliers of fairlife. Rainbow Valley's milk is trucked to the fairlife processing plant in Goodyear, Arizona via

FIRST AMENDED CLASS ACTION COMPLAINT

United Dairymen of Arizona, a co-op which the DeJongs and their dairies are members of.

68.    Butterfield is a calf ranch that is a supplier to multiple area dairy farms which ultimately truck their milk to the fairlife processing plant in Goodyear, Arizona.

69.    In its 2024 Rainbow Valley dairy farm investigation, ARM documented multiple instances of abuse and neglect, including, but not limited to:

    i)    Egregious and frequent violent animal cruelty as part of the business operating practices;

    ii)    Animals hit in the face, genitals, and other sensitive areas with knives, screwdrivers, and shards of metal;

    iii)    Employees, including management, kicking animals, including downed cows and calves too sick or weak to stand, and in sensitive areas like an injured leg repeatedly;

    iv)    Animals dragged by chains across concrete floors by a tractor, hoisted by the neck over a wall;

    v)    Downed cows pushed and scooped into tractor buckets, sometimes over long periods of time, including by the top manager of the dairy driving the tractor, resulting in death of multiple cows. In some instances, dirt is shoveled on or near the cow with the tractor bucket, including burying the head, suffocating the animal and effectively burying her alive;

    vi)    Cows shot with .22 rifle in the back of the neck in botched attempts to kill them, often causing pain and suffering. Every cow shot is shot in this manner;

    vii)    Excessive use of electric prod, including numerous instances where head manager electrically shocked downed cow in labor

27

over 70 times, including while tailing up, including inside the mouth and genitals, causing bellowing and other indications of distress;

viii) Cows hoisted off the ground by the hips with a hip clamp chained to a tractor and dragged;

ix) Whipping and beating animals multiple times a day to get them into the milking area, including dozens of instances of hard whipping;

x) Multiple workers intentionally and frequently breaking tails of the cows on dozens of occasions as apparent "discipline" by snapping them in half and holding it in that folded fashion, and crushing them with their hands or yanking them until they crack. In multiple instances, this is done until another worker gets the milker attached to the cow's udder. The pain of the broken tail and folding causes the cow to shake and freeze, unable to move or escape, which apparently makes it more convenient to attach the milking device to the udder;

xi) Hard plastic ankle strap ID tags attached together a few at a time to create whipping devices, which are given to employees and approved by management to beat the animals;

xii) Newborn calves dragged by their legs, either by hand, with leg chains, by the ears, or a rope around the neck. In one instance, a calf struggles while dragged by leg chains thousands of feet across dirt and concrete while an adult cow looks on and vocalizes. In another instance, a newborn calf is dragged by a rope around the neck across the dirt while an adult cow,

28

presumably the mother, chases after and is shooed away by the workers;

xiii)   During the dragging of the newborn calves by chains, multiple instances of workers intentionally twisting the calves' legs to inflict pain and injury, often breaking the bones in the legs;

xiv)   The chains and ropes used to drag and hoist cows and calves are formed like nooses, exacerbating the pain and injury via tightening around the necks, legs, or other body parts as the dragging or hoisting is done;

xv)   Calves carried upside down by the legs or by the tail and ear, including by every manager;

xvi)   Shoving, throwing, flipping calves into transport trucks;

xvii)   Force-feeding calves by pinning them and shoving a sharp tube down their throat, in such a manner to purposefully inflict pain. In some cases, botched use of this feeding tube resulted in death of the calves;

xviii)  Neglect, abandonment, and denial of access to food and water, veterinary care, and/or clean and sanitary living conditions;

xix)   Some calves kept in conditions without shade in weather up to 115 degrees;

xx)   Large numbers of dead calves and cows; and

xxi)   The majority of cows exhibiting lameness. Straight blades used by workers on hooves without pain medication while animals showed severe signs of distress.

70.   Every worker at the Rainbow Valley 2024 Investigation committed acts of cruelty and abuse. The head manager often participated in the cruelty itself or was standing by observing while the cruelty was taking place.

71.    Select images from the 2024 Rainbow Valley dairy investigation include:



Employee hitting a cow in the face with a metal object.



Cow being hoisted by the neck over a wall after being dragged across the floor by a chain attached to a tractor.

1
2
3
4
5
6
7



Downed cow being pushed by a tractor bucket.

The same cow after being hit again with the tractor bucket and being pushed

onto her back.

FIRST AMENDED CLASS ACTION COMPLAINT



Cow hoisted and dragged by hip clamp chained to tractor.



Employee has wrapped tail around bar before he holds onto it and yanks

backward with his body weight to break it.



Worker bending tail backward to break it with his hands as apparent

"discipline."



Calf force feeding.

FIRST AMENDED CLASS ACTION COMPLAINT

72.    In its 2024 Butterfield dairy farm investigation, ARM documented multiple instances of abuse and neglect, including, but not limited to:

i)      Egregious abuse such as throwing calves into trucks on multiple occasions;

ii)     Evidence of calves having been subjected to cruel and unnecessary suffering through the standard practice of dehorning, some via manual cutting and some by caustic paste;

iii)    Neglect, abandonment, and denial of access to food and water, veterinary care, and/or adequately spacious, safe, or clean and sanitary living conditions;

iv)     Calves in individual calf crates so small they cannot turn around or lie down comfortably. In some cases, they grow so large they can barely move. They are often kept in crates designed for newborn animals approximately 5 x 2 feet, up to the age of four months;

v)      In some cases, crates packed with two calves;

vi)     Stuck animals, sometimes so entangled in the crates they die that way;

vii)    Live calves being put into crates with decomposing corpses of calves;

viii)   Bar biting in the calf crates, which is an indicator of extreme frustration and stress; and

ix)     Temperatures over 130 degrees with some animals denied access to shade for multiple hours of the day, in some cases causing death.

73.    Select images from the 2024 Butterfield investigation include:

FIRST AMENDED CLASS ACTION COMPLAINT



Calf having recently been manually dehorned with clippers and then thrown back into the crate with no pain relief, marked by a strip of paint to indicate having been dehorned.





Three-month-old calves in crates having grown so large they can barely move. Note some have no access to shade and some are bar biting.



Calf unable to turn around in crate and got stuck, alive.

FIRST AMENDED CLASS ACTION COMPLAINT

74.    The above abuse documented in the 2024 Investigation of Butterfield and Rainbow Valley dairies violated Arizona's criminal animal cruelty law, A.R.S. ¶§ 13-2910, which prohibits acts and omissions that constitute cruelty defined as, among other things, subjecting any animal under the person's custody or control to cruel neglect or abandonment with or without resulting in serious physical injury, failing to provide medical attention necessary to prevent protracted suffering, and inflicting unnecessary physical injury or cruel mistreatment. It also violates the voluntary industry standards such as FARM and Validus, and renders fairlife's representations of the quality of its animal care and sustainability practices to be false and misleading.

75.    ARM's most recent investigation was conducted from December 4, 2024 through March 6, 2025 at Woodcrest Dairy in Roswell, New Mexico. ("2024-2025 Investigation") which is a Select Milk Producers farm. 100% of the milk produced at this farm goes to fairlife. The farm is listed as owned as a general partnership by Gertrude Verhoeven, Gary Verhoeven, Denise Vander Meulen, and Randy (Randall) Vander Meulen; and on information and belief, is also owned or managed by Jake (Jacob) Meulen.

76.    In its 2024-2025 Investigation, ARM documented multiple instances of abuse and neglect, including but not limited to:

i)    Repeatedly kicking animals, including cows too sick or weak to stand;

ii)    Dragging and crushing animals with tractor buckets and hoisting them up via tractor chained to metal hip clamps;

iii)    Repeated kicking and hitting animals in the face and body with fists, a shovel, plumbers wrench, or solid steel metal rod while the animals are restrained in a small metal cage called a head gate, the purpose of which is to lock the animal in, so they are unable to move

away from blows. In one case, a worker can be seen adopting a boxing stance while doing this;

iv)    Inserting metal rings through the nostrils of the cows while the animals are restrained in this small metal "head gate" cage unable to move, then yanking on or dropping body weight into a rope attached to the nose ring repeatedly to inflict pain. In some instances, the workers add multiple blows to the face while yanking on the nose ring rope. Cows can be heard bellowing loudly during this abuse;

v)    Multiple instances of violently shoving a steel tube called a pill gun down the throat of cows restrained in the metal head gate cage, and/or hitting them in the face or eyes with the steel pill gun, often repeatedly, while the animals make futile attempts to move away from the blows. In some cases, this practice is so violent it causes gashes and bleeding from the throat and back of the mouth. This is despite the ease and lack of pain with which the pill gun could and should have been utilized;

vi)    Attaching a chain to the fetus of animals in labor and workers jumping up and down on the chain with their full body weight, often before the mothers or calves were ready. The employees jump so hard that their weight ins bringing the calves' bodies down so violently they are slammed on the cement, which in some instances causes death apparently by blunt force trauma to the skull – leaving blood stains behind on the cement. In other cases, this jumping on the chains breaks the calves' legs, leaving them unable to walk;

vii)    Dragging, throwing, and slapping newborn calves;

viii)    Kicking, electric shocking, whipping, dragging, hitting with shovels, pipes, and chains of cows confined to the milking area;

psychological torture including using Coca-Cola bottles filled with coins shaken in the animals' faces to startle then into moving faster. Workers used careless and excessive force during milking, striking cows in the face, body, and genitals with wrenches and other tools;

ix)    Breaking tails of cows in the milking area with their hands, a practice committed by three different people. Some cows in the milking area had their bones broken and were left hemorrhaging. Nose rings were yanked using ropes and chains to force compliance;

x)     Neglect and failure to provide veterinary care, including leaving animals to suffer in freezing winter conditions, exposing them to snow and sleet for days; high mortality rates, with regular discarding of carcasses next to a manure pile; denying injured or sick animals veterinary care, including leaving some untreated for days, which led to worsening of their conditions or death; and

xi)    Tying cows' back legs together.

77.    Select images from the Woodcrest Dairy investigation include:

FIRST AMENDED CLASS ACTION COMPLAINT



Tightly confined cow in head gate with nose ring on rope being yanked and jerked.



Tightly confined cow in head gate being kicked in the face.

40



Tightly confined cow in head gate being rapid-fire kicked in the face.



Employee kicking downed cow.

FIRST AMENDED CLASS ACTION COMPLAINT



Cow hoisted by a hip clamp and dragged with a tractor.



Downed cow pushed by a tractor in her head and neck area.



Cow abused in the milker including intentional tail breaking by hand.



Newborn calf dragged by leg chains.



Cow with her back legs tied.

78.    The above practices took place throughout the day and night every day or nearly every day, including in front of the owners, the Meulen family. The Meulen family actively operates the dairy. They and their managers knew of these abusive practices, permitted and/or participated in them, and failed to take steps to deter or prevent the continuation of the abuse.

79.    ARM's investigation revealed all of the animals confined in the head gate were abused in the way or ways described above. This was done out of apparent frustration, punishment, enjoyment for the perpetrators, and torment of the cows. This abuse was carried out apparently by any and all staff in the head gate "medical" area of the facility.

80.    During the time ARM's investigator was employed at Woodcrest Dairy in New Mexico, ARM's 2024 Investigations were made public and garnered widespread media as well as acknowledgement and a statement by fairlife. However, no mention of the investigation was made at Woodcrest Dairy, nor was

any additional attention or training, oversight or review provided of animal handling or environmental sustainability practices during the remainder of the investigator's employment.

81.    Woodcrest Dairy is overseen by animal welfare entities including through Defendants' oversight structure, such as through animal welfare committees and veterinary personnel through Coca-Cola, Select Milk, and fairlife processes and procedures (purportedly including regular audits and video monitoring). All Defendants therefore knew, or should have known, of this animal abuse and neglect, including its extreme, prolonged, widespread, and repeated nature.

82.    The above abuse documented in the 2024-2025 Investigation violates New Mexico's animal cruelty statute, NM Stat § 30-18-1, constituting both animal cruelty and extreme (felony-level) animal cruelty under that statute. It also violates the voluntary industry standards such as FARM and Validus, and render fairlife's representations of the quality of its animal care and sustainability practices to be false and misleading.

83.    The 2023, 2024, and 2024-2025 Investigations contain factual similarities, despite taking place in different states and having different corporate identities, regarding the kinds of cruel practices and patterns that have commonalities in their type, level of frequency, and extreme nature. This includes, but is not limited to, the practice of breaking cows' tails in and around the milking equipment and the use of noose-like equipment to drag or hoist animals. This is evidence of a possible common enterprise, knowledge, collusion, and conspiracy to commit animal cruelty.

84.    When a consumer buys fairlife products, he or she has a number of indications of its environmental sustainability, including the name fairlife and the cartoon calf logo, manure sustainability claim, top farm sustainability claim, and recyclability claims. (collectively "Sustainability Claims").

85.     If a consumer is buying the "filtered milk" line of fairlife products in 2025 or bought it in the last few years, they are directed to URLs printed on the bottle, fairlife.com and fairlife.com/ultra-filtered-milk, or a QR code which takes them to a Smart Label landing page[14] each of which links them to fairlife's mission page at https://fairlife.com/our-mission/.

86.     If a consumer is buying the "core power" fairlife line in 2025 or bought it in the last few years, he or she is invited to follow the URLs on the bottle, corepower.com/great-taste or corepower.com, which take them to the same fairlife mission page at https://fairlife.com/our-mission/ ("mission page").

87.     Fairlife has three pillars listed on its mission page, under the banner "we believe in better." The mission page is structured into three sections, for their belief in "better care for" people, animals, and the planet. The page states "our purpose extends beyond what's in our bottles. We go the extra mile to provide better care for the people we nourish, animals that provide us with milk, and the planet we live on."

88.     On the "planet" section of the mission page, fairlife advertises that they have "sustainable farming efforts [that] focus on several opportunity areas, including using renewable energy on farms, cow feed, and manure handling."

89.     This manure sustainability claim indicates a false and misleading message to consumers about the environmental sustainability and benefits of biogas–methane digesters Defendants pioneered and continue to build and grow, discussed below.

---

[14] *E.g.*, For the 2% filtered milk line, the Smart Label site https://smartlabel-nutrition.fairlife.com/?fairlife-two-percent-ultra-filtered-milk-14-fl-oz&upc=811620020879#company (last visited Jan 7, 2025).

FIRST AMENDED CLASS ACTION COMPLAINT

90.     Also, on the "planet" section of the mission page, fairlife advertises that it has: "Completed life cycle analysis at supplying farms and validated that they are among the most sustainable in the country for environmental footprint."

91.     This top farm sustainability claim communicates a false and misleading message to consumers that fairlife-supplying farms are objectively less polluting and resource consumptive than is standard in the industry. It also communicates the false and misleading message to consumers that the life cycle analysis and validation process yields an outcome of increased sustainability and lower environmental footprint. In addition, it materially omits the issue of fairlife's growth and consolidation, and all of the actions and strategies it has taken to accelerate that growth and consolidation, some of which are illegal and form the basis of this First Amended Complaint, while having the intent and effect of becoming an outlier in the industry with rapid growth, consolidation, and record profits while other dairies in the industry continue to fold or be consolidated into massive conglomerates like fairlife and other Defendants, with disproportionately negative impact on small family dairies and non-dairy alternative companies.

92.     The 2024 Investigation also revealed large amounts of animal waste discharged into nearby wildlife areas near waterways and groundwater and open disposal of animal carcasses on or near adjacent recreational lands, rendering the top farm sustainability claim additionally false and misleading.

93.     Also, on the "planet" section of the mission page, until very recently, fairlife advertised the concrete "100% recyclable packaging commitment by 2025." On nearly all fairlife bottles, the chasing arrow symbol is stamped, indicating recyclability. Some of the large filtered milk line bottles and some of the Core Power bottles are also stamped with a "1" which indicates recyclability to consumers. The Core Power bottles also say "Recycle Me" on the label. Each of

47

these is independently a recyclability claim and also together indicate recyclability of the packaging, including all of the fairlife bottles.

94.     Fairlife's recyclability claims communicate a message to consumers that its packaging is recyclable. Its website recyclability claims specifically indicated 100% of its bottles are in fact recyclable, now that it is 2025. It also communicates the message that far greater than 0% of the packaging was recyclable prior to 2025.

95.     Coca-Cola has made specific representations about its commitment to recyclability of its bottles[15], including a progress report in 2023 that reported a 90% recyclability rate across its products[16] and has reported even higher percentages elsewhere.

96.     In addition to the website recyclability claim and the other sustainability claims, fairlife consumers are directed in other ways by fairlife's bottles to the conclusion that they are recyclable.

97.     Many fairlife bottles are stamped with the "1" and "PETE" on the bottle. The "1" indicates the bottle is PET or PETE plastic, which is known widely by consumers and industry alike to be the most commonly recycled and recyclable plastic, and most of these additionally have, or recently had, the chasing arrows symbol, which also indicates recyclability.

---

[15] https://www.coca-colacompany.com/sustainability/packaging/united-states-recycling#:~:text=Coca%E2%80%91Cola%20North%20America%20has,offer%20sustainable%20solutions%20at%20scale.

[16] https://www.coca-colacompany.com/content/dam/company/us/en/reports/2023-environmental-update/2023-environmental-update.pdf p. 5

FIRST AMENDED CLASS ACTION COMPLAINT

98.    Even the industry trade group the Association of Plastic Recyclers ("APR"), of which Coca-Cola is a member,[17] lists #1 in its guidelines as recyclable in most communities.[18]

99.    On information and belief, most large fairlife bottles have been stamped with "1" from 2023-present and some of the small bottles are currently stamped with a 1. Currently other fairlife bottles are stamped with the "7" apparently they are a composite of different substances. Some of the bottle types that now bear 1s formerly bore 7s.

100.    APR does not list "7" on its list of recyclable plastic.

101.    On information and belief, the large fairlife bottles have a nylon liner, which would render the bottle ineligible to be stamped with the "1" and would make the "7" the correct designation.

102.    On information and belief, some fairlife bottles were changed from the 7 to the 1 to knowingly and falsely indicate recyclability to consumers.

103.    Most of the Core Power line and some of the filtered milk line bottles are marked as a 7 on the bottom of the bottle. The 7 is the "other" category and includes mixed plastics, which can contain PET or PETE but is usually not recyclable.

104.    The smaller Core Power line of fairlife products explicitly say on the bottle "Recycle Me."

105.    All of these fairlife bottles are pigmented opaque PET or PETE containing plastic, with white or brown pigment.

---

[17] Association of Plastic Recyclers, About APR, APR Member Sampling, at https://plasticsrecycling.org/about-apr/ (last visited Jan. 17, 2025).

[18] https://plasticsrecycling.org/how-recycling-works/the-plastic-recycling-process/

FIRST AMENDED CLASS ACTION COMPLAINT

106.    Nearly all of the fairlife bottles also have the chasing arrows symbol stamped on them, also indicating recyclability.

107.    Coca-Cola also touts its commitment to recyclability, including by claiming PET is the most valuable type of plastic for its recyclability, saying "Plastic, especially PET, is among the most highly valued recyclable materials because it can be remade to make new bottles. No new plastic (PET) is used in the creation of bottles made from 100% recycled plastic* (rPET)–all thanks to consumers who recycle, thus contributing to the circular economy of plastic and reducing waste."[19]

108.    Separately and together, the above indications constitute recyclability claims and communicate a clear message of recyclability to consumers.

109.    In reality, 0% of fairlife's bottles are recyclable.

110.    Fairlife bottles are all wholly or partially PET or PETE opaque plastic.

111.    In order to create opaque plastic, titanium dioxide is used in the construction of the plastic. Titanium dioxide ($TiO_2$) is also used to create a specific sheen for the plastic. If $TiO_2$ is present in the plastic, it renders the plastic *not* recyclable by current available means, called mechanical recycling.

112.    Fairlife used bottles that are sent to be recycled are ultimately pulled out and discarded and/or burned, and *not* recycled into a new product.

113.    In addition, where there are attempts to recycle the plastic used to create fairlife bottles, it not only does not succeed, the intermixing of the fairlife bottles with the clear PET bottles contaminates the supply of plastic recycling from other brands and companies, damaging the integrity of the plastic products the recycling process is intended to create and frustrating the purpose of recycling

---

[19] Coca-Cola, Recycling in the United States, https://www.coca-colacompany.com/sustainability/packaging/united-states-recycling (last visited Jan 17, 2025).

altogether. Put another way, fairlife's recycling fraud is not only harming consumers and the environment vis-à-vis fairlife's bottles, but also a scourge to the institution of plastic recycling and the very concept of it.

114.    Even industry trade group APR, of which Coca-Cola is a member, publishes a design guide which classifies white or opaque pigmented plastic as "detrimental to recycling" because of the TiO2.[20]

115.    Coca-Cola is a member of another trade group as part of the Ellen MacArthur Foundation ("EMF") U.S. Plastics Pact. APR and the EMF Group U.S. Plastics Pact ("Plastics Pact") are perpetuating false and misleading information to communicate to the consuming public greater recyclability and commitment to recycling of plastics than is actually the case.

116.    Even so, fairlife's packaging violates even the low AMF and EMF standards.

117.    The Plastic Pact set forth specific targets. The first was to define a list of problematic or unnecessary packaging by 2021 and take steps to eliminate the items on the list by 2025. The second target was to make 100% of plastic packaging recyclable, compostable, or reusable by 2025.[21] The problematic and unnecessary materials list includes "Opaque or Pigmented PET–Polyethylene Terephthalate bottles (any color other than transparent blue or green)."[22]

---

[20] APR Design Guide, "The Authority on Recyclable Plastic Packaging Design," PET Rigid, Color, at https://plasticsrecycling.org/apr-design-hub/apr-design-guide/pet-rigid/, direct link at https://plasticsrecycling.org/apr-design-hub/apr-design-guide/pet-rigid#color-opaquewhite, (last visited Jan 17, 2025).

[21] U.S. Plastics Pact, U.S. Pact 2023-2024 Impact Report, at https://usplasticspact.org/2023-24-Impact-Report/ (last visited Jan. 17, 2025).

[22] U.S. Plastics Pact, U.S. Plastics Pact Problematic and Unnecessary Materials Report, at https://usplasticspact.org/problematic-materials/ (last visited Jan. 17, 2025).

FIRST AMENDED CLASS ACTION COMPLAINT

118.    The bottles, which contain TiO2 for opaque colored pigment and sheen, are deceptively advertised as recyclable, containing component(s) that eliminate and/or significantly limit the ability to recycle the items.

119.    The recyclability claims related to fairlife products are in violation of the FTC Green Guides, which sets forth standards for such advertising, as well as the state laws that adopt the Green Guides, including California.

120.    Fairlife is the only brand that uses opaque pigmented plastic drink containers. Its competitors use clear PET bottles or similar packaging.

121.    As fairlife grows, the damage to consumers and the environment from the recycling fraud and contamination is accelerated and exacerbated.

122.    Fairlife knowingly perpetuates this fraud and deception, and it is aware that its packaging is not recyclable. It is also aware that its packaging contaminates plastic recycling more broadly. It has made admissions that "clear PET … better supports recyclability and material circularity."

123.    Defendants also know, or should know, that consumers do in fact put these bottles in to be recycled, have the expectation that they will be recycled, and Defendants know that in reality at least some of the plastic used to make them makes it into the recycling processing chain such that they contaminate the recyclability of other plastics.

124.    In or before 2021, fairlife conducted market research and testing on clear PET bottles because that "better supports recyclability." It also made the claim that "we are getting closer to our long-term goal of 100% recyclable packaging." This statement is false and deceptive because it has not launched clear PET bottles. They also set a false and misleading 2022 goal of "launch[ing] additional products in 100% recyclable clear PET material."

125.    There are no operating recycling facilities that would consider opaque plastic PET bottles–including fairlife bottles–to be recyclable.[23]

126.    On information and belief, at some recycling facilities, the process does not (fully) sort out the white or opaque PET plastic used in fairlife bottles from the clear PET, so some of them do get into the stream and cannot be recycled themselves and contaminate the clear recyclable plastic.

127.    There is no end market able or willing to purchase the fairlife plastic bottles and recycle them into new products or for use in new products.

128.    On information and belief, fairlife plastic bottles actually contaminate the plastic recycling stream, causing structural damage and destruction of the recycled product. In response, multimillion dollar insurance payments have been made to settle claims for the damage to other companies for harm that can be traced back to fairlife bottles.

129.    There is no reasonable basis for Defendants' recyclability claims and they cannot be substantiated.

130.    The material recyclability claims are false and misleading to consumers, both because the product packaging is not in fact recyclable and because Defendants belie the greater harmful effect of the contamination the fairlife packaging causes to the plastics recycling supply chain more broadly. Both types of harm are further aggravated by the growth of the brand, driven by the false, misleading, and fraudulent practices alleged herein as a whole.

131.    Defendants also regularly tout their sustainability practices in the context of the biogas anerobic manure digesters via their manure sustainability claim. Defendants are pioneers in the biogas industry. Referring to their biogas

---

[23] https://plasticsrecycling.org/how-recycling-works/the-plastic-recycling-process/

digester system, Sue McCloskey has said "it's the ultimate in recyclability" and touted the system as the way Defendants exceeded dairy industry climate change goals.[24] About fairlife, she has said, "We have created a renewable biofuel… we displace 2 million gallons of diesel from having to be mined from the earth every year."[25]

132.    In reality, dairy biogas digesters are profit centers for highly industrialized and consolidated dairy companies. The success of their business model relies upon increasing consolidation and growth of the number of animals confined in these industrial farms.

133.    Biogas digesters also present their own environmental damage risks and hazards. For example, they can leak methane, and one such leak resulted in a fine from the Marion County, Indiana Department of Environmental Management against the McCloskeys' Prairies Edge Dairy Farms in 2017.[26] Biogas digesters can also present an explosion risk.

134.    While advertising fairlife as a sustainable brand and touting its practices such as biogas as climate change solutions, Defendants were all the while fighting the characterization of dairy as a contributor to climate change and the regulation of greenhouse gases via the dairy checkoff program.

---

[24] Christine Kopaczewski, "Meet 2017 Awesome Women Awards Honoree, Sue McCloskey," Good Housekeeping, August 17, 2017, available at https://www.goodhousekeeping.com/life/inspirational-stories/a45431/awesome-women-awards-sue-mccloskey/ (last visited Jan 11, 2025).

[25] The Innovation of Milk, Sue McCloskey, May 18, 2018, Tedx Talks https://www.youtube.com/watch?v=IhZwSu394D8.

[26] *State of Indiana County of Marion Commissioner of the Department of Environmental Management v. Prairies Edge Dairy Farms LLC*, Case No. 2017-24978-A (2017).

FIRST AMENDED CLASS ACTION COMPLAINT

135.   In touting their sustainability–even recyclability–of the biogas component of their operations, Defendants mislead consumers by mischaracterizing these systems as a means to reduce the carbon footprint of the dairy industry and their role in it. In reality, even if these biogas systems reduce the per-animal carbon footprint, their very structure and purpose is to accelerate the growth of the number of animals and concentration of animals so rapidly that the Defendants' ultimate contribution to environmental degradation is exacerbated by its biogas digesters, not alleviated by them.

136.   Select Milk and fairlife were focused on rapid growth, consolidation, and profit creation. Central to that strategy was the "story" of environmental sustainability and high levels of care for the cows.[27] As alleged herein, that story was and continues to be false and misleading. Defendants continued to grow, consolidate, and concentrate more and more animals while the typical "family" dairy farmer lost profits and went out of business. Politico called Mike McCloskey the "closest thing to a rock star in the industry."[28] Defendants' growth both relied upon the false and misleading representations about sustainability and animal care and also caused the harms to the environment and to animals to be immeasurably worse.

---

[27] In one germane example, fairlife, LLC and Continental successfully lobbied for taxpayer funding of a pipeline for their family of large dairies to the Continental/fairlife Coopersville, Michigan plant. Defendants lobbied for this money based on a representation that fairlife is "dedication to animal care and comfort, and a commitment to agricultural sustainability." Michigan Strategic Fund Board Meeting Packet, December 2019, pp. 67 and 113. Available at https://www.michiganbusiness.org/4a8352/globalassets/documents/msf-board/msf-board-packets/december-2019_msf-board-packet_final_redacted.pdf (last visited Jan 11, 2025).

[28] David Rogers, "GOP, Industry Rift Spills Over," Politico, Dec. 30, 2012, available at https://www.politico.com/story/2012/12/gop-industry-rifts-bring-milk-imbroglio-to-a-head-085589 (last visited Jan 11, 2025).

137.   In addition, Defendants' sustainability claims also communicate a false and misleading message of high animal care to consumers. The evidence of mistreatment of animals as described above also renders any representation of sustainability false and misleading.

138.   Fairlife's brand was built and grown on false and misleading animal care and sustainability messaging from the brand's inception. In actuality, this was a fiction meant to drive profit through growth, consolidation, and artificially increasing prices and the number of purchases. That growth further exacerbated–and continues to exacerbate–the harms caused by their false and misleading advertising.

139.   In the early 2000's, consumer demand for milk was naturally declining in favor of other products, and milk prices were dropping. Select Milk and fairlife co-founder Sue McCloskey has described the initial creation of Select Milk and growth of the brand through the creation of a "story" of high animal care and sustainability:

> "[Mike McCloskey] came home from that cooperative meeting and… Mike challenged us to do something better [than the existing cooperative structure at the time], so we got out a map around our farm and we drew a big circle and within the 300 mile radius circle, we started identifying milk buyers and processors. And then we started knocking on and what we told these milk buyers was that because of the incredible care we were able to give our cows, we were able to create this incredibly high-quality milk. We emphasized to them that we had a story to tell that their consumers were really looking for. One milk buyer company got it… they saw the big picture of how having this higher quality milk and having this story behind it was not only going to be beneficial to their bottom line, but also to their consumers. So we invited them to come out to the farm…Because of our belief in quality and transparency, we actually–together with a bunch of like-minded dairy farmers–created our own dairy cooperative, Select Milk Producers. Today, Select Milk Producers is one of the largest dairy co-ops in the country…As big as we are today, really it's all about the same values that we had at that small little 300-cow dairy farm in California. It's about making sure that our girls are extremely well taken care of, comfortable, have wonderful fresh air. It's about making

the higher quality milk for our consumers and it's about creating continuous improvement practices so that our farms can continue to become more and more sustainable."[29]

140.    This kind of sustainability and animal care messaging has continued and gotten more egregiously false and misleading over time, continuing to the present day.

141.    A central part of the fairlife brand's development, strategy, and focus is to anticipate the (legitimate) animal welfare and sustainability concerns of the consuming public and the nonprofit organizations that represent those public values. The strategy to address this included spinning a false and misleading story of high animal care, and the creation of Fair Oaks Farms, discussed in more detail below.

142.    Sue McCloskey commented on a "mommy blogger" page about the impetus behind the creation of the high animal care brand identity and claims, including the creation of Fair Oaks Farms, saying "It's funny that you mention PETA because they, along with a number of other acronym-named organizations, were exactly the catalyst that prompted us to open our doors. I think we all know that they have a vegan agenda and are willing to perpetuate myth or emotions to the fact level. There's not much we can do to change their minds other than what we're doing, which is trying to have an honest discussion."[30]

143.    Dismissing potential critics as perpetuating myths and emotions while framing the presentation of their "story" as "transparent" and "honest" became and continues to be hallmark of the fairlife brand, all the while knowing these were false, misleading, and disparaging.

---

[29] The Innovation of Milk, Sue McCloskey, May 18, 2018, Tedx Talks https://www.youtube.com/watch?v=IhZwSu394D8 (last visited Jan 21, 2025).

[30] Mommy Shorts, Our Big Trip to Fair Oaks Farms, 2016, Comment Section https://www.mommyshorts.com/2016/07/big-trip-farm.html (last visited Jan 21, 2025).

FIRST AMENDED CLASS ACTION COMPLAINT

144.   A particularly nefarious aspect of this was Defendants attempted–and in many ways successful–capture of animal advocacy and environmental leaders to praise the brand and further the lie of high animal care and sustainability. Survey data shows public opinion opposing animal cruelty is near universal, at well over 90%, and most of that population is concerned about factory farming practices.

145.   Defendants were aware of the negative public critiques of factory farming on animal treatment and environmental grounds and specifically chose to craft their story to prevent and diminish the impact of such criticism from being directed at them.

146.   One such component of their strategy was the creation–and continued operation–of Fair Oaks Farms, discussed below.

147.   Another component was the use of specific animal protection and environmental charity leadership to neutralize and co-opt these groups to actively praise fairlife, which Defendants used in promoting the brand to consumers. It was also a preemptive strategy to discredit and minimize any criticism or inquiry that might arise, including from undercover investigations, such as the ones ARM conducted.

148.   The Humane Society of the United States ("HSUS") (now called Humane World for Animals) is one of the nation's largest animal protection nonprofit organizations. Its mission is to create a better world for all animals. Its most recently published IRS Form 990 in 2023, which shows assets over $414 million and contributions of over $157 million. HSUS has represented its membership and constituency level at 11 million, or "1 in 28" Americans. It is also well known for its campaigns against factory farming, including undercover investigations showing animal cruelty and inhumane conditions and practices. In 2012, Mike McCloskey invited HSUS' then-President and CEO, Wayne Pacelle, to tour Fair Oaks Farms and presented the same false and misleading narrative about

animal care and sustainability to him. In response, Pacelle publicly praised the operation, calling McCloskey "innovative" and "charismatic," praising both the animal care–saying he "didn't see the animals exhibiting any lameness" and "I celebrate his steps toward more humane treatment"–and the environmental sustainability in the form of the biogas digesters, calling them "innovations in manure management and energy production." [31] The McCloskeys then quoted these positive statements in promoting fairlife,[32] co-opting the goodwill of HSUS, using it as a mouthpiece to communicate false and misleading advertising to consumers, and

---

[31] "It's a mega-dairy for sure, but the charismatic owner of this farm, Michael McCloskey, has been an innovator within the industry. For years, he's been a dissenter when it comes to the once-standard practice of tail docking, and every one of the cows on his farm has a tail, as she was meant to have. The cows bed on sand, which is more comfortable for the animals than concrete, and I didn't see the animals exhibiting any lameness as they walked back and forth between their living area and the milking facility.

The cows are milked by machine on an automated rotary, and the whole enterprise bears little resemblance to the images of a family dairy. But I celebrate his steps toward more humane treatment, as well as innovations in manure management and energy production (he's developed digesters to transform the manure into energy and to fuel the entire complex and his fleet of 18- wheelers that haul the milk to pasteurizing plants and then to market)." Wayne Pacelle, Humane Nation Blog, "Moving Forward for Pets and Farm Animals in the Heartland," Aug. 17, 2012, found in web archive at https://web.archive.org/web/20180613055645/https://blog.humanesociety.org/2012/08/farm-shelter-tour.html on Jan 5, 2025.

[32] *See, e.g.*, from the same mommy blog comment that indicates PETA and similar groups were the driving force behind the creation of Fair Oaks, Sue McCloskey says "You might find the following link an interesting read; http://blog.humanesociety.org/wayne/2012/08/farm-shelter-tour.html. In it, Wayne Pacelle, CEO of the USHS, talks about his visit to Fair Oaks Farms. It's pretty positive about what we are doing…" Mommy Shorts, Our Big Trip to Fair Oaks Farms, 2016, Comment Section https://www.mommyshorts.com/2016/07/big-trip-farm.html (last visited Jan 21, 2025).

---

FIRST AMENDED CLASS ACTION COMPLAINT

further insulating its brand from criticism and driving sales and prices up based on false and misleading representations of animal care.

149.    People for the Ethical Treatment of Animals ("PETA") is a well-known large animal rights organization, touting 9 million members and supporters and calling itself the largest animal rights organization in the world. Among other anti-factory farming campaigns, PETA has been conducting undercover investigations of factory farms for decades revealing abuse and inhumane conditions, and criticizing the meat, dairy, and egg industries, encouraging consumers to boycott them by going vegan. Defendants were able to get even PETA to make a positive statement about fairlife, praising its public commitment to phase out dehorning of calves. This commitment never came to fruition, as evidenced by the 2024 Investigation of Butterfield by ARM. The false and misleading nature of this empty phase-out commitment was compounded by co-opting and deactivating potential critique by PETA, perhaps the most notorious anti-factory farming voice for consumers in the world.

150.    In 2019, the McCloskeys were made aware that ARM had conducted an undercover investigation of fairlife suppliers before the video was made public. Mike McCloskey reached out to ARM's founder and lead investigator Richard Couto in an attempt to align himself with ARM in exchange for ARM agreeing to cancel its impending public release. This effort was not successful.

151.    The World Wildlife Fund ("WWF") touts itself as the world's leading conservation organization, with a worldwide reputation for environmental sustainability and wildlife protection. Its 2023 IRS Form 990 lists over $355 million in contributions. WWF has a number of campaigns, including a major one on plastics pollution. WWF is a leading member of the U.S. Plastics Pact, indicating to consumers the legitimacy of the program and its commitments. Defendant Coca-Cola is also a member of the U.S. Plastics Pact and sits on its board. Recyclability

claims of fairlife are further given a false boost by the co-opting of the public goodwill and trust in the WWF.

152. From the early days of crafting the high animal care and sustainability "story" around Select Milk and then Fair Oaks and the fairlife brand, using it to boost its growth and profitability, Defendants knew, or should have known, the "story" was false and misleading to consumers. Defendants were fully aware of and even cited consumer concern over animal care and environmental destruction by consolidated dairies like theirs as an impetus to craft the story.

153. At the time they were crafting the high animal care and sustainability "story," Defendants specifically knew of and were driven by the undercover investigations of other dairies and industrial animal agriculture conducted by HSUS and PETA and saw the negative consequences of the revelation of the truth of industrial animal farming. Creation of this "story" of animal care and sustainability must have been done with the knowledge and intent of the animal care and sustainability claims being false and misleading to consumers, as a contrast to the damage the exposure of the truth would have caused the brand.

154. Defendants also knew that some of the practices their farms engaged in were cruel and unnecessary for business purposes, such as dehorning. Fairlife made public statements regarding their intent to phase out dehorning and other cruel and publicly unpopular standard practices, and then later reneged, continuing these practices to this day. This appears to have been done specifically to deceive and mislead.

155. Following ARM's 2019 investigation, the *mea culpa* public response by McCloskey, fairlife, and other Defendants, there was no longer any plausible deniability that the animal care representations were false and misleading to consumers. The response was to make public commitments to making changes, although they never legally admitted any wrongdoing.

FIRST AMENDED CLASS ACTION COMPLAINT

156. The changes Defendants committed to making in the wake of the ARM 2019 Investigation and the ensuing consumer protection class action lawsuit were aimed at communicating to consumers an outcome of high levels of animal care, including absence of cruelty and neglect. In reality, these were merely policy and process commitments that the Defendants knew were set up to fail to prevent animal abuse and neglect. Their true purpose and effect were to falsely alleviate the concerns of the consumers while attempting to distance Defendants from potential future liability, and ultimately to tout these so-called changes as a way to further increase profits and growth.

157. On information and belief, the changes Defendants purported to make in the wake of the 2019 Investigation regarding firing offenders and cutting ties with offending entities were not genuine. For example, Defendants merely moved some of the worst offending employees and managers from the Indiana farms to a more out-of-sight location at fairlife's Puerto Rico facilities/suppliers.

158. The 2023 ARM Investigation revealed widespread animal cruelty and neglect, and removed any doubt about Defendants' knowledge that its animal care claims were false and misleading, and eliminated the ability for Defendants to credibly use the same strategy of issuing a public *mea culpa* paired with a promise to do better in the future.

159. Instead, Defendants' response to the 2023 ARM Investigation was to discredit ARM's claims by denying their veracity, falsely distancing themselves from what could not be denied, and threatening ARM with a defamation lawsuit if they did not cease their public allegations. All of this had the intent and effect of shutting down the media attention on the story, which yielded almost no publicity, and successfully shielded Defendants from what could have been widespread bad publicity. What cannot be denied, however, is that the 2023 ARM investigation caused Defendants to have both actual and constructive knowledge of extreme and

FIRST AMENDED CLASS ACTION COMPLAINT

widespread animal cruelty, and therefore the falsity and misleading nature of their animal care claims.

160.    The most recent 2024 and 2024-2025 ARM Investigations reveal animal cruelty at a frequency, scale, and scope across the fairlife supply chain that is unprecedented. In addition, multiple high-level managers and employees are directly implicated in criminal-level cruelty across different locations and supplier types. Individual and corporate defendants are legally liable for this cruelty.

161.    Today, the misleading nature, level of falsity, and fraud of the fairlife animal care and sustainability claims are all at an all-time high. The claims themselves are more egregious and robust, while the evidence of animal cruelty and environmental degradation has never been so extreme and widespread, nor so clearly linked to the higher-ups and corporate levels.

162.    Fair Oaks Farms is an umbrella name for a number of operations that take place at or near a Fair Oaks, Indiana compound. This includes but is not limited to Fair Oaks Farms, which is a d/b/a for Lake States Dairy Center and is also referred to as Fair Oaks Dairy Adventure. It includes working dairies, a small portion of which are visible to the public via tours, as part of the "Dairy Adventure," as well as a "Pig Adventure" which as a pork producing facility, and a "Crop Adventure" which includes attractions like U-Pick.

163.    The Fair Oaks Farms Dairy Adventure includes the Dairy Adventure Museum, tours on a cow-spotted and pig-snout painted tour bus, tours that show milking, and the birthing barn where guests can see cows giving birth.  It is particularly targeted at children and families, including school tour groups. It includes displays with fiberglass cartoon cows representing their diva-like care.

164.    Fair Oaks Farms holds representations of high animal care and environmental sustainability as central to its brand, messaging, and purpose. The Fair Oaks Farms website describes the Dairy Adventure Museum as 15,000 square

foot experiential learning space, saying, "Have fun learning about cow comfort, manure management, milk production, and the many other aspects of sustainable dairy farming that help feed the world!" and "meet the farmers who provide dairy to the world, and realize just how much goes into sustainably producing dairy."[33]

165.    Fair Oaks Farms exists to promote the fairlife brand. The fairlife brand is advertised and sold throughout the facility, and Fair Oaks Farms represents to its customers that the milk produced on site is bottled as fairlife milk and other fairlife products.

166.    As discussed throughout this First Amended Complaint, representations of high animal care and sustainability regarding fairlife are in fact false and misleading.

167.    A central feature of the origin and continued operation of Fair Oaks Farms is the promotion of sale and growth of the fairlife brand on the basis of high animal care and sustainability claims while also being a mechanism in anticipation of criticism of those very issues, in order to discredit and mislead consumers and consumer-facing leaders about fairlife's practices.

168.    In the 1990's, Defendant Select Milk became aware of the threat the industry faced from undercover investigations that animal protection organizations such as PETA and HSUS were conducting, as discussed above. Select Milk commissioned a White Paper to assess the threat from such groups and decided to preemptively create a high animal care narrative.

169.    The center of this strategy was the creation of Fair Oaks Farms for this purpose. Select Milk hired Gary Corbett to launch Fair Oaks Farms, who told Pacific Standard in 2019 that the White Paper Select Milk commissioned in the 1990's on so-called "anti-agriculture" activists found "these groups tend to be very

---

[33] Fair Oaks Farms, Planning your Adventure at Fair Oaks Farms, "The Dairy Adventure Museum" at https://fofarms.com/activities/ (last visited Jan 24, 2025).

FIRST AMENDED CLASS ACTION COMPLAINT

committed to their cause, very articulate, very well-funded, and passionate," and referred to himself as one of the "founding fathers" of Fair Oaks Farms.[34]

170. As Pacific Standard reported:

"With fewer farms and fewer farmers to sway consumers toward their side, the co-op worried that city folks, whom Corbett calls their "urban brethren," could fall prey to PETA's messaging. "Our initial reaction was that we've got to go on the offense," Corbett says. There was only one solution: Win the public over before it could turn on them. Prominent reformers in the industry, like celebrated animal scientist Temple Grandin, had already suggested that farms turn the metaphorical "high walls of industrial agriculture" into glass. Why not be literal about it? "We thought maybe the best credibility builder is if we invite people into our home," Corbett says."[35]

171. The inception of Fair Oaks farms came from the desire to combat the perceived threat of criticism and exposure by animal advocates. Specifically, the threat was defined as the threat of undercover investigation by animal advocates. Undercover investigations, by their very nature, reveal the truth of an operation. The focus on transparency or "inviting people into our home" in the form of Fair Oaks Farms, which began as a central concept and continues to be so today, is definitionally distinct from Defendants' point of view from the literal truth as revealed by undercover investigations. This indicates both that Defendants knew, or should have known, that their animal care representations were false and misleading–and in fact created them to be so–and that animal abuse, neglect, or

---

[34] Emily Moon, Dairy Disneyland: One Farm's Quest to Save Industrial Agriculture, Pacific Standard, March 19, 2019, at https://psmag.com/environment/dairy-disneyland-one-farms-quest-to-save-industrial-agriculture/ (last visited Jan. 24, 2025).

[35] *Id.*

other mistreatment was occurring. ARM's 2019 and 2023 Investigations only served to remove any doubt of that knowledge or intent.

172.   Further, the Fair Oaks Farms animal care concept and messaging (later to include environmental sustainability, particularly as the biogas elements of Defendants business model were implemented) was refined and developed via research into other museums and improving the appeal of Fair Oaks Farms based on that, the use of an outside advertising agency, and collaboration with government agencies in a way that resulted in checkoff funds being used to fund Fair Oaks Farms.

173.   Fair Oaks Farms is a successful instrument of the fairlife brand's false advertising and the animal cruelty taking place in its supply chain. Currently it's considered the number one agritourism destination in the Midwest.[36]

174.   Fair Oaks Farms has 12 farms on or near its campus. Two of these farms are Windy Ridge and Windy Too, owned by Steve Bos.

175.   Fair Oaks Farms sells milk and milk products at its retail stores from its on-site farms. These products are labeled and advertised as fairlife products.

176.   Windy Ridge and Windy Too were investigated by ARM in 2019. Subsequent to the investigation and confirmed as part of the ensuing 2022 class action litigation settlement, fairlife claimed to have Windy Ridge and Windy Too out of its supply chain and made public representations to that effect.

177.   In 2023, ARM conducted a new investigation of Windy Ridge and Windy Too. During the course of that investigation, ARM found evidence of truck routes transporting milk from Windy Ridge to the Coopersville, Michigan plant.

---

[36] Austin Frerick, Barons: Money, Power, and the Corruption of America's Food Industry 70 (2024).

178.    In the publicization of the investigation, ARM represented that fairlife was still being supplied by Windy Ridge and Windy Too, which was reported in at least one media outlet.

179.    On information and belief, in response, fairlife and Coca-Cola communicated with media outlets denying that they sourced any of their milk from Fair Oaks Farms, including Windy Ridge or Windy Too, which are two of the farms on or near the Fair Oaks Farms compound.

180.    No additional media covered the ARM investigation, or the connection ARM alleged between Fair Oaks Farms / Windy Ridge and Windy Too and the Coopersville fairlife plant following fairlife and Coca-Cola's denial.

181.    Around the same time as ARM's 2023 public release and this denial, fairlife and Coca-Cola privately sent ARM a cease-and-desist letter from a law firm in Ohio, followed by a voicemail message to the same effect. In this letter and voicemail, fairlife and Coca-Cola denied the sourcing from Fair Oaks Farms, insisted that ARM cease making those statements, and threatened a defamation lawsuit.

182.    Steve Bos also denied any connection between his farms Windy Ridge and Windy too and Fair Oaks Farms or fairlife in 2023 following the ARM investigation[37], telling the Chicago Tribune, "I would like to make it clear that I do not sell milk to [f]airlife, I am not one of the dairies of Fair Oaks Farms, and [Fair Oaks Farms owners] Sue and Mike McCloskey do not have ownership in Windy Ridge Farm."

183.    However, Bos and McCloskey were listed as officers in the 2022 IRS Form 990 for Lake States Dairy Center Inc. in Fair Oaks, Indiana, with Bos listed as

---

[37] https://plasticsrecycling.org/how-recycling-works/the-plastic-recycling-process/.

FIRST AMENDED CLASS ACTION COMPLAINT

the Principal Officer and President and Board member, and McCloskey listed as Secretary and Board member. Steve Bos is listed as the Principal Officer and board member for Lake States Dairy Center in the 2023 IRS Form 990. The 990s also list the website as fairoaksdairyadventure.com. Fair Oaks Farms is a d/b/a for Lake States Dairy Center.

184.    In response to the denial and the cease-and-desist letter and voicemail, ARM issued a statement saying it had evidence of a truckload of milk driven by a Ruhan trucker going from Windy Ridge to Coopersville on September 11, 2023, to be sold as fairlife milk.

185.    In response to this statement by ARM, fairlife and Coca-Cola admitted a singular truckload did in fact go from Windy Ridge to the Coopersville fairlife plant on September 11, 2023 but stated that it was a test run and subsequently dumped.

186.    Shortly after this admission, ARM realized that the date it had cited in its response was in error. In reality, their evidence shows a shipment on September 10, 2023.

187.    In December of 2024, a milk truck was followed from Windy Ridge to Coopersville, and the truck was documented entering the Continental Dairy entrance to the plant.

188.    Continental Dairy and fairlife products are manufactured at the same Coopersville plant. Continental Dairy and fairlife share infrastructure at the Coopersville plant, which is considered one stationary source by the Michigan Department of Environment, Great Lakes, and Energy Air Quality Division.

189.    Raw milk that enters the Coopersville plant is stored together in a storage silo. It is then divided into Continental Dairy products, which are powdered milk, and fairlife products, which remain liquid. Any milk that enters the

Coopersville plant is mixed together, and the Continental and fairlife-destined milk are not kept separate. Any given truckload will supply at least some fairlife milk.

190.   On information and belief, Windy Ridge and Windy Too have been supplying and continue to supply fairlife since at least 2019.

191.   Following the 2024 Investigations being made public in February of 2025, fairlife and United Dairymen of Arizona (UDA) both made public statements indicating that the ARM video contained unacceptable animal abuse and that they had suspended operations with the farms, i.e., Rainbow Valley and Butterfield dairies.

192.   UDA and fairlife are closely connected entities. The entities and membership of UDA along with Select Milk conduct much of fairlife's operations. The partnership UDA has with fairlife has been made public since the time fairlife created Arizona-based operations, with UDA handling much of the fairlife business in the region. In the 2024 Investigations, Rainbow Valley and Butterfield dairies were UDA members. In addition, ARM found that UDA drivers would cross off the UDA logo on transport records and hand write a given dairy when the trucks were going directly to fairlife, indicating a direct agency relationship in addition to the partnership and contract structure UDA and fairlife already have in place. UDA's connection to fairlife and the other defendants predates the Arizona fairlife facility's opening by more than a decade. The late Arie De Jong served on the board of directors of UDA for more than 24 years, including as its vice president and on the executive committee. Arie De Jong is related to both Thomas De Jong (owner of Rainbow Valley and Butterfield dairies) and Donald De Jong, who is on the fairlife board, owner of one of the farms ARM investigated and found cruelty in 2019, and the Chair of Select Milk Producers. Arie De Jong's company purchased a former auto parts plant in 2008 in Coopersville, Michigan to become the Coopersville, Michigan Contintental/fairlife plant.

193.   Following the publicity of the ARM 2024 Investigations, fairlife's public statement read:

> "The mistreatment of animals depicted in the recent videos is unacceptable. Effective immediately, our supplier, United Dairymen of Arizona (UDA), has suspended delivery of milk from these facilities to all UDA customers, and together we are looking into the circumstances surrounding these videos. We have zero tolerance for animal abuse. Although we operate as milk processors and do not own farms or cows, we mandate that all our milk suppliers adhere to stringent animal welfare standards, and we expect nothing less."

Notably, fairlife speaks for UDA as well as itself in this statement, further indicating control and collusion.

194.   UDA's statement added "we are shocked and saddened by the behavior depicted in the recently released videos… there is no place within our cooperative, or in our society, for mistreatment of animals." UDA condemned the conduct in the video and referred to it as "horrific." It also stated:

> "To ensure the highest standards of animal care across UDA member dairies, each farm participates in the Farmers Assuring Responsible Management (FARM) program, a national initiative designed to bring uniformity and assurance to the realm of animal welfare in dairy farming. Additionally, UDA invests substantial resources to provide the DairyKind training platform for all UDA member dairies. This platform equips dairy employees with the necessary skills and knowledge to ensure that every animal in their care receives proper, compassionate treatment," the statement continued.
> "There is no place within our cooperative, or in our society, for mistreatment of animals. While we look into the circumstances surrounding these videos, UDA has suspended delivery of milk from these facilities to all UDA customers."

195.   In reality, neither UDA nor fairlife has suspended operations from Rainbow Valley and Butterfield Dairies. Instead, these farms appear to have at least

predominantly switched from day-time truck transport of milk (as was the practice during the ARM 2024 investigation) to transporting milk late at night while it is dark and the roads are relatively empty. During these routes, (unrefrigerated) trucks load up with milk at Rainbow Valley and Butterfield Dairies. All of the trucks observed over the course of multiple nights then go to the UDA processing plant. Once there, on information and belief, the raw milk is then pumped into a silo, comingling it with raw milk from whatever other locations where milk is being trucked into the facility. Some of these trucks take a circuitous route to the UDA facility, taking early exits and inefficient paths. Subsequently, raw milk is pumped from UDA, likely from those comingled silos into trucks which then regularly transport the milk to the fairlife plant.

196.   ARM's 2024 Investigation also found that fairlife has a practice of using the milk silos at UDA to store excess milk from the fairlife plant for fairlife milk, another indication UDA silos may still contain fairlife milk.

197.   This practice of taking milk from farms fairlife purports to have been eliminated or suspended from its supply chain and then mixing the milk in a silo before sending it back into the fairlife supply chain constitutes a pattern. Following both the 2024 Arizona Investigations and the 2019 Investigations, fairlife publicly committed to cutting the offending farms from its supply chain and then was found to be sending truckloads of milk ultimately to fairlife processing plants in this way. This is also similar to the 2023 pattern described above. In all instances, this pattern and practice also involved fairlife and UDA either directly or through its connections with Arie De Jong.

198.   At the very least, this conduct constitutes bad faith, collusion, deception, and fraud.

# V.    CLASS ACTION ALLEGATIONS

199.    **Class Definition:** Plaintiffs Cornelius, Bhotiwihok, and Paugh bring this civil putative class action on behalf of themselves individually, and on behalf of all others similarly situated, as a class action pursuant to Rules 23(b)(2), (b)(3), and, as applicable, (c)(4) of the Federal Rules of Civil Procedure. The "Class" that Plaintiffs seek to represent are composed of, and defined as follows:

"All persons residing in California who purchased Defendants' fairlife Products during the relevant time period (February 26, 2021 thought the present)."

200.    Excluded from the above Class are Defendants, any entity in which Defendants have a controlling interest or that has a controlling interest in Defendants, and Defendants' legal representatives, assignees, and successors. Also excluded are those who purchased the fairlife products for resale; all persons who make a timely election to be excluded from the Class; and the judicial officers and staff to whom this case is assigned and any immediate family members thereof.

201.    Plaintiffs reserve the right to modify the definition of the proposed Class (or add one or more subclasses) should it be necessary and/or after further investigation or discovery.

202.    This action may be properly brought and maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. As alleged below, this class action satisfies the numerosity, typicality, adequacy, predominance, and superiority requirements.

203.    Upon application by Plaintiffs' counsel for certification of the Plaintiff Class(es), the Court may also be requested to utilize and certify subclasses in the interests of manageability, adequacy, predominance, and/or superiority requirements.

204.   **Numerosity:** The number of persons within the Class is substantial, estimated to be in excess of 100,000 persons dispersed throughout California. It is, therefore, impractical to join each member of the Class as a named Plaintiff. Accordingly, the utilization of the class action mechanism pursuant to Rule 23 is the most economically feasible means of determining and adjudicating the merits of this litigation and is in the interests of judicial economy. It is estimated that Defendants have sold millions of units of the fairlife products to Class members in California.

205.   **Commonality and Predominance:**  This civil action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

i)     whether the representations alleged herein that Defendants made about the fairlife products were or are true, misleading, or likely to deceive a reasonable consumer;

ii)    whether Defendants took adequate steps to ensure that the representations they made concerning the treatment of animals, sustainability, and recyclability were true, or whether they intended to make such false and misleading representations, and whether they knew, or should have known, that such representations were false and misleading to consumers;

iii)   whether the representations alleged herein concerning fairlife Products were material to a reasonable consumer's purchasing decision;

iv)    whether Defendants engaged in false or misleading advertising;

v)     whether Defendants' conduct constitutes violations of the laws asserted herein;

vi)    whether Plaintiffs and the other Class members have been economically injured and the proper measure of their losses or restitution as a result of those injuries; and

FIRST AMENDED CLASS ACTION COMPLAINT

vii)    whether Plaintiffs and the other Class members are entitled to injunctive, declaratory, or other equitable relief.

206.    **Typicality:** The claims of the named Plaintiffs are generally the same or typical of the claims of the members of the Class, and the named Plaintiffs' interests are consistent with, and not antagonistic to, those of the other Class members they seek to represent. The named Plaintiffs and all members of the Class have been injured by and/or sustained actual economic loss, and face continuing harm arising out of, Defendants' continuing uniform unlawful conduct as alleged herein.

207.    **Adequacy**: The Plaintiff Class representatives have no interests that are adverse to, or which conflict with, the interests of the absent members of the Class and are able to fairly and adequately represent and protect the interests of such a Class. Plaintiffs have raised viable statutory and common law claims of the type reasonably expected to be raised by members of the Class and will vigorously pursue those claims. If necessary, Plaintiffs may seek leave of this Court to amend this First Amended Complaint to include additional Class representatives to represent the Class as may be appropriate.

208.    **Competency of Class Counsel**: Plaintiffs have retained and are represented by experienced, qualified and competent counsel who are committed to prosecuting this class action. Class counsel have significant experience in consumer protection, product liability, animal protection rights, and/or complex civil class action litigation.

209.    **Superiority**: Class actions serve an important function in the judicial system by providing a vehicle whereby the claims of many individuals can be resolved at the same time. The class action procedure both eliminates the possibility of repetitious litigation and provides small claimants with a method of obtaining redress. A class action is superior to other viable methods for the fair and efficient

adjudication of this controversy since individual litigation of the claims of all Class members is impracticable. Even if every Class member could afford to pursue individual litigation, the court system could not. It would be unduly burdensome and unwieldy to the courts in which individual litigation of numerous cases would proceed. Individualized and piece meal litigation would also present the potential for varying, inconsistent, or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual and legal issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues raised herein, presents few management difficulties, provides comprehensive supervision by a single court, and conserves the resources of the parties and the court system and protects the rights and interests of each member of the Class. Plaintiffs do not anticipate any unusual difficulties in the management of this civil action as a class action.

210.   Additionally, the prosecution of separate actions by individual Class members may create a risk of multiple adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other members of the Class not parties to such adjudications or that would substantially impair or impede the ability of such nonparty Class members to protect their interests. The prosecution of individual actions by Class members could establish inconsistent or contradictory results and result in establishing incompatible standards of conduct for the Defendants.

FIRST AMENDED CLASS ACTION COMPLAINT

## VI.    CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Breach of Express Warranty

*(All Plaintiffs Against Defendants fairlife and Coca-Cola)*

211.    Plaintiffs reassert the allegations set forth in Paragraphs 1 through 210 above and incorporate such allegations in full by reference herein.

212.    Express warranties by sellers of consumer goods are created when an affirmation of fact or promise is made by the seller to the buyer, which relates to the goods and becomes the basis of the bargain. Such warranties can also be created based upon descriptions of the goods which are made as part of the basis of the bargain that the goods shall conform to the description. *See, e.g.*, Cal. Com. Code § 2313(1)(a)-(b).

213.    Each of the Plaintiffs formed a contract with Defendants fairlife and Coca-Cola —by virtue of their joint venture in creating fairlife and Coca-Cola's ownership. The terms of that contract include the promises and affirmations of fact that Defendants make on the fairlife products' packaging and through marketing and advertising, including the animal care claims and the sustainability and recyclability claims. The marketing and advertising constitute express warranties and became part of the basis of the bargain, and they are part of the standardized contracts between Plaintiffs and Class members on the one hand, and these Defendants, on the other.

214.    In addition, or in the alternative, to the formation of an express contract, Defendants made each of their above-described representations, including the animal care claims and the sustainability and recyclability claims to induce Plaintiffs and Class members to rely on such representations.

215.    Defendants' animal care, sustainability, and recyclability claims were material, and Plaintiffs and members of the Class did rely and were reasonable in relying upon such representations in making their purchases of the fairlife products.

216.    Defendants have breached their express warranties about the fairlife products because the representations set forth herein, including their animal care, sustainability, including the recyclability claims and express representations concerning how Defendants ensure the humane treatment of animals in the fairlife supply chain, as well as environmental sustainability in the supply chain and on the packaging, are false and misleading. They are false and misleading because Defendants could not, and in fact do not, live up to the promises made by the very name of the products themselves, "fairlife," or the promises of "caring for animals is a top priority at fairlife" and "our goal is that all cows and calves are provided with the best care possible that the supplying dairy farms are required to have a "zero tolerance policy for animal abuse," that they have "industry-leading animal welfare standards," and that "100% of supplying farms passed critical care standards in 2022," among other animal care claims made on, or linked to by, each and every label of the fairlife products.

217.    Nor do Defendants live up to the promises made by the sustainability claims, including fairlife's claim of "100% recyclable packaging commitment by 2025," the "Recycle Me" and chasing arrows symbol on the products indicating recyclability when in fact they are not, among other sustainability claims.

218.    Defendants knew, or should have known, of the false and misleading nature of these claims from the very inception of the brand, which was created to increase sales and pricing via sustainability and animal care claims. This was motivated by watching the negative consequence of animal protection organizations conducting undercover investigations revealing the truth of industrial farming

operations like theirs and responded by creating false and misleading representations on animal care.

219.   Defendants gained actual knowledge of the falsity and misleading nature of the animal care claims at least from the 2019 ARM Investigation, which they responded to by publicly promising to do better to consumers, and in reality, failed to take adequate steps to correct, making further–and worse–false and misleading animal care claims in response. Defendants then gained actual knowledge of the false and misleading nature of the specific animal care claims at issue and the failure of their remedial efforts at least through the 2023 ARM Investigation and continued with making the false and misleading animal care claims and denied, threatened, and attempted to contain the negative publicity from the 2023 ARM Investigation instead.

220.   The 2024 and 2025 ARM Investigations shows the continuation, expansion, and worsening of animal cruelty and neglect. With respect to the sustainability claims, Defendants knew, or should have known, of the false and misleading nature of those claims as well. All of the sustainability claims were a mechanism to drive growth of an inherently high-resource consuming and polluting product over less resource consuming and polluting alternatives. This omission and misleading and false characterization of the sustainability claims was the Defendants' intent and effect on consumers. The sustainability claims around biogas were knowingly false and misleading because they have known risks such as methane production and explosions, and because they incentivize and drive greater growth and consolidation which is inherently polluting and resource intensive. Defendants also knew, or should have known, the sustainability claims around recyclability are false and misleading because Coca-Cola has been part of multiple industry groups acknowledging the problematic nature of opaque PET and the lack

of recycling facilities which would recycle opaque PET or number 7 plastic, and the fact that fairlife tested clear PET bottles.

221.    Defendants both knowingly enabled and contributed to the false and misleading nature of the animal care claims and sustainability claims and failed to ensure that the material representations and omissions they were making to consumers were true. As a result of the systemic acts and omissions through intentional, knowing, or reckless acts and failure of oversight to ensure the truthfulness of the representations of every fairlife product label and linked advertisement, consumers purchased fairlife products from a company that sourced dairy from farms that mistreated their cows and calves and caused environmental degradation in violation of the express agreement that it created with its consumers.

222.    Defendants could not legitimately make animal care claims and sustainability claims to consumers because they could not operate a brand in a way that comported with the animal care claims and sustainability claims and/or they could not verify whether those promises were accurate and because they knew, or should have known, those claims were false and misleading. Nor did they enforce these promises through adequate oversight, even where a given claim may not have been impossible or clearly false. Accordingly, Defendants charged consumers a price premium for express—but empty—promises.

223.    Defendants breached their express warranties about the fairlife products because the representations, as set forth herein, were false and misleading.

224.    Plaintiffs and the Class members expected, and would have been reasonable in expecting, that Defendants ensured the statements on the products' labels were truthful such that cows and calves were treated humanely, and the product packaging was recyclable and not otherwise environmentally destructive when purchasing fairlife products. Accordingly, Plaintiffs and the members of the Classy did not receive the benefit of their bargain when they discovered that at least

some of Defendants' cows and calves were abused, neglected, and treated in a cruel and inhumane manner and that the packaging is not in fact recyclable and Defendants' practices are also not environmentally sustainable.

225.   Defendants had actual notice of the breaches set forth herein via multiple investigations by ARM, prior litigation, as well as public pressure against biogas and plastic waste pollution and recyclability fraud.

226.   By reason of, and as a proximate result of, Defendants' breaches of their express warranties, Plaintiffs and the Class members have been damaged in the amount of the price they purchased for the fairlife products, or in an amount equal to the price premium that they paid when they purchased the products, in an amount to be proven at trial.

227.   Therefore, Plaintiffs on behalf of themselves and the members of the Class, pray for the relief as set forth below.

## SECOND CLAIM FOR RELIEF

**Violations of California's False Advertising Law**

**Cal. Bus. & Prof. Code § 17500,** *et seq.*

*(All Plaintiffs Against Defendants fairlife and Coca-Cola)*

228.   Plaintiffs reassert the allegations set forth in Paragraphs 1 through 210 above and incorporate such allegations in full by reference herein.

229.   Plaintiffs bring this claim against Defendants for violations of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq*. ("FAL").

230.   California's FAL makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public. . . in any advertising device. . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services professional or

otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

231.   Defendants have intentionally represented and continue to represent to the public, including Plaintiffs and members of the Class, through Defendants' deceptive packaging and marketing in making the animal care claims and sustainability claims, including  recyclability, that the fairlife products are made with milk from animals treated with high levels of care and not abused or neglected and that production methods are environmentally sustainable, including that the packaging is recyclable. Defendants' representations are untrue, misleading, and/or deceptive and Defendants know, or should know, they are untrue, misleading and/or deceptive, because the products do not contain milk from animals treated with high levels of care and not abused or neglected and production methods are not environmentally sustainable, including the fact that the fairlife supplying farms are not among the most sustainable in the country for environmental footprint, their manure handling is not environmentally sustainable, and the packaging is not recyclable. Because Defendants have disseminated false and misleading information regarding the products, and Defendants know, knew, or should have known, through the exercise of reasonable care that these material representations are, and continue to be, false and misleading, Defendants have violated the FAL.

232.   Defendants' conduct is also misleading because they fail to disclose material information about the fairlife products, such as the fact that, in spite of explicit representations and marketing, the products have been created using cows and calves that have been abused and mistreated and that the production methods are not environmentally sustainable, including plastic packaging that is not recyclable.

233.   Defendants also failed to disclose material information regarding their explicit representations and marketing, such as Mike and Sue McCloskey's employment with animal welfare certifier/auditor FARM, that the FARM standards are not industry leading but in fact representative of the dairy industry generally with nearly all dairies being FARM members, the cruelty and neglect revealed in the 2023 ARM Investigation, that the reasoning behind changes like the $40 million-plus investment in animal care and increased auditing was due to ARM's 2019 Investigation and the ensuing legal action, that Defendants' business model and marketing strategy was one of extreme growth and consolidation in a way that exacerbates environmental destruction in spite of its environmental sustainability claims, and that the animal care and sustainability claims were part of a long-running brand strategy to avoid losing consumers if the truth regarding animal care and sustainability were revealed via an undercover investigation by an animal protection organization, which ultimately did in fact happen with ARM's investigations.

234.   Cal. Bus. & Prof. Code § 17580 specifically addresses environmental representations, including recyclability.

> a)   17580. A person who represents in advertising or on the label or container of a consumer good that the consumer good that it manufactures or distributes is not harmful to, or is beneficial to, the natural environment, through the use of such terms as "environmental choice," "ecologically friendly," "earth friendly," "environmentally friendly," "ecologically sound," "environmentally sound," "environmentally safe," "ecologically safe," "environmentally lite," "green product," or any other like term, or through the use of a chasing arrows symbol or by otherwise directing a consumer to recycle the consumer good, shall maintain in written form in its

records all of the following information and documentation supporting the validity of the representation:

1)   The reasons the person believes the representation to be true.

2)   Any significant adverse environmental impacts directly associated with the production, distribution, use, and disposal of the consumer good.

3)   Any measures that are taken by the person to reduce the environmental impacts directly associated with the production, distribution, and disposal of the consumer good.

4)   Violations of any federal, state, or local permits directly associated with the production or distribution of the consumer good.

5)   Whether, if applicable, the consumer good conforms with the uniform standards contained in the Federal Trade Commission Guidelines for Environmental Marketing Claims for the use of the terms "recycled," "recyclable," "biodegradable," "photodegradable," or "ozone friendly."

6)   If the person uses the term "recyclable," uses a chasing arrows symbol, or otherwise directs a consumer to recycle the consumer good, whether the consumer good meets all of the criteria for statewide recyclability pursuant to subdivision (d) of Section 42355.51 of the Public Resources Code.

FIRST AMENDED CLASS ACTION COMPLAINT

b)     Information and documentation maintained pursuant to this section shall be furnished to any member of the public upon request…. (emphasis added)38

235.    The California Public Resources Code section incorporated by Cal. Bus. & Prof. Code § 17580 regarding recyclability claims is Public Resources Code - PRC § 42355.51 which states:

a)     A person shall not offer for sale, sell, distribute, or import into the state any product or packaging for which a deceptive or misleading claim about the recyclability of the product or packaging is made.

b)   (1) Subject to paragraph (2), a product or packaging that displays a chasing arrows symbol, a chasing arrows symbol surrounding a resin identification code, or any other symbol or statement indicating the product or packaging is recyclable, or otherwise directing the consumer to recycle the product or packaging, is deemed to be a deceptive or misleading claim pursuant to this section and Section 17580.5 of the Business and Professions Code unless the product or packaging is considered recyclable in the state pursuant to subdivision (d) and is of a material type and form that routinely becomes feedstock used in the production of new products or packaging.

3)     …for a product or packaging that is not considered to be recyclable in the state pursuant to subdivision (d), all of the following apply:

---

38 Cal. Bus. & Prof. Code § 17580(e)(2) excludes from the scope of misleading recycling directions to consumers "beverage container[s] subject to the California Beverage Container Recycling and Litter Reduction Act." That Act excludes milk from its definition of "beverage" so does not apply to the fairlife packaging.

FIRST AMENDED CLASS ACTION COMPLAINT

(A)     Displaying a chasing arrows symbol or any other statement indicating the product is recyclable directly on the product shall be deemed to be deceptive or misleading pursuant to this section and Section 17580.5 of the Business and Professions Code.

(B)     If a product or packaging has multiple material types, a chasing arrows symbol or statement indicating recyclability may be displayed on the external packaging that is considered to be recyclable in the state pursuant to subdivision (d) if the chasing arrows symbol or statement makes clear in the same or greater font, font size, or symbol size which other components of the product or packaging are not recyclable.

(C)     Displaying a chasing arrows symbol or any other statement indicating recyclability on packaging containing a consumable product shall, for purposes of this section, be deemed to refer only to the packaging. For purposes of this subparagraph, "consumable product" means a commodity that is intended to be used and not disposed of.

…

2)     Subject to paragraph (3), a product or packaging is considered recyclable in the state if, based on information published by the department pursuant to subparagraph (B) of paragraph (1), the product or packaging is of a material type and form that meets both of the following requirements:

FIRST AMENDED CLASS ACTION COMPLAINT

(A)    The material type and form is collected for recycling by recycling programs for jurisdictions that collectively encompass at least 60 percent of the population of the state.

(B)    (i) The material type and form is sorted into defined streams for recycling processes by large volume transfer or processing facilities, as defined in regulations adopted pursuant to Section 43020, that process materials and collectively serve at least 60 percent of recycling programs statewide, with the defined streams sent to and reclaimed at a reclaiming facility consistent with the requirements of the Basel Convention.

(ii)    The department may adopt regulations modifying this requirement to encompass transfer or processing facilities other than large volume transfer or processing facilities, as the department deems appropriate for achieving the purposes of this section.

3)    A product or packaging shall not be considered recyclable in the state unless the product or packaging meets all of the following criteria, as applicable:

(A)    For plastic packaging, the plastic packaging is designed to not include any components, inks, adhesives, or labels that prevent the recyclability of the packaging according to the

APR Design® Guide published by the Association of Plastic Recyclers.

(B)    For plastic products and non-plastic products and packaging, the product or packaging is designed to ensure recyclability and does not include any components, inks, adhesives, or labels that prevent the recyclability of the product or packaging.

(C)    The product or packaging does not contain an intentionally added chemical identified pursuant to the regulations implementing subparagraph (4) of subdivision (g) of Section 42370.2.

…

4)  Notwithstanding paragraphs (2) and (3), a product or packaging is recyclable in the state if the product or packaging has a demonstrated recycling rate of at least 75 percent, meaning that not less than 75 percent of the product or packaging sorted and aggregated in the state is reprocessed into new products or packaging.

5)  (A) Before January 1, 2030, notwithstanding paragraphs (2) and (3), a product or packaging not collected pursuant to a curbside collection program is recyclable in the state if the non-curbside collection program recovers at least 60 percent of the product or packaging in the program and the material has sufficient commercial value to be marketed for recycling and be transported

at the end of its useful life to a transfer, processing, or recycling facility to be sorted and aggregated into defined streams by material type and form….

236.   Cal. Bus. & Prof. Code § 17580.5 additionally prohibits untruthful or deceptive environmental marketing claims: "It is unlawful for a person to make an untruthful, deceptive, or misleading environmental marketing claim, whether explicit or implied. For the purpose of this section, "environmental marketing claim" shall include any claim contained in the "Guides for the Use of Environmental Marketing Claims" published by the Federal Trade Commission ("FTC"). Cal. Bus. & Prof. Code § 17580.5(a). These Guides are also known as the FTC Green Guides.

237.   Defendants' recyclability claims are covered in the FTC Green Guides, which govern both general environmental claims and specific strict requirements for recyclability claims, including but not limited to available recycling facilities for a substantial majority of consumers or communities where the product is sold, requirements for qualifications and disclosures to be made and to be clear, classifying as deceptive unqualified recycling claims where the presence of an incidental component significantly limits the ability to recycle the product, and overstatement directly or by implication an environmental attribute or benefit such as the claim of recyclability where the material is unlikely to be used again for another purpose. Section 260.12 of the Guides states: "Recyclable claims. (a) It is deceptive to misrepresent, directly or by implication, that a product or package is recyclable. A product or package should not be marketed as recyclable unless it can be collected, separated, or otherwise recovered from the waste stream through an established recycling program for reuse or use in manufacturing or assembling another item. (b) Marketers should clearly and prominently qualify recyclable

claims to the extent necessary to avoid deception about the availability of recycling programs and collection sites to consumers."

238.   Defendants' recyclability claims are deceptive under Cal. Bus. & Prof. Code §§ 17580, 17580.5 and Public Resources Code - PRC § 42355.51, as well as the FTC Green Guides. Fairlife advertises "100% recyclable packaging commitment by 2025," uses the chasing arrows symbol on all of its products, uses a "1" code on its large filtered milk line bottles, the Core Power line bottles marked "7" with the chasing arrows or a 1 symbol and all Core Power bottles additionally say "Recycle Me." All of these, separately and together, constitute recyclability claims which are all are false and deceptive to consumers because in fact none of this fairlife packaging is recyclable.

239.   Fairlife bottles are all opaque PET/PETE, which is made opaque by a TiO2-based pigment, rendering the bottles nonrecyclable.

240.   Fairlife has not disclosed any clarifying information pursuant to California Business & Professions Code § 17580 or 17580.5 including the fact that its environmental marketing claims do not comply with the FTC Green Guides, 16 CFR Part 260, Guides for the Use of Environmental Marketing Claims. Defendants have also not disclosed the significant adverse environmental impacts of the production of their Products. The recyclability claims are also deceptive and misleading under the California Public Resources Code - PRC § 42355.51, since the packaging is not considered recyclable under the California standards referenced herein and does not routinely become feedstock used in the production of new products or packaging.

241.   Fairlife packaging is not sorted into defined streams for recycling or sent to and reclaimed at a recycling facility. It also includes components and/or labels that prevent the recyclability of the packaging according to the APR Design Guide and in fact includes components and/or labels that prevent the recyclability of

the packaging. Fairlife plastic bottles also have no sufficient commercial value to be sorted for recycling.

242.   Defendants' advertising and fairlife product labels give consumers the false impression that Defendants' oversight would ensure that their products are not, nor have they been, created using dairy cows and calves that were mistreated, nor using practices that were environmentally damaging, including packaging that is 100% recyclable–or even that any percentage of its packaging is recyclable.

243.   As a result of Defendants' false advertising, Defendants have fraudulently obtained and continue to fraudulently and deceptively obtain money from Plaintiffs and the members of the Class.

244.   Plaintiffs request that this Court cause Defendants to restore this fraudulently obtained money to Plaintiffs and the members of the Class, to disgorge the profits the Defendants made on these transactions, and to permanently enjoin Defendants from violating the FAL or violating it in the same fashion in the future as discussed herein. Plaintiffs and the members of the Class may be irreparably harmed and/or denied an effective and complete remedy if the Court does not grant such an Order.

245.   Therefore, Plaintiffs on behalf of themselves and the members of the Class, pray for the relief as set forth below.

## THIRD CLAIM FOR RELIEF

**Violation of California's Unfair Competition Law**

**Cal. Bus. & Prof. Code § 17200, *et seq.***

*(All Plaintiffs Against Defendants fairlife and Coca-Cola)*

246.   Plaintiffs reassert the allegations set forth in Paragraphs 1 through 245 above and incorporate such allegations in full by reference herein.

247.   Plaintiffs bring this claim against these Defendants alleging violations of California's Unfair Competition Law. Cal. Bus. & Prof. Code § 17200, *et seq*. ("UCL").

248.   The UCL provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. The intent and purpose of the UCL is to protect consumers and competition by promoting fair competition in commercial markets for goods and services. The coverage of section 17200 is broad and intended to enjoin ongoing wrongful business in whatever context such activity might occur. The UCL is written in the disjunctive and each of its prongs is a separate and distinct theory of liability and provide an independent basis for relief. Defendants' wrongful conduct satisfies all three prongs of the UCL.

249.   Each of the named Plaintiffs is a "person" within the meaning of California Business & Professions Code section 17201. Each of the Plaintiffs and the members of the Class are residents of California.

250.   Under the UCL, a business act or practice is "unlawful" if it violates any established federal, state, statutory, regulatory, or court-made or local law.

251.   Defendants' false and misleading advertising of the fairlife products was and continues to be "unlawful" conduct because it violates the FAL, sections 17580 and 17580.5 of the California Business & Professions Code, section 42355.51 of the California Public Resources Code, the FTC Green Guides, and other applicable laws and statutes as described herein.

252.   As a result of Defendants' unlawful business acts and practices, Defendants have unlawfully obtained money from Plaintiffs and the members of the Class by reason of their purchases of fairlife products.

253.   Under the UCL, a business act or practice is "unfair" if the defendants' conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the benefits for committing such acts or practices are outweighed by the gravity of the harm to the alleged victims.

254.   Defendants' conduct was and continues to be of no benefit to purchasers of the fairlife products, as it is misleading, unfair, unlawful, offends public policy, is immoral, unethical, oppressive, unscrupulous, and is substantially injurious to consumers who rely on the fairlife products' packaging and marketing. Creating consumer confusion and a carefully curated false understanding as to the recyclability of the packaging, welfare of the animals and the environmentally impactful acts and practices used to derive the products is of no benefit to consumers. Therefore, Defendants' conduct was and continues to be "unfair."

255.   As a result of Defendants' unfair business acts and practices, Defendants have unfairly obtained and continue to unfairly obtain money from Plaintiffs and the members of the Class from their purchases of fairlife products.

256.   Under the UCL, a business act or practice is "fraudulent" if it actually deceives or has the capacity, likelihood, or tendency to deceive a reasonable consumer and the consuming public.

257.   Defendants' conduct here was, and continues to be, fraudulent because it has the effect of deceiving consumers into believing that Defendants have methods to ensure the ethical and treatment of the animals from which they source dairy for the fairlife products at a high level of care. In reality, if Defendants were willing or able to ensure that their animal care claims were truthful and accurate, multiple undercover investigations would not have revealed systematic abuse and cruel and neglectful practices at its facilities.

258.   Defendants' conduct here is also fraudulent because its acts and omissions in their sustainability claims have the effect of deceiving consumers into believing the acts and practices that go into the production of fairlife Products are environmentally sustainable, including, but not limited to its plastic packaging being 100% recyclable. In fact, Defendants' farms are highly growth- and consolidation-oriented which causes and exacerbates environmental destruction, such as with pollution from large amounts of manure, which Defendants then contribute additionally to environmental destruction with its (growing) biogas manure digester systems which cause environmental pollution and hazards; and fairlife packaging is in fact not recyclable and poses a contamination hazard to plastics that are recyclable.

259.   Because Defendants intentionally misled and deceived Plaintiffs and the members of the Class, Defendants' conduct was "fraudulent."

260.   As a direct and proximate result of Defendants' fraudulent business acts and practices, Defendants have fraudulently obtained and continue to fraudulently obtain money from Plaintiffs and the members of the Class.

261.   By reason of, and as a direct and proximate result of, the Defendants' unfair, unlawful, and/or fraudulent business practices and conduct, Plaintiffs have suffered economic harm. Accordingly, pursuant to the provisions of the UCL (section 17203), Plaintiffs and the Class members are entitled to restitution from the Defendants for their economic injuries.

262.   Redress and relief under the UCL are necessary because Plaintiffs have no adequate remedy at law.

263.   Whether a business practice is unfair, unlawful, and/or fraudulent is a question of fact for the finder of fact to determine.

264.    The UCL is a strict liability statute, and it is not necessary to show Defendants intended to injure or harm the Plaintiffs. Moreover, a business practice may violate the UCL even if it affects only one victim.

265.    Pursuant to sections 17203 and 17535 of the California Business & Professions Code, the entry of permanent and mandatory relief against the Defendants is necessary and warranted to enjoin their ongoing unfair business conduct.

266.    Therefore, Plaintiffs on behalf of themselves and the members of the Class, pray for restitutionary and injunctive relief.

## FOURTH CLAIM FOR RELIEF

### Violation of California's Consumers Legal Remedies Act
### Cal. Civ. Code § 1750, *et seq.*

*(All Plaintiffs Against Defendants fairlife and Coca-Cola)*

267.    Plaintiffs reassert the allegations set forth in Paragraphs 1 through 266 and incorporate such allegations in full by reference herein.

268.    Plaintiffs bring this claim against Defendants fairlife and Coca-Cola alleging violations of California's Consumers Legal Remedies Act, Cal. Civ. Code §1750, *et seq*. ("CLRA").

269.    The fairlife products are "goods" within the meaning of California Civil Code section 1761(a), and the purchases of such products by Plaintiffs and the members of the Class "transactions" within the meaning of California Civil Code section 1761(e).

270.    California Civil Code section 1770(a)(2) prohibits "misrepresenting the source, sponsorship, approval, or certification of goods or services." By marketing the fairlife products with the animal care claims and sustainability and recyclability claims, Defendants have represented and continue to represent that the products are derived from cows treated with high animal care and without cruelty and neglect, as

well as environmentally sustainable practices including recyclability of packaging, none of which is truthful. Accordingly, Defendants have violated section 1770(a)(2) of the CLRA.

271.  California Civil Code section 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have." By marketing the fairlife products with the animal care claims and sustainability and recyclability claims, Defendants have represented and continue to represent that the products have characteristics (are derived from cows treated with high levels of care and not cruelly treated or neglected and products produced in a sustainable manner including recyclable packaging) that they do not have. Accordingly, Defendants have violated section 1770(a)(5) of the CLRA.

272.  California Civil Code section 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." By marketing the products with the animal care claims and sustainability and recyclability claims, Defendants have represented and continue to represent that the products are of a particular standard or quality (from cows treated with high levels of care and not cruelly treated or neglected and products produced in a sustainable manner including recyclable packaging) when they are not. Therefore, Defendants have violated section 1770(a)(7) of the CLRA.

273.  California Civil Code section 1770(a)(9) prohibits: "[a]dvertising goods or services with intent not to sell them as advertised." By marketing the fairlife products with the animal care claims and sustainability and recyclability claims, where they knew, or should have known, that such representations were untruthful and also by not ensuring the truthfulness of the representations, Defendants have violated section 1770(a)(9) of the CLRA.

274.   Defendants have also violated the CLRA by intentionally failing to disclose material information about the products, such as the fact that Defendants' promises regarding the treatment of dairy cows and calves and other animal care, sustainability, and recyclability claims are empty, not genuine, not enforced or in some cases not enforceable, and that products have been derived from cows and calves that are or have previously been systematically abused and mistreated, and environmentally destructive practices including packaging that is not in fact recyclable.

275.   All of these failures to disclose constitute a fraudulent omission under the CLRA because they are contrary to representations made by the Defendants, and they are facts Defendants were obligated to disclose.

276.   At all relevant times, Defendants have known, or reasonably should have known, that their animal care claims and sustainability claims were inaccurate; consumers purchased the fairlife products based upon guarantees that the cows and calves in Defendants' supply were treated in accordance with the animal care and sustainability claims including that they lived a "fair" life–and not being treated in violation of criminal cruelty laws–and based upon guarantees of environmental impact and practices consistent with Defendants' sustainability claims, including 100% recyclable packaging. Consumers justifiably relied upon Defendants' promises based upon the packaging on and linked to the products themselves, and Defendants made those promises because they would drive sales and increase the price of the products.

277.   Accordingly, the promises and representations are material, because reasonable consumers would rely upon them when making purchases of the products. Because of the materiality of the representations, reliance may be inferred on behalf of the Class members.

FIRST AMENDED CLASS ACTION COMPLAINT

278.   Plaintiffs and the members of the Class have suffered and continue to suffer injuries caused by Defendants because they would not have purchased the fairlife products or would have paid significantly less for the products had they known that Defendants' conduct was misleading and fraudulent.

279.   Pursuant section 1782(a) of the California Civil Code, on April 11, 2025, counsel for Plaintiffs sent to each defense counsel (via certified mail and email), a Correction Demand Notice identifying the Defendants' alleged wrongful and unlawful conduct and requesting that they cease such conduct which is violative of the CLRA. More than 30 days have now elapsed since that notice was provided to Defendants. Consequently, Plaintiffs hereby amend their CLRA claim for relief to add a claim for damages against Defendants fairlife and Coca-Cola.

280.   Under California Civil Code section 1780(a), Plaintiffs and the members of the Class seek injunctive relief pursuant to the CLRA, prohibiting Defendants fairlife and Coca-Cola from further wrongful acts and unfair and unlawful business practices.

281.   Therefore, Plaintiffs for themselves and the members of the Class pray for the relief set forth below.

## FIFTH CLAIM FOR RELIEF

### Common Law Unjust Enrichment

*(All Plaintiffs Against Defendants fairlife and Coca-Cola)*

282.   Plaintiffs reassert the allegations set forth in paragraphs 1 through 281 above and incorporate such allegations in full by reference herein.

283.   Plaintiffs bring this common law claim for unjust enrichment against Defendants, in the alternative, to their breach of express warranty claim.

284.   Plaintiffs and the Class members conferred benefits on Defendants by purchasing the fairlife products, including by paying a price premium for the products.

FIRST AMENDED CLASS ACTION COMPLAINT

285.    Defendants have been unjustly enriched by retaining the revenues derived from Plaintiffs and the Class members' purchases of the fairlife products. Retention of the monies under these circumstances is unjust and inequitable because Defendants' labeling of the products was misleading to consumers, which caused injuries to Plaintiffs and the Class members because they would not have purchased or would have paid less for the products if they had known the true facts.

286.    Defendant Coca-Cola retained a benefit despite not exercising adequate oversight over operations and processes that source dairy and packaging for the fairlife products.

287.    Defendant fairlife retained a benefit through the profits it retained in spite of and because of its failure to ensure that dairy cows are treated with high animal care in sourcing milk products and its lack of oversight over and knowing or reckless participation in environmentally damaging practices. Fairlife was also unjustly enriched by reason of its misrepresentations concerning environmental sustainability including the recyclability of its plastic bottles and labels.

288.    Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiffs and the Class members is unjust and inequitable, Plaintiffs and the Class members seek restitution of all monies Defendants acquired from their unlawful conduct, including disgorgement of all profits and establishment of a constructive trust.

289.    Therefore, Plaintiffs on behalf of themselves and the members of the Class pray for the relief as set forth below.

## SIXTH CLAIM FOR RELIEF

### Aiding and Abetting

*(All Plaintiffs Against Defendants Select Milk and the McCloskeys)*

290.    Plaintiffs reassert the allegations set forth in paragraphs 1 through 289 above and incorporate such allegations in full by reference herein.

291.    Plaintiffs bring this claim for aiding and abetting against Defendants Select Milk and the McCloskeys. These Defendants have aided and abetted Defendants fairlife and Coca-Cola's false advertising, unfair competition (injunctive relief only), and CLRA violations (injunctive relief only), as set forth in Plaintiffs' Second, Third, and Fourth Claims for Relief above.

292.    These Defendants substantially aided and/or encouraged Defendants fairlife and Coca-Cola' unlawful and wrongful false advertising and unfair competition conduct and practices.

293.    These Defendants had accrual knowledge of the purpose and unlawful practices of Defendants fairlife and Coca-Cola.

294.    Defendants' aiding and abetting has caused economic harm to the Plaintiffs and the members of the Class.

295.    Therefore, Plaintiffs on behalf of themselves and the members of the Class, pray for the relief as set forth below.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of the members of the Class alleged and identified in this First Amended Complaint, respectfully request the Court enter an Order:

1.    Certifying the proposed Class under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), and, in the alternative, (c)(4) as set forth above;

2.    Declaring that Defendants are financially responsible for providing sufficient notice to the Class members of the pendency of this lawsuit;

FIRST AMENDED CLASS ACTION COMPLAINT

3.    Declaring that Defendants have committed the violations of law alleged herein;

4.    Ordering and overseeing any and all injunctive relief the Court deems appropriate, which includes permanently enjoining Defendants from engaging in false and misleading marketing, promotion, and advertising of fairlife products and their containers;

5.    Awarding statutory damages in the maximum amount for which the law provides;

6.    Awarding restitution, monetary damages, including, but not limited to any compensatory, incidental, or consequential damages in an amount that the Court or jury will determine, in accordance with applicable law;

7.    Providing for any and all equitable monetary or other relief the Court deems appropriate;

8.    Awarding punitive or exemplary damages in accordance with proof and in an amount consistent with applicable precedent;

9.    Appointing Plaintiffs' counsel of record as Class Counsel;

10.    Awarding Plaintiffs' counsel their reasonable costs and expenses of suit, including attorneys' fees;

11.    Awarding pre- and post-judgment interest to the extent the law allows; and

FIRST AMENDED CLASS ACTION COMPLAINT

12.    Providing such further relief as this Court may deem just and proper.

DATED:  May 29, 2025            WAYMAKER LLP

By: */s/ Donald R. Pepperman*
        DONALD R. PEPPERMAN
        BRIAN E. KLEIN
        SAM S. MEEHAN

        LAW OFFICE OF CHERYL LEAHY
        CHERYL L. LEAHY

        *Attorneys for Plaintiffs*

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, and Local Rule 38-1, Plaintiffs hereby demand a trial by jury on all claims and/or issues so triable.

DATED:  May 29, 2025            WAYMAKER LLP

By: */s/ Donald R. Pepperman*
        DONALD R. PEPPERMAN
        BRIAN E. KLEIN
        SAM S. MEEHAN

        LAW OFFICE OF CHERYL LEAHY
        CHERYL L. LEAHY

        *Attorneys for Plaintiffs*

FIRST AMENDED CLASS ACTION COMPLAINT